# IN THE COURT OF COMMON PLEAS
## BELMONT COUNTY, OHIO

| | |
|---|---|
| ANTHONY J. GREGOR and ASHLEY N. GREGOR<br>41430 Brown Road<br>P.O. Box 91<br>Bethesda, OH 43719<br><br>and<br><br>BRK ENERGY LLC<br>41430 Brown Road<br>P.O. Box 91<br>Bethesda, OH 43719<br><br>and<br><br>DOWN HOME FARMS HOLDINGS, LLC<br>49001 Centerville-Jacobsburg Road<br>Jacobsburg, OH 43933<br><br>and<br><br>JAMES O. DUNFEE and ENA SUE DUNFEE<br>49001 Centerville-Jacobsburg Road<br>Jacobsburg, OH 43933<br><br>and<br><br>JAMES R. BLANEY as trustee on behalf of the GUY E. BLANEY LIVING TRUST<br>61638 S. 26 Road<br>Bethesda, OH 43719<br><br>and<br><br>JAMES R. BLANEY and BRENDA BLANEY<br>61638 S. 26 Road<br>Bethesda, OH 43719<br><br>and<br><br>HEIDI R. KEMP as trustee on behalf of the DALLAS C. KEMP TRUST<br>41440 Brown Road | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Civil Action No.: _21CV123_<br><br>Judge: __Frank A. Fregiato__<br><br><br><br>**COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Bethesda, OH 43719                                )
                                                  )
and                                               )
                                                  )
TERENCE L. KEMP and VIRGINIA M. KEMP              )
60905 Chestnut Level Road                         )
Belmont, OH 43718                                 )
                                                  )
and                                               )
                                                  )
DALLAS ROGER KEMP and BILLI R. KEMP               )
64121 Garrett Road                                )
Bethesda, OH 43719                                )
                                                  )
and                                               )
                                                  )
TONY L. KEMP                                      )
61330 Chestnut Level Road                         )
Belmont, OH 43718                                 )
                                                  )
and                                               )
                                                  )
KRISS GREGOR and VALERIE GREGOR                   )
41467 Brown Road                                  )
Bethesda, OH 43719                                )
                                                  )
and                                               )
                                                  )
JOHN A. SIKISH and LUCINDA M. SIKISH              )
65955 Plainfield Road                             )
Belmont, OH 43718                                 )
                                                  )
and                                               )
                                                  )
THOMAS B. MCGAUGHY as trustee on behalf of        )
the THOMAS B. MCGAUGHY TRUST                      )
13 Laurel Avenue                                  )
Wheeling, WV 26003                                )
                                                  )
and                                               )
                                                  )
NANCY LOUISE LOY as trustee on behalf of the      )
JAMES HERSHEL AND NANCY LOUISE LOY                )
FAMILY TRUST                                      )
62929 Johnson Road South                          )
P.O. Box 355                                      )

2

Bethesda, OH 43719                                    )
                                                      )
and                                                   )
                                                      )
MAPLE RIDGE FARM, LLC                                 )
237 Kathryn Court                                     )
Washington Court House, OH 43160                      )
                                                      )
and                                                   )
                                                      )
OK RIDGE FARM, LLC                                    )
237 Kathryn Court                                     )
Washington Court House, OH 43160                      )
                                                      )
and                                                   )
                                                      )
CARLOS E. POWELL and SUSAN D. POWELL                  )
45359 Roscoe Road                                     )
St. Clairsville, OH 43950                             )
                                                      )
and                                                   )
                                                      )
KEVIN L. DAVIS and KAREN L. DAVIS                     )
203 Oak Street                                        )
P.O. Box 473                                          )
Bethesda, OH 43719                                    )
                                                      )
and                                                   )
                                                      )
MARCIA JO WELLS and STEVEN J. WELLS                   )
56014 Brands Run Road                                 )
Alledonia, OH 43902                                   )
                                                      )
and                                                   )
                                                      )
GREGG M. STUBBS                                       )
5759 Strathmore Lane                                  )
Dublin, OH 43017                                      )
                                                      )
and                                                   )
                                                      )
KENNETH J. PERKINS and KARLA J. PERKINS               )
42521 Bina Road                                       )
Belmont, OH 43718                                     )
                                                      )
and                                                   )

3

DOROTHY J. BOWMAN ）
66985 Graham Road ）
St. Clairsville, OH 43950 ）
）
and ）
）
JOANNE L. CAMPBELL ）
9043 Indian Mound Road ）
Pickerington, OH 43147 ）
）
and ）
）
GEORGE J. EBBERT ）
1823 Ryan Road ）
Fairmont, WV 26554 ）
）
and ）
）
MARY L. SAUER ）
1066 Augustana Drive ）
Naperville, IL 60565 ）
）
and ）
）
MONAHAN FARMS, LLC ）
41280 Bethesda-Belmont Road ）
P.O. Box 392 ）
Bethesda, OH 43719 ）
）
Plaintiffs, ）
）
v. ）
）
RICE DRILLING D LLC ）
625 Liberty Avenue ）
Suite 1700 ）
Pittsburgh, PA 15222 ）
）
and ）
）
EQT PRODUCTION COMPANY ）
625 Liberty Avenue ）
Suite 1700 ）
Pittsburgh, PA 15222 ）
）

4

and                                          )
                                             )
EQT ENERGY, LLC                              )
625 Liberty Avenue                           )
Suite 1700                                   )
Pittsburgh, PA 15222                         )
                                             )
and                                          )
                                             )
EQT CORPORATION                              )
625 Liberty Avenue                           )
Suite 1700                                   )
Pittsburgh, PA 15222                         )
                                             )
            Defendants.                      )
                                             )
John/Jane Does 1-5                           )
Names and address unknown                    )
                                             )
and                                          )
                                             )
ABC Entities 1-5                             )
Identities and addresses unknown             )


## COMPLAINT

Plaintiffs, Anthony J. Gregor and Ashley N. Gregor, BRK Energy LLC, Down Home

Farms Holdings, LLC, James O. Dunfee and Ena Sue Dunfee, James R. Blaney as trustee on behalf

of the Guy E. Blaney Living Trust, James R. Blaney and, Brenda Blaney, Heidi R. Kemp as trustee

on behalf of the Dallas C. Kemp Trust, Terence L. Kemp and Virginia M. Kemp, Dallas Roger

Kemp and Billi R. Kemp, Tony L. Kemp, Kriss Gregor and Valerie Gregor, John A. Sikish and

Lucinda M. Sikish, Thomas B. McGaughy as trustee on behalf of the Thomas B. McGaughy Trust,

Nancy Louise Loy as trustee on behalf of the James Hershel and Nancy Louise Loy Family Trust,

Maple Ridge Farm, LLC, OK Ridge Farm, LLC, Carlos E. Powell and Susan D. Powell, Kevin L.

Davis and Karen L. Davis, Marcia Jo Wells and Steven J. Wells, Gregg M. Stubbs, Kenneth J.

5

Perkins and Karla J. Perkins, Dorothy J. Bowman, Joanne L. Campbell, George J. Ebbert, Mary L. Sauer, and Monahan Farms, LLC (hereinafter collectively "Plaintiffs"), individually and on behalf of all others similarly situated, state for their Complaint against Rice Drilling D LLC, EQT Production Company, EQT Energy, LLC, EQT Corporation, John/Jane Does 1-5 and ABC Entities 1-5 (hereinafter collectively "Defendants"), as follows:

## PARTIES

1.     Plaintiffs Anthony J. Gregor and Ashley N. Gregor, husband and wife, are individuals who reside at 41430 Brown Road, P.O. Box 91, Bethesda, Ohio 43719 in Belmont County, Ohio.

2.     Plaintiff BRK Energy LLC is a limited liability company organized under the laws of the state of Ohio with its principal place of business at 41430 Brown Road, P.O. Box 91, Bethesda, Ohio 43719 in Belmont County, Ohio.

3.     Plaintiff Down Home Farms Holdings LLC is a limited liability company organized under the laws of the state of Ohio with its principal place of business at 49001 Centerville-Jacobsburg Road, Jacobsburg, Ohio 43933 in Belmont County, Ohio.

4.     Plaintiffs James O. Dunfee and Ena Sue Dunfee, husband and wife, are individuals who reside at 49001 Centerville-Jacobsburg Road, Jacobsburg, Ohio 43933 in Belmont County, Ohio.

5.     Plaintiff James R. Blaney is the sole Trustee of the Guy E. Blaney Living Trust, an Ohio trust dated June 13, 1996, who resides at 61638 S. 26 Road, Bethesda, Ohio 43719 in Belmont County, Ohio.

6.     Plaintiffs James R. Blaney and Brenda Blaney, husband and wife, are individuals who reside at 61638 S. 26 Road, Bethesda, Ohio 43719 in Belmont County, Ohio.

7.     Plaintiff Heidi R. Kemp is the sole Trustee of the Dallas C. Kemp Trust, an Ohio trust dated August 17, 2012, amended and restated October 31, 2014, who resides at 41440 Brown Road, Bethesda, Ohio 43719 in Belmont County, Ohio.

8.     Plaintiffs Terence L. Kemp and Virginia M. Kemp, husband and wife, are individuals who reside at 60905 Chestnut Level Road, Belmont, Ohio 43718 in Belmont County, Ohio.

9.     Plaintiffs Dallas Roger Kemp and Billi R. Kemp, husband and wife, are individuals who reside at 64121 Garrett Road, Bethesda, Ohio 43719 in Belmont County, Ohio.

10.     Plaintiff Tony L. Kemp is an individual who resides at 61330 Chestnut Level Road, Belmont, Ohio 43718 in Belmont County, Ohio.

11.     Plaintiffs Kriss Gregor and Valerie Gregor, husband and wife, are individuals who reside at 41467 Brown Road, Bethesda, Ohio 43719 in Belmont County, Ohio.

12.     Plaintiffs John A. Sikish and Lucinda M. Sikish, husband and wife, are individuals who reside at 65955 Plainfield Road, Belmont Ohio 43718 in Belmont County, Ohio.

13.     Plaintiff Thomas B. McGaughy is the sole Trustee of the Thomas B. McGaughy Trust, a West Virginia trust dated September 2, 2010, amended and restated June 13, 2017, who resides at 13 Laurel Avenue, Wheeling, West Virginia, 26003.

14.     Plaintiff Nancy Louise Loy is the sole Trustee of the James Hershel and Nancy Louise Loy Family Trust, an Ohio trust dated June 23, 2015, as amended, who resides at 62929 Johnson Road South, P.O. Box 355, Bethesda, Ohio 43719 in Belmont County, Ohio.

15.     Plaintiff Maple Ridge Farm, LLC is a limited liability company organized under the laws of the state of Ohio with its principal place of business located at 237 Kathryn Court, Washington Court House, Ohio 43160.

16.     Plaintiff OK Ridge Farm, LLC is a limited liability company organized under the laws of the state of Ohio with its principal place of business located at 237 Kathryn Court, Washington Court House, Ohio 43160.

17.     Plaintiffs Carlos E. Powell and Susan D. Powell, husband and wife, are individuals who reside at 45359 Roscoe Road, St. Clairsville, Ohio 43950 in Belmont County, Ohio.

18.     Plaintiffs Kevin L. Davis and Karen L. Davis, husband and wife, are individuals who reside at 203 Oak Street, P.O. Box 473, Bethesda, Ohio 43719 in Belmont County, Ohio.

19.     Plaintiffs Marcia Jo Wells and Steven J. Wells, husband and wife, are individuals who reside at 56014 Brands Run Road, Alledonia, Ohio 43902 in Belmont County, Ohio.

20.     Plaintiff Gregg M. Stubbs is an individual who resides at 5759 Strathmore Lane, Dublin, Ohio 43017.

21.     Plaintiffs Kenneth J. Perkins and Karla J. Perkins, husband and wife, are individuals who reside at 42521 Bina Road, Belmont, Ohio 43718 in Belmont County, Ohio.

22.     Plaintiff Dorothy J. Bowman is an individual who resides at 66985 Graham Road, St. Clairsville, Ohio 43950 in Belmont County, Ohio.

23.     Plaintiff Joanne L. Campbell is an individual who resides at 9043 Indian Mound Road, Pickerington, Ohio 43147.

24.     Plaintiff George J. Ebbert is an individual who resides at 1823 Ryan Road, Fairmont, West Virginia 26554.

25.     Plaintiff Mary L. Sauer is an individual who resides at 1066 Augustana Drive, Naperville, Illinois 60565.

26.     Plaintiff Monahan Farms, LLC is a limited liability company organized under the laws of the state of Ohio with its principal place of business located at 41280 Bethesda-Belmont Road, P.O. Box 392, Bethesda, Ohio 43719 in Belmont County, Ohio.

27.     Defendant Rice Drilling D LLC is a foreign limited liability company organized under the laws of the state of Delaware with its principal place of business located at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222.

28.     Defendant EQT Production Company is a foreign corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222.

29.     Defendant EQT Energy, LLC is a foreign limited liability company organized under the laws of the state of Delaware with its principal place of business located at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222.

30.     Defendant EQT Corporation is a foreign corporation organized under the laws of the state of Delaware with its principal place of business located at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222.

31.     Defendants Rice Drilling D LLC, EQT Production Company, and EQT Energy, LLC are registered to conduct business in the State of Ohio and conduct business in Belmont County, Ohio.

32.     Defendants Rice Drilling D LLC, EQT Production Company, and EQT Energy, LLC are all indirect wholly owned subsidiaries of EQT Corporation.

33.     John/Jane Does 1-5 and ABC Entities 1-5 are individuals and/or entities, whose identities and involvement are currently unknown to Plaintiffs, but who are believed to be liable to Plaintiffs and/or have acted in concert with the Defendants or otherwise engaged in actions

which are illegal and/or in breach of the lease agreements at issue, which would subject them to liability for the claims raised in this Complaint.

34.     Defendants John/Jane Does 1-5, ABC Entities 1-5, Rice Drilling D LLC, EQT Production Company, and EQT Energy, LLC are alter egos of EQT Corporation and, together with EQT Corporation, comprise one entity (hereinafter collectively "EQT").

## JURISDICTION AND VENUE

35.     Plaintiffs and the proposed Class members own property and/or reside in Belmont County, Ohio.

36.     The land, which is the subject of the leases at issue, is primarily located in Belmont County, Ohio.

37.     Venue is proper in Belmont County because a substantial part of Defendants' conduct that gives rise to Plaintiffs' and the Class members' claims occurred in Belmont County and all or part of Plaintiffs' and the Class's claims for relief arose in Belmont County.

## FACTS

### The Smith-Goshen Leases

38.     Plaintiffs and the Class members all own certain mineral rights and/or royalty interests located in Belmont County, Ohio.

39.     Plaintiffs and most of the Class members were members of a land group commonly referred to as the Smith-Goshen Landowners Group.

40.     The Smith-Goshen Landowners Group included hundreds of landowners who owned tens of thousands of acres of oil and gas mineral rights in Belmont County, Ohio.

41.     Members of the Smith-Goshen Landowners Group including Plaintiffs and other landowners in Belmont County, Ohio, entered into leases covering their oil and gas mineral rights in Belmont County, Ohio, with Defendant Rice Drilling D, LLC (hereinafter the "Smith-Goshen Leases").

42.     The members of the Smith-Goshen Landowners Group used the same form lease agreement, resulting in the Plaintiffs and Class members' leases being materially identical.

43.     Certain other landowners in Belmont County, Ohio, who were not members of the Smith-Goshen Landowners Group, also entered into leases using the same form lease agreement as members of the Smith-Goshen Landowners Group. These leases will also be referred to as "Smith-Goshen Leases."

44.     Collectively, Plaintiffs and/or their predecessors-in-interest, entered into the Smith-Goshen Leases with Rice Drilling D LLC covering more than 2,300 gross acres. Representative copies of several Smith-Goshen Leases entered into by Plaintiffs and the Class members are attached as Exhibit 1. All the leases have not been attached because they are essentially identical, already in the possession of Defendants and the attachment would be voluminous.

45.     The Smith-Goshen Leases each contain an identical royalty provision, titled Article III. Royalty Payments, which states:

> The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee **from an unaffiliated third party purchaser in an arms length transaction at the point of sale** for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called the "Royalty Payment"). Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included

11

in the unit bears to the total number of acres in the unit. So long as payment exceeds fifty dollars ($50.00) payment of Royalty for oil, gas, other hydrocarbons and by-products marketed during any calendar month shall be on or before the 30th day after receipt of such funds by the Lessee. Each Royalty Payment shall be accompanied by a stub, schedule, summary, or remittance identifying the Lease and showing the gross amount and proceeds paid to Lessee for all Leased Products produced. (Emphasis added.)

46. The term "Leased Products" is defined in the first paragraph in Article I. Grant of Lease of each Smith-Goshen Lease as "oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith other than as reserved to Lessor below (herein called 'Leased Products')."

47. The Smith-Goshen Leases each contain an identical definition of "Affiliate" in Article XVII, which states:

**Affiliate**: An 'Affiliate' is any entity in which Lessee, or any parent company, subsidiary, or affiliate of Lessee, owns an interest of more than ten percent (10%) or exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation or other entity which owns an interest in or exercises any degree of control, directly or indirectly, over Lessee.

## The Stolen Royalty Payments

48. At the time the Smith-Goshen Leases were executed, Rice Drilling D LLC was a wholly owned subsidiary of Rice Energy Inc.

49. Plaintiffs, and members of the Class, received royalty payments from or on behalf of Rice Drilling D LLC for the Leased Products produced from the land subject to the Smith-Goshen Leases.

50. On or about November 13, 2017, EQT Corporation merged with Rice Energy, Inc. (hereinafter the "EQT-Rice Merger").

51. Rice Drilling D LLC remained the Lessee of the Smith-Goshen Leases following the EQT-Rice Merger but became an indirect wholly-owned subsidiary of EQT Corporation.

12

52.    Following the EQT-Rice Merger, Plaintiffs began to receive royalty payments and remittance statements from Defendant EQT Production Company which has assumed the rights and obligations of the Lessee under all of the Smith-Goshen Leases and maintains those rights and obligations jointly and severally with Rice Drilling D LLC.

53.    Defendants initially sell the Leased Products produced from the land subject to the Smith-Goshen Leases to an affiliate believed to be EQT Energy, LLC, and/or another affiliate as defined in the Smith-Goshen Leases.

54.    The price this affiliate pays for the Leased Products (the "Affiliate Price") is then used to calculate the royalties paid to Plaintiffs and other Class members under each lease, in violation of each lease.

55.    EQT Energy, LLC and/or other affiliates, identities unknown, then sell the Leased Products to unaffiliated third-party purchasers in arm's length transactions (the "Unaffiliate Price").

56.    The Unaffiliate Price is always more than the Affiliate Price.

57.    The Affiliate Prices and the Unaffiliate Prices (and thus the difference) are easily and readily identifiable in Defendants' records for each Plaintiff and Class member.

58.    Under the Smith-Goshen Leases, Plaintiffs and the Class members should have been paid 20% of the gross proceeds received from unaffiliated third party purchasers in arm's length transactions, not 20% of the proceeds Defendants received from an affiliate.

59.    Defendants intentionally, knowingly, and unlawfully paid, and continue to pay, royalties to Plaintiffs and other Class members based on the proceeds received from an affiliate in sales at the Affiliate Prices not the gross proceeds received from unaffiliated third party purchasers

13

in arm's length transactions in sales at the Unaffiliate Prices, resulting in Plaintiffs and the Class Members receiving much less royalties than they are due under their lease terms.

60.     Defendants are aware their actions are illegal because EQT Corporation, EQT Production Company, and EQT Energy, LLC have been parties to similar lawsuits filed in West Virginia raising claims related to EQT paying royalties on the price EQT Production Company received from its affiliate, EQT Energy, LLC, and not the price EQT Energy, LLC received from unaffiliated third parties in arms-length transactions. *See Mills Wetzel Lands, Inc. v. EQT Prod. Co.*, N.D.W.Va. Civil Action No. 5:18CV23; *see also* EQT Corporation's 2021 10-K which references a legal proceeding identified as "*Mary Farr Secrist, et al. v. EQT Production Company, et al., Circuit Court of Doddridge County, West Virginia*" and states that "On June 27, 2018, the Court held that EQT Production Company and its marketing affiliate EQT Energy LLC are alter egos of one another and that royalties paid under the leases should have been based on the price of gas produced under the leases when sold to unaffiliated third parties, and not on the price when the gas was sold from EQT Production Company to EQT Energy, LLC." *Securities and Exchange Commission, EQT Corporation 10-K for period ending December 31, 2020*, page 41.

61.     Both the royalty payments and the statements provided to the Plaintiffs and Class members were specifically designed to prevent the Plaintiffs and Class members from determining and/or discovering that the royalty payments are based upon Affiliate Prices, not Unaffiliate Prices.

### Alter Ego

62.     Defendant Rice Drilling D LLC is a wholly owned subsidiary of Rice Drilling B LLC.

63.     Rice Drilling B LLC is a wholly owned subsidiary of EQT RE, LLC.

14

64.     EQT RE, LLC is a wholly owned subsidiary of Defendant EQT Production Company.

65.     Defendant EQT Production Company is a wholly owned subsidiary of EQT Investment Holdings, LLC.

66.     EQT Investment Holdings, LLC is a wholly owned subsidiary of Defendant EQT Corporation.

67.     Defendant EQT Energy, LLC is a wholly owned subsidiary of Defendant EQT Production Company.

68.     All Defendants share the same corporate address of 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222.

69.     Upon information and belief, following the EQT-Rice Merger, Rice Drilling D LLC, EQT Production Company, and EQT Energy, LLC, are, in reality and effect, divisions and/or business segments of and within EQT Corporation, the entity and corporate umbrella for which they operate.

70.     EQT Production Company, EQT Energy, LLC and any other affiliate companies who paid or received the Affiliate Prices were created by EQT Corporation.

71.     Many officers and key employees are employed and/or involved with all the entities.

72.     David M. Khani is the Chief Financial Officer of EQT Corporation.

73.     David M. Khani is a Director of EQT Production Company.

74.     David M. Khani is a Manager of EQT Energy, LLC.

75.     William E. Jordan is the Executive Vice President and General Counsel of EQT Corporation.

76.     William E. Jordan is a Manager of EQT Energy, LLC.

77.     Toby Z. Rice is the President and Chief Executive Officer of EQT Corporation.

78.     Toby Z. Rice is a Director and President of EQT Production Company.

79.     Toby Z. Rice is a principle at Rice Drilling D LLC.

80.     EQT Production Company, EQT Energy, LLC, and EQT Corporation have shared common management and direction.

81.     Following the EQT-Rice Merger and Rice Drilling D LLC becoming an indirect wholly owned subsidiary of EQT Corporation, Rice Drilling D LLC also has shared common management and direction.

82.     EQT Corporation is the general manager of all other Defendants directly or by and through another wholly owned entity of EQT Corporation.

83.     The Defendants are predominantly staffed with officers and directors of EQT Corporation.

84.     EQT Corporation finances the other Defendants.

85.     EQT Corporation controls the resources and income the other Defendants receive.

86.     The Defendants, other than EQT Corporation, have only the capital and resources which EQT Corporation authorizes and permits these subsidiaries to have, and such Defendants are mere departments and part of business segments which do not even have separate addresses.

87.     The Defendants are all housed in one building, primarily in one office complex, in Pittsburgh, Pennsylvania.

88.     EQT Corporation authorizes and arranges financing for the other Defendants if it is needed.

89.     EQT Corporation's "business segments" are not stand-alone businesses.

16

90. The Boards of Directors and Officers of the Defendants other than EQT Corporation are essentially treated as employees reporting to their supervisors who are officers or directors of EQT Corporation.

91. EQT Corporation's Board has control over each Defendant's budget, revenue, business, responsibilities, and employees.

92. EQT Corporation's Board monitors all operations of, and exercises oversight over, all other Defendants through an Audit Committee. Said Defendants must get approval for significant expenditures, including capital expenditures, from EQT Corporation's Enterprise Risk Committee.

93. EQT Corporation is operating EQT Production Company, EQT Energy, LLC, and Rice Drilling D LLC, as if they were, in fact, part of EQT Corporation.

94. Defendants are collaterally estopped from arguing they are not alter egos of each other because Courts have determined EQT Production Company and EQT Energy, LLC to be alter egos of EQT Corporation. *Kay Co., LLC v. EQT Prod. Co.*, N.D. W.Va. Civil Action No. 1:13-CV-151, 2017 U.S. Dist. LEXIS 228275, at *70 (Sep. 6, 2017) ("Based upon the foregoing, this Court finds that EQT Corporation is the alter ego of the subsidiary defendants [including EQT Production Company and EQT Energy, LLC] and of EQT Midstream Partners and that the defendants are alter egos of each other with respect to this civil action.")

95. For the reasons set forth above, Defendants EQT Production Company, EQT Energy, LLC, and Rice Drilling D LLC are alter egos of EQT Corporation, who together with EQT Corporation, comprise one entity.

## CLASS ACTION ALLEGATIONS

96.     Plaintiffs reincorporate and allege all paragraphs of this Complaint as if fully rewritten.

97.     This action is brought for individual claims and pursuant to Ohio R. Civ. P 23 as a class action on behalf of the named Plaintiffs and on behalf of the following Class:

> All persons or entities (including their predecessors and successors-in-interest) who own oil and gas mineral interests and/or royalty interests in Belmont County, Ohio that entered into, are parties to, or are beneficiaries of oil and gas leases with Defendants (or any of Defendants' affiliates, predecessors, successors, and/or subsidiaries); which leases contain the royalty language contained in the Smith-Goshen Leases requiring royalties to be paid on twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arm's length transaction; and who have received royalty payments from Defendants (or any of Defendants' affiliates, predecessors, successors, and/or subsidiaries) for production of natural gas from the land covered by the Smith-Goshen Leases which were based on the proceeds Defendants received in a sale to an affiliate and not the gross proceeds Defendants received in a sale to an unaffiliated third party purchaser in an arm's length transaction.

98.     The majority of the members of the proposed Class are citizens of the State of Ohio and/or the number of citizens of the State of Ohio in the proposed Class is substantially larger than the number of citizens from any other state.

99.     Defendants are the sole Defendants from whom significant relief is sought by members of the Class.

100.     Defendants' alleged conduct forms a significant basis for the claims asserted by the proposed Class.

101.     The principal injuries resulting from the Defendants' conduct, or any related conduct of the Defendants, occurred in the State of Ohio.

18

102. No other class action has been filed asserting the same or similar factual allegations against Defendants on behalf of Plaintiffs and the Class members.

103. The claims asserted herein do not involve matters of national or interstate interest.

104. The claims asserted herein will be governed by the laws of the State of Ohio.

105. The properties at issue are located in Ohio.

106. The class consists of hundreds of owners of oil and gas mineral interests and/or royalty interests.

107. As a result, the Class is so numerous that joinder of all class members as parties in this action is impracticable.

108. Plaintiffs and members of the Class all sustained damages arising out of the Defendants' conduct.

109. There are questions of law and fact common to the Class, including but not limited to:

    a. Whether Defendants failed to properly pay all gas royalties due under the Smith-Goshen Leases by calculating royalty payments based on the Affiliate Price and not the Unaffiliate Price;

    b. Whether Defendants have unlawfully converted the Class members' property by failing to pay the full amount of the royalties due under the Smith-Goshen Leases and other identical leases;

    c. Whether Defendants have been unjustly enriched by their actions;

    d. The appropriate measure of damages; and

    e. Such other factual and legal issues as are apparent from the allegations and causes of action alleged herein.

110. Class status is warranted under Rule 23 because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate, final monetary damages, injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole the same.

111. Class status is also warranted under Rule 23 because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of this controversy.

112. Plaintiffs' claims are typical of the claims of the Class.

113. Plaintiffs will fairly and adequately protect the interests of the Class in this action and anticipate no difficulty in the management of this matter as a class action.

114. Plaintiffs have retained the below qualified counsel to represent the interests of the class.

## COUNT ONE – BREACH OF CONTRACT

115. Plaintiffs reincorporate and allege all paragraphs of this Complaint as if fully rewritten herein.

116. Plaintiffs and the Class members are Lessors under the Smith-Goshen Leases.

117. Defendants are the current Lessees under the Smith-Goshen Leases.

118. These Smith-Goshen Leases are binding contracts between Defendants and the Plaintiffs and Class members.

119. The clear and unambiguous royalty language in the Smith-Goshen Leases requires that:

> The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arms length transaction at the point of sale for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called

the "Royalty Payment"). Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds.

120.    The Smith-Goshen Leases require that Lessor be paid twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third-party purchaser in an arm's length transaction at the point of sale.

121.    Defendants disregarded this provision and breached their contractual obligations to pay royalties based on the gross proceeds received from an unaffiliated third-party purchaser in an arm's length transaction at the Unaffiliate Price.

122.    In the alternative, the purported "affiliate" Defendants have been selling the Leased Products to is actually an alter ego of the Lessee which renders the first sale a nullity and/or an improper sale upon which to calculate royalties under the lease terms.

123.    Defendants committed such breach knowingly and intentionally and concealed it from Plaintiffs and the Class members.

124.    Defendants continue to improperly pay royalties based upon the Affiliate Price, not the Unaffiliate Price, despite this matter having been brought to their attention through a letter and an email on behalf of one of the Plaintiffs, said letter and email attached hereto as Exhibit 2.

125.    Despite specifically knowing that Defendants are in breach of the lease agreements with the Plaintiffs and Class members, Defendants maintain the position that they will not pay the correct royalty amounts for past violations of the lease, and into the future.

126.    Any further notice of violations of the leases by Plaintiffs and the Class members concerning the improper payment of royalties, as discussed above, is futile given Defendants'

21

position that it is not in breach of the leases, it will not make Plaintiffs and the Class members whole for their damages and it will not change how royalties are calculated and paid in the future.

127.    Defendants' breach of the Smith-Goshen Leases caused injury to Plaintiffs and Class members which said injury will continue to grow into the future.

128.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members have incurred actual damages in an amount in excess of $25,000.00. The amount of the damages will grow if EQT continues to breach the Smith-Goshen Leases in the ways set forth above.

## COUNT TWO – CONVERSION

129.    Plaintiffs reincorporate and allege all paragraphs of this Complaint as if fully rewritten herein.

130.    Defendants have converted Plaintiffs' and the Class members' property through its wrongful acts and have damaged Plaintiffs and the Class members.

131.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the other Class members have been damaged in an amount in excess of $25,000.00.

## COUNT THREE – UNJUST ENRICHMENT

132.    Plaintiffs reincorporate and allege all paragraphs of this Complaint as if fully rewritten herein.

133.    Defendants, by their policies and improper actions, benefited from and increased profits by effecting a scheme which deprived Plaintiffs and the Class members of the full amount of royalties due to them under the Smith-Goshen Leases.

134.    Defendants benefitted from the royalty amounts wrongfully withheld.

135. Defendants concocted this scheme with full knowledge that in doing so, Defendants would benefit by paying Plaintiffs and the Class members lower royalties based on the proceeds received from an affiliate at the Affiliate Price and not the gross proceeds received from an unaffiliated third-party purchaser in an arm's length transaction at the Unaffiliate Price.

136. Defendants accept and receive the benefits of royalty monies properly due to Plaintiffs and the Class members.

137. It is inequitable and unjust for Defendants to retain the royalty payments wrongfully withheld.

138. Plaintiffs and the Class members are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants plus interest on these amounts.

## COUNT FOUR – DECLARATORY RELIEF

139. Plaintiffs reincorporate and allege all paragraphs of this Complaint as if fully rewritten.

140. The clear and unambiguous royalty language in the Smith-Goshen Leases requires that Plaintiffs and the Class members be paid royalties based on twenty percent (20%) of the gross proceeds received from an unaffiliated third-party purchaser in an arm's length transaction.

141. Defendants do not have the right to pay Plaintiffs and the Class members royalties based on the Affiliate Price.

142. Plaintiffs and the Class members ask this Court to issue a declaratory judgment that Defendants are prohibited from paying royalties under the Smith-Goshen Lease on proceeds received in sales to Affiliates and that the royalties must be based upon the gross proceeds received from unaffiliated third-party purchasers in arm's length transactions at the Unaffiliate Price.

143. Plaintiffs and the other Class members ask this Court to issue a declaratory judgment that Defendants must properly report to Plaintiffs and the other Class members the gross proceeds received from unaffiliated third-party purchasers in arm's length transactions at the Unaffiliate Price going forward.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants in favor of Plaintiffs and the members of the Class and award the following relief:

A. That this action be certified as a class action pursuant to Rule 23 of the Ohio Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B. That the conduct alleged herein be declared, adjudged, and decreed to be unlawful and in violation of the Smith-Goshen Leases;

C. Compensatory, consequential, and general damages in an amount to be determined at trial but in excess of $25,000.00;

D. Attorney fees, costs incurred, disbursements of the action and the costs of the administration of the class payments;

E. Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

F. Pre and post-judgment interest;

G. A declaratory judgment that (1) Defendants are prohibited from paying royalties under the Smith-Goshen Lease on proceeds received in sales to Affiliates and that the royalties must be based upon gross proceeds received from unaffiliated third-party purchasers in arm's length transactions at the Unaffiliate Price, and (2) Defendants must properly report to Plaintiffs

and the other Class members the gross proceeds received from unaffiliated third-party purchasers in arm's length transactions at the Unaffiliate Price going forward;

H.    That Defendants be enjoined from the conduct alleged herein; and

I.    Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Patrick Kasson (0055570)
David Hudson (0084988)
Brandon Abshier (0083505)
Kent Hushion (0099797)
Reminger Co., LPA
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215
Telephone: (614) 232-2418
pkasson@reminger.com
dhudson@reminger.com
babshier@reminger.com
khushion@reminger.com


Sean E. Jacobs (0088351)
Heidi R. Kemp (0095587)
Emens Wolper Jacobs & Jasin Law Firm Co., LPA
One Easton Oval, Suite 550
Columbus, Ohio 43219
Telephone: (614) 414.0888
Fax: 614.414.0898
sjacobs@ewjjlaw.com
hkemp@ewjjlaw.com

*Attorneys for Plaintiffs*

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of the maximum number of jurors permitted by law on all issues triable of right by a jury.

_____

Patrick Kasson (0055570)

196
COPY

Smith-Goshen Land Owners Group

## PAID-UP OIL AND GAS LEASE
### Lease Date: November 6, 2012

This is an oil and gas lease (the "Lease") made this 6th day of November, 2012, between <u>DALLAS C. KEMP, single,,</u> herein called "Lessor" (collectively if there is more than one) whose address is <u>60530 CHESTNUT LEVEL ROAD, BELMONT OH 43718</u> and Rice Drilling D, LLC, hereinafter called "Lessee", whose address is 171 Hillpointe Drive, Suite 301, Canonsburg, PA 15317.

### ARTICLE I. GRANT OF LEASE

Lessor, in consideration of the payments described herein and the covenants and agreements hereafter contained, hereby leases and lets exclusively to the Lessee all the oil, gas, minerals and their constituents (not including coal) underlying the land described below for the sole purpose of exploring for, drilling, operating, producing and gathering the oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith other than as reserved unto Lessor below (herein called "Leased Products"). Together with such exclusive rights as may be necessary or convenient for the Lessee to explore for, develop, produce, measure, and market production from the Leasehold and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploration tests; to drill (either vertically, horizontally, or directionally), maintain, operate, treat, vent, dewater, cease to operate, plug, abandon, and remove wells; to stimulate or fracture all seams or other strata or formations; to use or install roads, electric power, telephone facilities (including data acquisition), compression facilities and collection facilities for use in the production, transportation and marketing of products from the Leasehold and from neighboring lands across the Leasehold, and such rights shall survive the term of this agreement for so long thereafter as operations are continued; to use oil and gas free of cost, to operate, maintain, repair, store, and remove material and equipment relating to the operations. Lessor shall not be responsible for any costs with respect to Lessee's Operations. Lessee is prohibited from performing any activity on the Leased Premises which is not expressly permitted pursuant to the terms and conditions of the Lease.

<u>Description of the Land Included in the Lease</u>: The oil, gas, mineral interests and land included in this Lease (herein called the "Leased Premises") is located in the County of Belmont, State of Ohio, with a permanent parcel number (or numbers) as follows: <u>09-00409.001; 09-00465.000; 09-00433.000.</u>

i



EXHIBIT
1

Smith-Goshen Land Owners Group

The Leased Premises contain 153.45 gross acres. A legal description of the Leased Premises is attached hereto and made a part hereof as Exhibit A,

## Reservations

(a)     Lessor's Reserved Rights: Lessor reserves all rights not specifically granted to Lessee in this Lease. Lessor specifically reserves the rights to all products contained in any formation: (1) from the surface of the Leased Premises to the top of the formation commonly known as the Marcellus Shale, (2) in any and all formations below the base of the Marcellus Shale to the top of the formation commonly known as the Utica Shale, and (3) in all formations below the base of the Utica Shale. Notwithstanding anything to the contrary, Lessee is specifically granted the right to penetrate and drill through the shallower formations in order to drill and produce the Leased Products and the Leased Premises. Lessor also reserves a right of way on all lands granted hereunder and the right to use the Leased Premises and any improvements thereon for any and all other purposes, so long as that right of way does not cause unreasonable interference with Lessee's operations or pose a safety concern to Lessee. Lessee agrees not to unreasonably interfere with the use and enjoyment of said land by Lessor and Lessor's family, agents, employees, invitees, and guests and to comply with all other specific provisions herein relating to the use of the land.

(b)     Other Minerals Reserved: Lessor expressly excludes from this Lease and reserves all minerals of every kind and character in, on and under the Leased Premises except the Leased Products herein defined. This includes but is not limited to all of the sulfur, coal, lignite, uranium and other fissionable material, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances (except the Leased Products described above) presently owned by Lessor in, under, or upon the Leased Premises. Lessor also reserves  rights of ingress or egress and use of the Leased Premises by Lessor or its lessees or assignees for purposes of exploration for and production and marketing of the materials and minerals reserved hereby which rights shall not unreasonably interfere with the rights of Lessee.

## ARTICLE II. TERM OF LEASE

Lease Term: This Lease shall become effective on the date it is signed, which date will be inserted below the title of this document on page 1 (herein called the "Lease Date") and remain in force for a Primary term of five years from the Lease Date. Subject to the provisions hereinafter contained, this Lease shall be for a term of five (5) years from the Lease Date (herein called the "Primary Term") and for as long thereafter as operations are conducted on the Leasehold or as long as a well capable of production in Commercial Quantities is located on the Leasehold or on lands unitized or combined with the Leasehold, or for as long as extended by other provisions herein.

2

Smith-Goshen Land Owners Group

**Option to Extend the Primary Term**: Lessee is given the option to extend the Primary Term of this Lease for an additional five (5) year period. To exercise this option Lessee must notify Lessor in writing of Lessee's intent to exercise the option at least ninety (90) calendar days before the expiration of the Primary Term and Lessee must pay to Lessor, at any time prior to the termination of the Primary Term, a lease bonus for the five (5) year extension period equal to the signing bonus set forth in this Lease.

## ARTICLE III. PAYMENTS

**Signing Bonus Payment**: Lessee agrees to pay Lessor, proportionate to Lessor's percentage of ownership, a lease signing bonus of Six Thousand Two Hundred and Fifty dollars ($6250.00) for each net mineral acre contained within the Leased Premises. Such payment shall be according and pursuant to the Letter of Understanding to be executed by Lessor. Lessor understands that payment of the signing bonus will not be paid until title is cleared and certified title is obtained by an oil and gas attorney of Lessees choosing.

In the event Lessee believes in good faith that a title defect exists for the Leased Premises then Lessee shall provide written notice to Lessor as soon as practical, but in no event later than the time for payment set forth in the Letter of Understanding, of the title defects which render title unacceptable to Lessee. In the event a title defect exists, Lessee shall provide a description of the title defect and any supporting documentation in its possession. Lessor shall have a 120 business day cure period from the date of receipt of written notice to cure the defect in a manner satisfactory to the Lessee. If the title defect is cured to the satisfaction of Lessee within the 120 business day cure period the bonus payment shall be paid to Lessor within 30 days following the date the title defect is cured.

**Royalty Payments**: The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arms length transaction at the point of sale for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called the "Royalty Payment"). Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. So long as payment exceeds fifty dollars ($50.00) payment of Royalty for oil, gas, other hydrocarbons and by-products marketed during any calendar month shall be on or before the 30th day after receipt of such funds by the Lessee. Each Royalty Payment shall be accompanied by a stub, schedule, summary, or remittance identifying the Lease and showing the gross amount and proceeds paid to Lessee for all Leased Products produced. All Royalty Payments shall be paid to

3

Smith-Goshen Land Owners Group

Lessor at the address recited above Article I in this Lease or at such other address as shall be provided by Lessor to Lessee in writing.

**Shut-in Royalty Payment:** After the expiration of the Primary Term of this Lease if a well drilled on the Leased Premises or lands pooled therewith which is capable of producing gas in Commercial Quantities but the production thereof is shut-in, shut-down or suspended for lack of any available market for production for a period of time exceeding three consecutive months the Lessee shall pay a "shut-in" royalty equal to the sum of twenty-five dollars ($25.00) per net mineral acre each month until production is re-established (or Lessee surrenders the Lease). Lessee shall remit all shut-in payments to Lessor at the address provided in this Lease on or before forty-five (45) days after the third month after the date on which the well is shut-in. The payment of shut-in royalties will keep this Lease in effect after the Primary Term, however this Lease will not be kept in force solely by shut-in royalty payments for a period longer than a total of thirty six (36) months whether cumulative or not. A shut in solely due to pipeline or equipment breakage, damage or malfunction, upgrade, maintenance or safety during the drilling or completions of a new well shall not be calculated towards the three (3) year aggregate limitation on shut in, provided that Lessee exercises good faith and due diligence to correct the condition.

**Payment in Lieu of Free Gas**: In the event any well is drilled upon the Leased Premises or any portion thereof, Lessee shall pay annually to Lessor, which the well pad is located on, in lieu of any right to free gas, a sum equal to the value of three hundred fifty thousand (350,000) cubic feet of natural gas produced from each such well located on the Leased Premises up to a maximum of four wells. Said amount shall be paid in annual installments, with the value based upon the prior twelve months average gross price received by Lessee for gas sold from the Leased Premises.

## ARTICLE IV. POOLING AND UNITIZATION

**Pooling and Unitization**: Subject to the limitations below, Lessee is granted the right to pool or unitize, prior to or after drilling, all or part of the land covered by this Lease with any contiguous land so as to establish a pooled unit or units (herein called "Pooled Units"). When designating Pooled Units the Lessee shall make reasonable efforts to avoid excluding small or irregular shaped portions of the Leased Premises and to form Pooled Units in the shape of a square or rectangle. Lessee shall execute in writing an instrument identifying and describing the pooled acreage being drilled for, the leases included in the Pooled Unit, the formations and depths covered by the Pooled Unit, and the substance (either oil, gas or both) and file such instrument for record in the county or counties in which the pooled land is situated prior to drilling on the Pooled Unit. The Pooled Unit shall be effective on the date of execution of the declaration of unit. Lessor shall be provided a copy of such recorded instrument, and all amendments thereto by Lessee. No Pooled Unit for any vertical well with no horizontal drilling component which includes any portion of the Leased Premises shall exceed eighty (80) contiguous acres without the written consent of Lessor. No Pooled Unit for any well that includes lateral or horizontal drilling shall exceed six hundred forty (640) acres with

4

Smith-Goshen Land Owners Group

a ten percent (10%) tolerance without the written consent of the majority of the Lessors in the Unit unless any additional acreage added to the unit allows for further development of the unit. A majority will be determined upon the Lessors proportionate share of the total acreage owned by in the unit. Each acre, or fraction thereof, equals one vote towards consent; one acre equals one vote, 100 acres equals 100 votes. In the event the unit exceeds 640 acres with a 10% tolerance, 80% of the acreage in the unit (as measured with the one acre one vote standard as set forth above) must agree to the unit size. Without the prior written consent of all Lessors in the Unit, a unit shall not exceed 1000 acres. If a greater amount of acreage than that set forth in the designated limits provided herein is necessary to adequately develop the unit than the designated number of acres the unit may be increased. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created so long as that change is in order for Lessee to further develop and drill the Unit. The drilling, operations in preparation for drilling, production from, or payment for Royalty or Shut-In Royalty for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold. There shall be allocated to the Leased Premises included in a Pooled Unit the proportion of the production from the Pooled Unit that the number of net mineral acres covered by the Leased Premises and included in the Pooled Unit bears to the total number of net mineral acres in such Pooled Unit; and royalties shall be paid hereunder upon that portion of such production so allocated.

**Pugh Clause**: Upon expiration of the Primary Term this Lease shall automatically terminate and be of no further force or effect as to any portions of the Leased Premises not included within any Production Unit and those formations and horizons 100 feet below the deepest depth drilled. In addition, at the end of the Primary Term or any time thereafter, whichever is applicable, this Lease shall terminate as to all depths and horizons contained in a Production Unit from which oil and gas is not capable of being produced in Commercial Quantities. Initial: _J_ _C_ _K_ _____

## ARTICLE V. WATER PROTECTION

**Fresh Water Damage Protection**: In the event any activity carried on by the Lessee pursuant to the terms of this Lease adversely damages, disturbs, or injures the quality or quantity of Lessor's fresh water well, spring or source located on the Leased Premises, Lessee shall, at its sole cost and expense, take all reasonable steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all related costs of repair and maintenance to be paid by Lessee.

**Water Testing**: Lessee shall maintain the quality and quantity of Lessor's water supply (wells, springs or other domestic water source) to be measured by testing the Lessor's supply prior to surface disturbance on the Leased Premises or on any lands pooled or unitized therewith located within a radius of 2000 feet surrounding the wellhead. All testing shall be conducted by a certified independent testing laboratory. Testing must be for the entire Prominent Indicator Parameters of chemicals and agents utilized by

5

Smith-Goshen Land Owners Group

Lessee in its Operations and the burden shall be upon Lessee to provide evidence of all such chemicals and agents in order for the testing agent to adequately test the water. Lessee shall pay all costs of testing and Lessor shall be provided complete copies of any and all testing results and data, and shall have full rights to contact the testing lab for inquiry and information. Lessee shall cooperate with Lessor to obtain any favorable pricing extended to it by a certified testing laboratory should Lessor desire to obtain water testing outside of the testing provided for herein. Should Lessor experience a material adverse change in the quality of Lessor's water supply, during or immediately after the completion of Lessee's drilling operations; Lessee shall, within 48 hours of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Any pollution or reduction of any water supply after operations commence will be presumed to be the result of Lessee's operations unless Lessee can prove otherwise. If Lessor's water supply is polluted, reduced, or is otherwise adversely or materially affected as a result of Lessee's Operations, Lessee shall take any and all steps to restore water quality and quantity to its pre-drilling condition or fully compensate Lessor for the damage and inconvenience caused thereby. During any period of remediation, Lessee, at its sole expense, agrees to provide Lessor with an adequate supply of potable water consistent with Lessor's use of his/her water supply prior to Lessee's Operations on the Leased Premises or on lands pooled or unitized therewith.

## ARTICLE VI. LAND PROTECTION

**Non-Disturbance**: Lessee and its employees and authorized agents shall not disturb, use or travel upon any of the land of Lessor other than that land being used in its operations being conducted pursuant to this Lease.

**Damages:** The Lessee shall be liable to Lessor and pay market or replacement cost for any and all damages to the Leased Premises resulting from Lessee's Operations. Damages include but are not limited to any damage to Lessor's water, growing crops, trees, livestock, fences, buildings, water springs, soil, septic systems, agricultural fields and lands and any other property connected with drilling, operating, producing, gathering, or any geophysical or exploratory work conducted by or for the Lessee. Lessee shall promptly replace any drain tile and barriers, including but not limited to, fences, gates and walls removed or damaged by the Lessee during its Operations on the Leased Premises. Whenever a Pad has been installed or later repaired on the Leased Premises, Lessee, at its sole expense, shall restore the surface of the Leased Premises as near as practicable to the condition it was in prior to such work being undertaken. Upon Completion of all planned Operations on the Leased Premises, Lessee will within three (3) months undertake restoration of the Leased Premises to reclaim the Leased Premises to as near as practicable the pre-drilling condition.

**Irrigation and Agricultural Activities:** Lessor reserves the right to initiate or continue irrigation and agricultural activities (including timbering) on the Leased Premises so long as those agricultural activities do not interfere with the limits of disturbance of Lessee and Lessee will use all reasonable efforts to accommodate Lessor's

6

Smith-Goshen Land Owners Group

agricultural use. Subject to Lessee's prior approval and in accordance with Lessee's safety and construction standards, Lessor shall have the right to install and/or construct drainage or drain tile systems across, atop or under any pipeline installed by Lessee in a manner that does not interfere with Lessee's use of said pipelines.

**Agricultural Activities:** Lessee will plan its surface Operations in a manner that will reduce or minimize intrusion into crop fields, hay lands, pasture lands, or any other agricultural activity which is engaged in by the Lessor. In addition to the Damages Provision contained in this Lease, in the event that the Lessee needs to injure crops in order to conduct surface Operations, Lessee shall fully compensate Lessor for all damages and loss of crops at current market value so long as those crops are not located on a Well Pad (hereinafter defined) which Lessor is receiving payment for.

**Agreement as to Location of Operations:** Before Commencing Operations on the Leased Premises or any lands pooled therewith, Lessee and Lessor shall mutually agree in writing on the location and size of all well sites, pads, meters, roads, pipelines, fences, gates, buildings, electrical wires, and other equipment, supplies and facilities which Lessee wishes to locate on any portion of the Leased Premises so as to minimize disruption of Lessor's use of the Leased Premises; provided, however, that Lessor's consent shall not be unreasonably withheld or unreasonably delayed. Any wells, pads, roads, pipelines, gates, electrical wires, and other equipment, supplies and facilities Lessee locates on the Leased Premises will be maintained in good repair at all times by Lessee at its sole expense.

**Siting/Spud Fee:** Lessee shall pay to Lessor in consideration for damage to the Leased Premises the sum of thirty thousand dollars ($30,000) for a Well Pad located on the Leased Premises contemporaneously with Lessee disturbing any land where a pad for a horizontal well is to be located on the Leased Premises (herein called the "Pad Payment") for a well pad not to exceed five (5) acres. If any well pad exceeds five (5) acres then for each additional acre of disturbed land the Lessee shall pay eight thousand dollars ($8,000). A well pad includes any acreage for pits, tanks, equipment, roadways and other operations servicing the wells on that pad. Lessee shall pay Lessor a separate Pad Payment for each pad constructed on the Leased Premises.

**Restrictions on Location of Operations:** Without a separate written agreement between the Lessor and the Lessee, no pump stations, tanks, batteries, pipelines, roads, telephone and power lines, ponds, water holding facilities, dryers, separators or other equipment or facilities shall be located on the Leased Premises unless they are for the purpose of transporting, processing or treating Leased Products from the Leased Premises or lands pooled or unitized therewith, and the afore listed items shall not be located nearer than (and no well shall be drilled nearer than) one thousand (1,000) feet from any dwelling or residential structure or five hundred (500) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent. In order to effectively develop the Leasehold Premises it is understood that it is in the best interest of both Lessor and Lessee to work together in agreeing upon the location of operations on the Leasehold Premises. Should there be

7

Smith-Goshen Land Owners Group

no alternate location outside the aforementioned "buffer zones" then Lessee and Lessor shall agree to a location within the buffer zones. There shall be no compressors located on the Leased Premises, unless the compressor is solely used for the well located on the Leasehold Premises or a well located on a property pooled or unitized with the Leasehold Premises, unless Lessor consents in a prior separate written agreement. Any compressor operations permitted hereunder shall be designed and installed utilizing means to minimize noise, including but not limited to, sound enclosures and barriers, and quiet motors.

**Restrictions on Lessee's Use of Leased Premises:** Unless Lessor consents in a separate written agreement, the Lessee shall under no circumstances:

      (a) Use the Leased Premises for the disposal of any drill cuttings, brine or other liquids, or the permanent storage or disposal of any liquids or solids.

      (b) Use the Leased Premises or any portion thereof, surface or subsurface, for gas or oil storage purposes.

      (c) Use any water from the Leased Premises, surface or subsurface, or drill any well to take water from or inject any substance into the Leased Premises

      (d) Install or dig any pits other than drilling pits (not permanent storage pits) on the Leased Premises

**Pipelines and Utility Lines:** In the event that pipeline is necessary then Lessor and Lessee shall enter into a separate pipeline right of way agreement which is consistent with the terms and conditions of this Lease including location approval. In addition to the restrictions set forth in this Lease, Lessee agrees to bury any pipelines constructed on the Leased Premises at a depth, which shall in all cases be below tillage and drainage tile depth (at least 36 inches). Lessee agrees to restore the surface as near as practicable to the condition it was in prior to such installation. Lessee shall comply with all applicable rules, regulations, and statutes regarding pipeline construction, maintenance, and operation. Absent a separate right of way agreement Lessee's right to use said pipelines terminates when Lessee's production from the Leased Premises or lands unitized with the Leased Premises permanently ceases. Any utility lines used by Lessee in its Operations shall be buried upon the written request of Lessor. Such utility lines shall be removed upon termination of this Lease, unless Lessor agrees in writing to have such utility lines kept in place. Lessee shall provide Lessor a plat map showing the location and depth of all buried utility lines and pipelines.

**Fencing:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to fence all wells, well sites, tank batteries, pits, separators, drip stations, pump engines, or other equipment permanently located on the Leased Premises. All fences must be kept in good repair by the Lessee.

**Gates:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to construct gates on all access roads and provide an access key or double lock system allowing access by both Lessor and Lessee. Gates must be closed and locked at all times when equipment is not being accessed and when Lessee's personnel are not on the Leased Premises.

8

Smith-Goshen Land Owners Group

**Roads:** Roadways or drives constructed by Lessee on the Leased Premises during its Operations shall not exceed fifty (50) feet in width or a minimum width required to perform required Operations. After the completion of all planned operations on the Leased Premises, in the event of a producing well on the Leased Premises, any permanent access road for well servicing purposes shall be a maximum of twenty (20) feet or a minimum width required to perform maintenance or other Operations. Lessee agrees to improve, construct or maintain all roads used by it in good repair utilizing shale, gravel, or crushed stone, culverts and supports as necessary to provide a smooth, rut-free all-weather surface. When such roads are no longer being used, Lessee agrees, upon Lessor's request, to remove toppings and to restore the surface as nearly as practicable to its former condition. Lessee shall not use shale, gravel, or crushed stone sourced from the Leased Premises without the prior written consent of Lessor. Lessee shall prevent its employees, agents and contractors from operating vehicles in a negligent manner or at speeds in excess of twenty-five (25) miles per hour while on the Leased Premises.

**Pits:** Any pit permitted under this Lease will conform to all applicable regulatory requirements (state, local, and federal) and will conform to the best industry practices. Lessee will immediately notify all applicable regulatory authorities and Lessor of any damage to such facilities.

**Soil Testing:** For areas within the Limits of Disturbance upon Lessor's written request, Lessee shall, at its sole cost and expense, have Lessor's current soil tested by an independent third party agreed upon by Lessor and Lessee: (1) prior to the commencement of spudding any well on the Leased Premises, (2) twelve (12) months from the date of completion of any well on the Leased Premises, (3) twenty-four (24) months from the date of completion of any well on the Leased Premises, and (4) within sixty (60) days following the completion of drilling Operations on the Leased Premises. All tests provided for herein must meet all applicable EPA requirements and Lessor shall be provided complete copies of any and all testing results and data. If such test results reflect a material adverse change in the Lessor's soil quality, then Lessee shall use its best efforts to return the soil to its pre drilling condition.

**Timber:** Lessee shall notify Lessor in writing at least forty-five (45) calendar days prior to any removal by Lessee of marketable timber (marketability to be within the reasonable discretion of a certified professional forester). At Lessor's option, Lessor may choose to harvest timber, which shall be complete by the end of the 45 day period, or Lessor may require an appraisal on the timber by a qualified independent certified, professional forester, at Lessee's expense, and Lessee shall pay Lessor the appraised value for the timber identified prior to its removal by Lessee.

**Firewalling and Maintenance of Production Equipment:** Dikes, firewalls or other methods of secondary containment must be constructed and maintained at all times around all tanks, separators and receptacles so as to contain a sufficient volume of liquid to accomplish the intended purposes.

9

Smith-Goshen Land Owners Group

**Maintenance and Repair:** Maintenance and repair of roadways and all other facilities used by Lessee in connection with this Lease shall be the sole responsibility of the Lessee. If Lessor sends written notice to Lessee informing Lessee of any repairs or other maintenance to roads or other facilities that the Lessee has failed to address and the Lessee fails to initiate the repair or other maintenance within thirty (30) days of the written notice being sent or fails to complete the repairs or other maintenance within sixty (60) days of the notice being sent (if the repairs are capable of being completed within the 60 day period) then Lessor reserves the right to repair and maintain the roadways and the Lessee agrees to fully reimburse Lessor for the cost of the maintenance or repair undertaken by the Lessor.

**Hydraulic Fracturing:** Lessee shall not use, dispose of or release on the Leased Premises or permit to exist or to be used, disposed of or released on the Leased Premises as a result of its Operations any substances (other than those Lessee has been licensed or permitted by applicable public authorities to use on the Leased Premises) which are defined as "hazardous materials," toxic substances" or "solid wastes" in federal, state or local laws, statutes or ordinances. Should any pollutant, hazardous material, toxic substances, contaminated waste or solid waste be accidentally released on the Leased Premises, Lessee shall promptly notify Lessor and any applicable governmental body of such event. Lessee shall be responsible for and timely pay all costs of clean-up, remediation, and other costs related to and arising from the event, including but not limited to penalties. Lessee represents and warrants that during any hydraulic fracturing process it will not use any chemicals it has not been permitted to use by an applicable governmental, regulatory, state or federal agency, for the purposes of fracturing or pumping the same into any formation in and/or under the Leased Premises. Upon Lessor's written request Lessee will provide Lessor with all Material Safety Data Sheets (MSDS) available for any chemicals used by Lessee in its hydraulic fracturing process on the Leased Premises.

## ARTICLE VII. TAXES AND ASSESSMENTS

**Taxes:** Lessee shall pay all taxes and/or assessments on Leased Products, and any increase in other taxes attributable to Lessee's operations imposed by any local, state, or federal entity or governmental unit attributable to, or resulting from Lessees operations under the tax and assessment structure in effect at the time of the execution of this lease. Lessee shall, in addition, pay all severance taxes or other excise or personal property taxes arising out of or relating to this Lease and/or the Leased Products under the tax and assessment structure in effect at the time of the execution of this lease. In the event Ad Valorem and/or other real property taxes pertaining to or attributable to the Leased Premises, or any property associated therewith, are increased in any manner by reason of the Operations of Lessee relating to the Leased Premises, Lessee shall be responsible for the amount of any such tax increase and shall reimburse Lessor for the amount of such increase within thirty (30) days after Lessor provides Lessee with written documentation reflecting such increase and the basis thereof. Subsequent to the execution of this Lease, in the event there is a change

10

Smith-Goshen Land Owners Group

in Ohio tax code that provides for an increase in ad valorem taxes or severance tax or any other tax attributable to or resulting from the assessment of oil and gas due to oil and gas production from the leased premises, Lessor and Lessee agree to abide by the law and pay their proportional share accordingly.

**Agricultural Programs**: In the event the Leased Premises are subject to any federal, state, local and/or agricultural program (e.g. CAUV, CREP, CRP, Forest Land Program, etc.), and any roll-back or reimbursement or recoupment or retroactive assessment (including interest and penalties therefrom) is made against the Leased Premises on account of, arising out of, or relating to the Operations of Lessee on the Leased Premises, Lessee shall be responsible for paying Lessor any and all such amounts, but only insofar as such amounts imposed result from operations on the portion of the Leased Premises actually utilized by Lessee's Operations.

## ARTICLE VIII. TITLE AND WARRANTIES

**Lessor Limited Warranty**: Lessor makes no representation or warranty as to Lessor's title to the Leased Premises other than that Lessor represents that the title is good to Lessors knowledge and Lessor is not aware of any unrecorded encumbrances or encroachments or conditions affecting title to the Leased Premises, and Lessee agrees that no claims will be made against Lessor pertaining to warranty of title. It shall be Lessee's burden and obligation to assure itself of the quality of title to the Leased Premises.

**Title Curative**: Lessee assumes primary responsibility for taking the curative steps required to resolve any issues regarding Lessor's title to the Leased Premises as may be necessary to carry out the purposes of this Lease. Lessor agrees to cooperate with the Lessee in resolving title issues.

**Monies Paid**: Any monies paid to Lessor under the terms of this Lease are nonrefundable and under no circumstances will Lessee initiate any kind of action to recover any monies paid to Lessor.

**Lessor Encumbrances**: Any mortgage, lease, easement, or other interest granted by Lessor voluntarily after the Effective Date of this Lease shall be subject to this Lease. If Lessor defaults on any obligation secured by any lien or encumbrance on the Leased Premises during the term of this Lease, Lessee may, in its sole discretion, pay and discharge such obligation on behalf of Lessor but only if Lessee gives Lessor at least forty-five (45) calendar days prior written notice of such intention to pay and after receipt of said notice Lessor makes no arrangements to address the amount in default. If Lessee makes such payment in compliance with the terms outlined above, the Lessee shall be entitled to recover from Lessor by deduction from any future payments to Lessor, with interest at Ohio's legal rate for judgments, amounts actually paid by Lessee to discharge such obligations.

11

Smith-Goshen Land Owners Group

**Liens Against Lessee**: If any lien or encumbrance is filed against the Leased Premises arising out of or pertaining to any Operations by Lessee or anyone contracting with Lessee, Lessee shall, within forty-five (45) calendar days following the date such lien or encumbrance is recorded, cause such lien or encumbrance to be released from record, and Lessee shall provide Lessor written evidence of such release. Lessee's contention that the lien or encumbrance arises from a bona fide dispute shall not be grounds for Lessee's failure or refusal to remove the lien or encumbrance as required herein.

**Lesser Interest**: If Lessor owns an interest in the Leased Premises that is less than the entire fee simple estate, then all royalties, rentals, and other payments provided for under this Lease shall be paid in the proportion that Lessor's interest in the Leased Premises bears to the entire undivided fee simple estate.

## ARTICLE IX. TERMINATION AND RELEASE

**Termination**: Upon termination of this Lease or any portion thereof for any reason, or upon expiration of this Lease, Lessee shall provide Lessor with a surrender or other written cancellation of this Lease in recordable form, cause such document to be promptly recorded and deliver such document to Lessor within sixty (60) calendar days after the date or termination or expiration. In the event that the Lessee does not comply with the terms of this provision, and there is no bona fide dispute as to the termination or expiration of the lease, Lessee grants to Lessor the right and authority, to take any other steps to evidence the said termination or expiration of this Lease, including but not limited to following the Ohio Affidavit of Forfeiture statute and/or initiating proceedings to quiet Lessor's title, and Lessee shall be obligated to pay all of Lessor's costs, including but not limited to reasonable attorneys' fees as well as any damages accruing to Lessor from Lessee's non-compliance therewith.

**Removal of Equipment**: The Lessee, upon expiration or other termination of this Lease, is obligated to remove all fixtures, improvements, pumps, tanks, tubing, casing, machinery, unused pipelines, rubbish, debris and all other property it has placed on the Leased Premises. This duty must be performed within six (6) months after expiration or other termination of this Lease, or the release of any lands covered by this Lease, or Lessor may claim the property, in whole or in part, or have property and fixtures removed, in whole or in part, at Lessee's sole expense including all of Lessor's reasonable attorneys' fees. This provision may not apply if the Lessee sells equipment to Lessor in a separately negotiated agreement.

**Plugging**: In the event Lessee deems a well is not producing in commercial quantities Lessee shall promptly, properly and effectively plug all wells on the Leased Premises in accordance with the regulations of the State of Ohio.

12

Smith-Goshen Land Owners Group

## ARTICLE X. LESSOR'S INFORMATION RIGHTS, ETC.

**Information Rights**: Lessee grants to Lessor or Lessor's authorized agent, the right to annually inspect, examine and make copies of the Lessee's books, accounts, contracts, and all other records pertaining to production, transportation, sale, and marketing of Leased Products from the Leased Premises at any time during normal business hours. In exercising this right Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee. If as a result of such inspection Lessor discovers a deficiency in payment of royalties or other amounts due to Lessor under this Lease, Lessee will be liable for the amount of the deficiency plus interest at the maximum rate allowed by law. In the event that the deficiency exceeds 125% of the amount actually owed to Lessor, then Lessee shall pay all reasonable costs incurred by Lessor in conducting the inspection that led to discovery of the deficiency.

## ARTICLE XI. ASSIGNMENT OR TRANSFER OF LESSEE INTEREST

**Assignment of Lease**: The rights of either party hereunder may be assigned or otherwise transferred, in whole or in part and as to any horizon, and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns of the parties hereto. Each assignee of all or any portion of the rights of Lessee hereunder agrees to be bound by the provisions of this Lease to the same extent as if such assignee were an original party to this Lease. Lessee and any assignee shall provide to Lessor a true copy of any assignment with recording information reflected thereon (if recorded) and addresses of all assignees within thirty (30) days of making such assignment. Failure by Lessee to satisfy any of the above stated obligations shall constitute a default and be subject to the default provisions of this Lease.

## ARTICLE XII. LESSEE COMPLIANCE

**Laws**: Lessee agrees that everything done by it in connection with this Lease shall be done in a good and workmanlike manner and in accordance with all applicable laws, orders, rules, and regulations, including, without limitation, all applicable environmental rules and regulations. Lessee's failure to comply with any applicable law, regulation, or order shall be a default under this Lease subject to the default provisions in this Lease. In addition to other requirements herein provided, in all instances, Lessee shall undertake the restoration of the Leased Premises to the condition required under the applicable laws of the State of Ohio prior to or within three (3) months following expiration or other termination of this Lease. Lessee shall also use the best industry practices, and all reasonable safeguards to prevent its operations from: (i) causing or contributing to soil erosion, (ii) polluting or contaminating any environmental medium, (iii) decreasing the fertility of the soil, (iv) damaging crops, native or cultivated grasses, trees, or pastures, (v) harming or in any way injuring persons or animals, and (vi) damaging buildings, roads, structures, improvements, farm implements, gates or fences. Lessee shall dispose of salt water, frac water or liquid waste oil and other

13

Smith-Goshen Land Owners Group

waste in accordance with the rules and regulations of the Ohio Department of Natural Resources and all other applicable governmental authorities.

**Insurance**: At any and all times the Lessee or any person acting on Lessee's behalf is on or about the Leased Premises, Lessee agrees that it will carry at least the following insurance coverage with one or more financially sound insurance carriers: a.) Commercial General Liability of $6,000,000 minimum coverage for bodily injury, property damage, contractual liability, products/completed operations and personal injury for all Operations on the Leased Premises, b.) Umbrella Liability Insurance of $6,000,000 minimum coverage, c.) Workers Compensation and Employer's Liability Insurance in the form prescribed by laws of the state of Ohio, d.) Environmental Liability Insurance of $5,000,000 minimum coverage, and e.) Business Auto and Umbrella Liability Insurance of $5,000,000 minimum coverage. Such insurance policies shall waive all rights of subrogation against Lessor. Upon request, in the event the pad location is located on the Leased Premises, Lessee shall furnish Lessor, prior to drilling, with a Certificate of Insurance naming Lessor as an additional insured. Any Certificate of Insurance under this section shall not be reduced or canceled until at least thirty (30) days after Lessor receives written notice of such change or cancellation.

**Indemnity**: Lessee agrees to indemnify, defend, and hold harmless Lessor and Lessor's heirs, successors, agents, assigns, and any other person acting under Lessor's direction and/or control against any and all claims, damages, costs, losses, liabilities, expenses (including but not limited to any reasonable attorneys' fees, expert fees, and court costs) arising out of, incidental to or resulting from the Lessee's Operations and actions, and the Operations and actions of Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under Lessee's direction and control. Lessee's obligations hereunder shall survive the termination of this Lease.

## ARTICLE XIII. FORCE MAJEURE

**Force Majeure**: In the event the Lessee is unable to perform any of the acts to be performed by the Lessee (except payment of money as required under the terms of this lease or required by a court of law) by reason of force majeure, including but not limited to events outside the control of Lessee, acts of God, strikes, riots, and governmental restrictions or any other cause which makes performance of the Lessee's duties unreasonable or impossible, the Lessee shall provide written notice to Lessor within thirty (30) days of the force majeure event. This Lease shall nevertheless remain in full force and effect until the Lessee can perform said act or acts and in no event shall the within Lease expire for a period of one hundred twenty (120) days after the termination of any force majeure. Any delay by a governmental agency beyond ninety (90) days from the date of application to obtain any required permit to drill, complete or re-work a well shall be grounds to invoke force majeure until the permit is granted. If this Lease is the subject matter of any lawsuit, arbitration proceeding or action, then this Lease shall not expire during the pendency of such

14

Smith-Goshen Land Owners Group

lawsuit, proceeding or action, or any appeal thereof, and the time period of the lawsuit, arbitration proceeding or action, or any appeal thereof, shall be added to the term of this Lease, absent such lawsuit, proceeding or action or any appeal thereof. A force majeure event as set forth above shall not exceed a period of thirty six months.

**Coal Force Majeure:** If, after using all its best efforts to obtain a drilling permit should Lessee's operations be delayed, postponed or interrupted as a result of any coal, stone or other mining related operation under any existing and effective lease, permit or authorization covering such operations on the Leased Premises or on other lands affecting the Leased Premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption. In the event a coal force majeure event is declared Lessee shall, upon termination of the conditions which caused the force majeure event or at least once every 12 months, use its best efforts to obtain a drilling permit to develop the Leasehold Acreage.

## ARTICLE XIV. NOTICES AND DEFAULT

**Notice of Default**: This lease shall not be subject to civil action or other proceeding to enforce a claim of default or forfeiture due to Lessee's alleged failure to perform as specified herein, unless Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy Lessor's demand within sixty (60) days from receipt of the notice or such longer time as may be reasonably necessary under the circumstances to satisfy Lessor's demand, but shall not exceed 180 days unless agreed upon by Lessor and Lessee. Any notices required under this Lease shall be deemed sufficiently given if personally delivered or mailed by certified mail, return receipt requested, to the Lessor and/or the Lessee, whichever is applicable, at their respective addresses recited above Article I, or to such other address as either shall notify the other in writing. In the event Lessee assigns all or any part of this Lease without properly providing Lessor with a copy of such recorded assignment which includes the assignee's address, the Lessee shall be jointly and severally liable for all of assignee's obligations under this Lease notwithstanding any language to the contrary.

**Default on Payment Terms**: Failure of Lessee to timely pay Lessor any amounts required under this Lease shall, at Lessor's option, be deemed a default by Lessee subject to the default notice requirements set forth in this Lease.

**Execution and Recording**: The Lessor and Lessee shall execute two copies of this Lease and Memorandum of Lease. The Memorandum of Lease will be recorded and a copy provided to Lessor within 30 days of receipt of the recorded document by Lessee

**Reports and Documents**: Upon written request by Lessor, a copy of all documents Lessee files with the Ohio DNR Division of Oil and Gas Resources Management, pertaining to this Lease shall be delivered to the Lessor within forty-five (45) days of

15

Smith-Goshen Land Owners Group

filing with the Ohio DNR Division of Oil and Gas Resources Management and Lessee shall give Lessor at least ten (10) days advance written notice of the spud date and commencement date of any drilling on the Leased Premises. Lessee shall provide Lessor written notice of any judicial proceedings brought to the attention of Lessee affecting the Leased Premises.

## ARTICLE XV. LESSEE COVENANTS

**Lessee Covenants**: Any and all duties and obligations Lessee has are under implied covenants to benefit landowners and covenants under this lease. The Lessee will utilize current and future technologies to develop the property as operator sees fits after drilling an initial well, as a prudent operator all reasonable efforts to maximize the development of the resources associated with the Leased Premises in a prudent and efficient manner will be employed with the intent and purpose to cause all of Lessor's acreage to be included in one or more units of production, primarily implementing horizontal drilling techniques, but not excluding vertical techniques so as to maximize production recovery of all the oil and gas resources and to minimize or eliminate any "orphan" acreage. It is mutually agreed and understood that the operator, but for force majeure or government prohibitions, will use its best efforts as a prudent operator to fully produce and include all of Lessor's acreage in one or more operating units.

## ARTICLE XVI. ACTIONS AND PROCEEDINGS

**No Arbitration**: Arbitration shall not be a remedy for dispute resolution under this Lease.
**Governing Law and Ohio Courts**: This Lease shall be governed in accordance with the laws of the State of Ohio. Any actions or proceedings arising in connection with this Lease or performance thereunder shall be ascertained and determined by the Ohio state court in the county where the Lease is recorded.

## ARTICLE XVII. HEADINGS and MISCELLANEOUS

**Section Headings**: The Section Headings contained herein are inserted for convenience only and shall not control or affect the meaning or construction of any provision.

**Entire Contract**: The entire agreement between Lessor and Lessee is embodied in this Lease, Memorandum, and Letter of Understanding attached hereto. In the event of an inconsistency the Letter of Understanding shall control. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease. Initial: _ D _ _ L _ _ K _ _____

**Severability**: If any portion of this Lease is held invalid or unenforceable, the other provisions shall remain in full force and effect.
**Confidentiality Clause:** Lessor and Lessee recognizes and acknowledges the competitive and confidential nature, as well as, the economic value of the terms and

16

Smith-Goshen Land Owners Group

conditions incorporated herein and the damage that could result to Lessor and/or Lessee if said terms and conditions were disclosed to any third party. Lessor and Lessee hereby agrees to maintain said terms and conditions secret and confidential and shall not disclose same to any third party other than the family, financial, legal or other professional advisors.

## ARTICLE XVIII. DEFINITIONS

**Commercial Quantities**: "Commercial Quantities" shall mean production of quantities of Leased Products sufficient to yield a profit to the Lessee over operating, marketing and related overhead expenses.

**Operations**: "Operations" shall mean any action done by Lessee (or by Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under the Lessee's direction or control) related to or in connection with the activities contemplated by this Lease.

**Commence Operations**: Commencement of operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein described premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed promptly by a drilling rig for the spudding of the well to be drilled.

**Completion of Operations**: "Completion of Operations" shall mean the completion of all planned drilling operations as to equipment and facilities relating to drilling, including any associated pits, tanks, or other facilities no longer needed for production, or in the event of a dry hole, all such facilities.

**Affiliate**: An "Affiliate" is any entity in which Lessee, or any parent company, subsidiary, or affiliate of Lessee, owns an interest of more than ten percent (10%) or exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation or other entity which owns an interest in or exercises any degree of control, directly or indirectly, over Lessee.

**Pad**: "Pad" is defined as any construction designed to facilitate one or more wells in a concentrated surface area.

**Production Unit**: "Production Unit" is defined as a unit of one or more tracts which are brought together by the Lessee for the purpose of forming a drillsite complying with the state requirements for drilling one well in order to develop the lands as if they were under a single lease.

**Pooled Unit**: "Pooled Unit" is defined as land described in this Lease which Lessee has pooled, prior to drilling, with contiguous land covered with other leases so as to establish one or more pooled development units. A Pooled Unit may also be a production unit.

17

Smith-Goshen Land Owners Group

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth above.

LESSOR:

DALLAS C. KEMP

LESSEE:

Rice Drilling D, LLC

Toby Z. Rice
Chief Executive Officer

18

Smith-Goshen Land Owners Group

## ACKNOWLEDGEMENT

STATE OF OHIO                    )
                                 )
COUNTY OF Belmont                )

On this 6th day of November, 2012, before me, the undersigned Notary Public for the State of Ohio, personally appeared the above named DALLAS C. KEMP, single, the Lessor, who acknowledged and signed the foregoing instrument, and that the same is their free act and deed individually.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal this _____ day of November, 2012

MISTY A KIDD
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
January 19, 2017
Recorded in
Belmont County

Notary Public _____

Printed Name: Misty A. Kidd

My Commission Expires: Jan. 19, 2017

## CORPORATE ACKNOWLEDGEMENT

STATE OF PENNSYLVANIA            )
                                 )    ss.:
COUNTY OF WASHINGTON             )

On this the 20 day of August, 2013 before me, the undersigned authority, personally appeared Toby Z. Rice, who acknowledged himself to be the Chief Executive Officer of Rice Drilling BD LLC, and that he as such Chief Executive Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Chief Executive Officer.

My commission expires_____        Signature: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Colin P. Peck, Notary Public
North Strabane Twp., Washington County
My Commission Expires April 22, 2014
Member, Pennsylvania Association of Notaries

19

Smith-Goshen Land Owners Group

## **EXHIBIT A**

## LEGAL DESCRIPTION OF THE LEASED PREMISES

| **Tax Parcel ID Number** | **Section** | **Township** | **Range** | **Gross Acreage** | **Deed Book Volume & Page** |
|---|---|---|---|---|---|
| 09-00409.001 | 2 | 7 | 5 | 37.28 | |
| 09-00465.000 | 8 | 7 | 5 | 56.27 | |
| 09-00433.000 | 8 | 7 | 5 | 59.90 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

20

## Letter of Understanding

The undersigned Lessor (herein referred to as "Lessor"), and Rice Drilling D, LLC (hereinafter "Lessee") hereby engage in this Letter of Understanding ("LOU") to set forth procedures that will be followed by Lessee and Lessor in connection with the title review of the oil and gas rights underlying and in connection with the property which is subject to that certain oil and gas lease ("Lease") contemplated between Lessor and Lessee, as to the period of Lessee due diligence, and subject to the terms contained herein, the payment of the bonus amount to the Lessor.

1)     **Due Diligence.** Lessee is to complete its due diligence review for determination of Defensible Title within a period of one hundred twenty (120) business days following the date of execution and delivery of the Lease by Lessor ("Due Diligence Period"). "Defensible Title" is defined as title of record, subject to and including, but not limited to, the following criteria:

    a.     As to each described parcel, the Lessor owns one hundred percent (100%) of the working interest in and to the oil and gas rights underlying and in connection with the property subject to the Lease, and that the Lessor has the unencumbered rights to lease same.

    b.     The rights granted by Lessor to Lessee are free and clear of all liens and other encumbrances which may adversely affect (i) the Lessor's ability to grant all rights provided for in the Lease, or (ii) Lessee's ability to fully enjoy the rights granted in the Lease, including but not limited to mortgages. In the event a mortgage requires the consent of a lender, mortgagor, or any other party, the lack of such consent shall be considered a Title Defect.

    c.     The Lease has been properly executed and acknowledged by Lessor in a manner sufficient to convey the rights contemplated by the Lease to Lessee and the Memorandum of Lease is in recordable form according to the laws of the State of Ohio, or other relevant jurisdiction.

    d.     The evidence of a prior lease that includes or encumbers the oil and gas rights to be granted to Lessee shall be considered a Title Defect. The existence of surface or shallow easements, including utility easements, which do not materially impair Lessee's rights under the Lease according to the Ohio Marketable Title Act, and the existence of a prior coal reservation will not be deemed a Title Defect.

    e.     The oil and gas rights underlying and in connection with the property subject to the Lease are not affected by any other encumbrances, instruments, obligations, defects and irregularities which: (i) interfere with the operation or use of the subject property or the oil and gas rights subject to the Lease; (ii) would prevent Lessee from receiving the proceeds of production from the oil and gas rights subject to the Lease; (iii) would reduce the net mineral acres conveyed by Lessor

to Lessee below that which is noted in the Lease; (iv) would reduce the interests of Lessee with respect to hydrocarbons produced from the subject property or the oil and gas rights in connection with the Lease below a net revenue interest of 80%; or (v) would increase the share of the costs and expenses that Lessee would be obligated to pay under a Lease without a proportionate increase in the net revenue interest for such Lease.

"Title Defect" shall be defined as an event or situation that causes the oil and gas rights underlying and in connection with the property subject to the Lease, or a portion thereof, to lack Defensible Title.

During the Due Diligence Period, Lessor shall, upon request from Lessee, execute all reasonable documents, curative or otherwise, to further the intention of the parties hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary contained within this LOU, Lessor expressly acknowledges and agrees that determination of Defensible Title under this LOU shall be in Lessee's reasonable discretion. Lessor hereby waives any and all implied covenants now or hereafter existing relating to any obligations of Lessee under the terms and conditions of this LOU but no other documents.

The parties also expressly acknowledge and agree that if Lessee elects to consummate a lease that has Defensible Title with any lessor (including Lessor) that is part of the group known as the "Smith-Goshen Group" of Belmont County, Ohio that is executing this LOU contemporaneously with Lessor, then Lessee must offer to consummate leases with all members of the "Smith-Goshen Group" whose leases have Defensible Title, including Lessor (provided that Lessor has Defensible Title to the Lease). Notwithstanding the foregoing, Lessee shall have the right to terminate the LOU for any reason or no reason during the Due Diligence Period, provided that Lessee has performed its due diligence review of all leases (including the Lease) submitted by lessors (including Lessor) in the "Smith-Goshen Group", and in such event, Lessee shall provide written notice to Lessor of such termination ("Termination Notice"); provided, however, if lessors in the "Smith-Goshen Group" hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title, then within thirty (30) days after delivery of the Termination Notice, Lessee agrees to pay all such lessors, including Lessor, with leases having Defensible Title the sum of One Thousand Dollars ($1,000.00) per net acre having Defensible Title as liquidated damages and not as a penalty (the "Termination Payment"). The parties agree that no lessor in the "Smith-Goshen Group", including Lessor, shall have the right to cure a Title Defect within the Lessor Cure Period (defined below) under Section 2 below if Lessee elects to terminate the LOU in accordance with the terms of this Section 1 and it is determined by Lessee within the Due Diligence Period that lessors in the "Smith-Goshen Group" do not hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title. Upon delivery of the Termination Notice and payment of the Termination Payment, if applicable, Lessee shall have no further obligation, for payment or otherwise, to Lessor or other lessors in the "Smith-Goshen Group".

2)      **Bonus Payment.** Upon execution and delivery of the Lease by Lessor, Lessee shall pay an initial non-refundable consideration in the amount of One Dollar ($1.00) per parcel

consideration paid to and acknowledged by Lessor. Upon: (i) satisfactory completion of the Due Diligence Period (and any applicable cure periods and cure requirements provided to Lessor as specified in this Section 2); (ii) determination by Lessee that Lessor has Defensible Title to the oil and gas rights subject to the Lease; and (iii) Lessee's election to consummate the Lease, Lessee shall pay to Lessor Six Thousand Two Hundred and Fifty Dollars ($6250.00) per net mineral acre conveyed to Lessee, pursuant and subject to the terms contained in this LOU. For the avoidance of doubt, the parties expressly acknowledge and agree that Lessee shall have the right to terminate this LOU for any reason or no reason, subject to Section 1 above, in which event Lessee shall not be required to consummate the Lease with Lessor.

Subject to Lessee's right to terminate this LOU in accordance with Section 1 above and the limitations on the right of a lessor within the "Smith-Goshen Group", including Lessor, to cure a Title Defect set forth therein, the parties agree as follows:

a. If Lessee determines that there is a Title Defect(s) affecting the Lease, Lessee shall so advise the Lessor, in writing as soon as practical, but in no event later than the expiration of the Due Diligence Period, of the Title Defect(s). When notifying Lessor of a Title Defect, Lessee shall provide Lessor with a description of the Title Defect and any supporting documentation in its possession. In the event Lessor receives written notice from the Lessee of a Title Defect, Lessor shall have one hundred and twenty (120) business days from the date of receipt ("Lessor Cure Period") of such written notice to cure the Title Defect in a manner satisfactory to the Lessee, in its reasonable discretion. If the Title Defect is cured to the satisfaction of the Lessee within such Lessor Cure Period, then (i) Lessee will pay the Lessor the bonus payment corresponding to the acreage affected by the Title Defect within thirty (30) business days following the date such Title Defect was cured to Lessee's satisfaction, or (ii) as applicable, the Termination Payment corresponding to such acreage within thirty (30) business days following the date such Title Defect was so cured, consistent with Section 1.

b. After the Due Diligence Period and all applicable cure periods specified herein have expired, and if Lessee in its reasonable discretion determines that the Lease lacks Defensible Title, upon written notification of rejection from Lessee by regular mail to Lessor, this LOU shall terminate and shall be of no force and effect, and Lessee shall have no further payment obligation to Lessor.

3)    **Exclusivity.** Lessor agrees that during the Due Diligence Period, it will not solicit, discuss, negotiate for or enter into any agreement or arrangement with a third party for the lease of the oil and gas rights and interests set forth in the Lease.

*[remainder of page intentionally left blank; signature page to follow]*

In witness whereof, the parties have executed this LOU as of the __10__ day of __December__ , 2012.

LESSOR(S):

_Dallas C. Kemp_
DALLAS C. KEMP


RICE DRILLING D LLC

BY: TOBY Z. RICE
ITS: CHIEF EXECUTIVE OFFICER


---------------------------------------------------------------------------------------

FOR INTERNAL USE ONLY

| | |
|---|---|
| Lease # __0196__ | Leasehold Acres __193.360 Acres__ |
| Ownership Interest _____ | Total Payment Amount _____ |

**EXHIBITS**

A. Form of Lease

B. IRS Form W-9 Request for Taxpayer Identification Number and Certification

C. Memorandum of Lease

**TAX PARCEL # INFORMATION SHEET**

**LEASE #          0196**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tax Parcel ID # | 09-00409.001 | Lease Acres | 37.280 | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | 09-00433.000 | Lease Acres | 59.900 | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | 09-00441.000 | Lease Acres | 5.690 | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | 09-00465.000 | Lease Acres | 56.270 | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | 09-01272.000 | Lease Acres | 34.220 | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |

Smith-Goshen Land Owners Group

## PAID-UP OIL AND GAS LEASE
### Lease Date: November 10, 2012

This is an oil and gas lease (the "Lease") made this 10th day of November, 2012, between <u>JOHN A. SIKISH & LUCINDA M. SIKISH A/K/A CINDY M. SIKISH, husband and wife</u> herein called "Lessor" (collectively if there is more than one) whose address is <u>65955 PLAINFIELD ROAD, BELMONT, OHIO 43718,</u> and Rice Drilling D, LLC, hereinafter called "Lessee", whose address is 171 Hillpointe Drive, Suite 301, Canonsburg, PA 15317.

### ARTICLE I. GRANT OF LEASE

Lessor, in consideration of the payments described herein and the covenants and agreements hereafter contained, hereby leases and lets exclusively to the Lessee all the oil, gas, minerals and their constituents (not including coal) underlying the land described below for the sole purpose of exploring for, drilling, operating, producing and gathering the oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith other than as reserved unto Lessor below (herein called "Leased Products"). Together with such exclusive rights as may be necessary or convenient for the Lessee to explore for, develop, produce, measure, and market production from the Leasehold and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploration tests; to drill (either vertically, horizontally, or directionally), maintain, operate, treat, vent, dewater, cease to operate, plug, abandon, and remove wells; to stimulate or fracture all seams or other strata or formations; to use or install roads, electric power, telephone facilities (including data acquisition), compression facilities and collection facilities for use in the production, transportation and marketing of products from the Leasehold and from neighboring lands across the Leasehold, and such rights shall survive the term of this agreement for so long thereafter as operations are continued; to use oil and gas free of cost, to operate, maintain, repair, store, and remove material and equipment relating to the operations. Lessor shall not be responsible for any costs with respect to Lessee's Operations. Lessee is prohibited from performing any activity on the Leased Premises which is not expressly permitted pursuant to the terms and conditions of the Lease.

<u>Description of the Land Included in the Lease</u>: The oil, gas, mineral interests and land included in this Lease (herein called the "Leased Premises") is located in the County of Belmont, State of Ohio, with a permanent parcel number (or numbers) as follows: <u>33-00016.000.</u>

1

Smith-Goshen Land Owners Group

The Leased Premises contain <u>76.346</u> gross acres. A legal description of the Leased Premises is attached hereto and made a part hereof as Exhibit A,

## Reservations

(a) <u>Lessor's Reserved Rights</u>: Lessor reserves all rights not specifically granted to Lessee in this Lease. Lessor specifically reserves the rights to all products contained in any formation: (1) from the surface of the Leased Premises to the top of the formation commonly known as the Marcellus Shale, (2) in any and all formations below the base of the Marcellus Shale to the top of the formation commonly known as the Utica Shale, and (3) in all formations below the base of the Utica Shale. Notwithstanding anything to the contrary, Lessee is specifically granted the right to penetrate and drill through the shallower formations in order to drill and produce the Leased Products and the Leased Premises. Lessor also reserves a right of way on all lands granted hereunder and the right to use the Leased Premises and any improvements thereon for any and all other purposes, so long as that right of way does not cause unreasonable interference with Lessee's operations or pose a safety concern to Lessee. Lessee agrees not to unreasonably interfere with the use and enjoyment of said land by Lessor and Lessor's family, agents, employees, invitees, and guests and to comply with all other specific provisions herein relating to the use of the land.

(b) <u>Other Minerals Reserved</u>: Lessor expressly excludes from this Lease and reserves all minerals of every kind and character in, on and under the Leased Premises except the Leased Products herein defined. This includes but is not limited to all of the sulfur, coal, lignite, uranium and other fissionable material, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances (except the Leased Products described above) presently owned by Lessor in, under, or upon the Leased Premises. Lessor also reserves rights of ingress or egress and use of the Leased Premises by Lessor or its lessees or assignees for purposes of exploration for and production and marketing of the materials and minerals reserved hereby which rights shall not unreasonably interfere with the rights of Lessee.

## ARTICLE II. TERM OF LEASE

<u>Lease Term</u>: This Lease shall become effective on the date it is signed, which date will be inserted below the title of this document on page 1 (herein called the "Lease Date") and remain in force for a Primary term of five years from the Lease Date. Subject to the provisions hereinafter contained, this Lease shall be for a term of five (5) years from the Lease Date (herein called the "Primary Term") and for as long thereafter as operations are conducted on the Leasehold or as long as a well capable of production in Commercial Quantities is located on the Leasehold or on lands unitized or combined with the Leasehold, or for as long as extended by other provisions herein.

2

Smith-Goshen Land Owners Group

**Option to Extend the Primary Term**: Lessee is given the option to extend the Primary Term of this Lease for an additional five (5) year period. To exercise this option Lessee must notify Lessor in writing of Lessee's intent to exercise the option at least ninety (90) calendar days before the expiration of the Primary Term and Lessee must pay to Lessor, at any time prior to the termination of the Primary Term, a lease bonus for the five (5) year extension period equal to the signing bonus set forth in this Lease.

## ARTICLE III. PAYMENTS

**Signing Bonus Payment**: Lessee agrees to pay Lessor, proportionate to Lessor's percentage of ownership, a lease signing bonus of Six Thousand Two Hundred and Fifty dollars ($6250.00) for each net mineral acre contained within the Leased Premises. Such payment shall be according and pursuant to the Letter of Understanding to be executed by Lessor. Lessor understands that payment of the signing bonus will not be paid until title is cleared and certified title is obtained by an oil and gas attorney of Lessees choosing.

In the event Lessee believes in good faith that a title defect exists for the Leased Premises then Lessee shall provide written notice to Lessor as soon as practical, but in no event later than the time for payment set forth in the Letter of Understanding, of the title defects which render title unacceptable to Lessee. In the event a title defect exists, Lessee shall provide a description of the title defect and any supporting documentation in its possession. Lessor shall have a 120 business day cure period from the date of receipt of written notice to cure the defect in a manner satisfactory to the Lessee. If the title defect is cured to the satisfaction of Lessee within the 120 business day cure period the bonus payment shall be paid to Lessor within 30 days following the date the title defect is cured.

**Royalty Payments**: The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arms length transaction at the point of sale for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called the "Royalty Payment"). Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. So long as payment exceeds fifty dollars ($50.00) payment of Royalty for oil, gas, other hydrocarbons and by-products marketed during any calendar month shall be on or before the 30th day after receipt of such funds by the Lessee. Each Royalty Payment shall be accompanied by a stub, schedule, summary, or remittance identifying the Lease and showing the gross amount and proceeds paid to Lessee for all Leased Products produced. All Royalty Payments shall be paid to

3

Smith-Goshen Land Owners Group

Lessor at the address recited above Article I in this Lease or at such other address as shall be provided by Lessor to Lessee in writing.

**Shut-in Royalty Payment:** After the expiration of the Primary Term of this Lease if a well drilled on the Leased Premises or lands pooled therewith which is capable of producing gas in Commercial Quantities but the production thereof is shut-in, shut-down or suspended for lack of any available market for production for a period of time exceeding three consecutive months the Lessee shall pay a "shut-in" royalty equal to the sum of twenty-five dollars ($25.00) per net mineral acre each month until production is re-established (or Lessee surrenders the Lease). Lessee shall remit all shut-in payments to Lessor at the address provided in this Lease on or before forty-five (45) days after the third month after the date on which the well is shut-in. The payment of shut-in royalties will keep this Lease in effect after the Primary Term, however this Lease will not be kept in force solely by shut-in royalty payments for a period longer than a total of thirty six (36) months whether cumulative or not. A shut in solely due to pipeline or equipment breakage, damage or malfunction, upgrade, maintenance or safety during the drilling or completions of a new well shall not be calculated towards the three (3) year aggregate limitation on shut in, provided that Lessee exercises good faith and due diligence to correct the condition.

**Payment in Lieu of Free Gas:** In the event any well is drilled upon the Leased Premises or any portion thereof, Lessee shall pay annually to Lessor, which the well pad is located on, in lieu of any right to free gas, a sum equal to the value of three hundred fifty thousand (350,000) cubic feet of natural gas produced from each such well located on the Leased Premises up to a maximum of four wells. Said amount shall be paid in annual installments, with the value based upon the prior twelve months average gross price received by Lessee for gas sold from the Leased Premises.

### ARTICLE IV. POOLING AND UNITIZATION

**Pooling and Unitization:** Subject to the limitations below, Lessee is granted the right to pool or unitize, prior to or after drilling, all or part of the land covered by this Lease with any contiguous land so as to establish a pooled unit or units (herein called "Pooled Units"). When designating Pooled Units the Lessee shall make reasonable efforts to avoid excluding small or irregular shaped portions of the Leased Premises and to form Pooled Units in the shape of a square or rectangle. Lessee shall execute in writing an instrument identifying and describing the pooled acreage being drilled for, the leases included in the Pooled Unit, the formations and depths covered by the Pooled Unit, and the substance (either oil, gas or both) and file such instrument for record in the county or counties in which the pooled land is situated prior to drilling on the Pooled Unit. The Pooled Unit shall be effective on the date of execution of the declaration of unit. Lessor shall be provided a copy of such recorded instrument, and all amendments thereto by Lessee. No Pooled Unit for any vertical well with no horizontal drilling component which includes any portion of the Leased Premises shall exceed eighty (80) contiguous acres without the written consent of Lessor. No Pooled Unit for any well that includes lateral or horizontal drilling shall exceed six hundred forty (640) acres with

4

Smith-Goshen Land Owners Group

a ten percent (10%) tolerance without the written consent of the majority of the Lessors in the Unit unless any additional acreage added to the unit allows for further development of the unit. A majority will be determined upon the Lessors proportionate share of the total acreage owned by in the unit. Each acre, or fraction thereof, equals one vote towards consent; one acre equals one vote, 100 acres equals 100 votes. In the event the unit exceeds 640 acres with a 10% tolerance, 80% of the acreage in the unit (as measured with the one acre one vote standard as set forth above) must agree to the unit size. Without the prior written consent of all Lessors in the Unit, a unit shall not exceed 1000 acres. If a greater amount of acreage than that set forth in the designated limits provided herein is necessary to adequately develop the unit than the designated number of acres the unit may be increased. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created so long as that change is in order for Lessee to further develop and drill the Unit. The drilling, operations in preparation for drilling, production from, or payment for Royalty or Shut-In Royalty for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold. There shall be allocated to the Leased Premises included in a Pooled Unit the proportion of the production from the Pooled Unit that the number of net mineral acres covered by the Leased Premises and included in the Pooled Unit bears to the total number of net mineral acres in such Pooled Unit; and royalties shall be paid hereunder upon that portion of such production so allocated.

**Pugh Clause**: Upon expiration of the Primary Term this Lease shall automatically terminate and be of no further force or effect as to any portions of the Leased Premises not included within any Production Unit and those formations and horizons 100 feet below the deepest depth drilled. In addition, at the end of the Primary Term or any time thereafter, whichever is applicable, this Lease shall terminate as to all depths and horizons contained in a Production Unit from which oil and gas is capable of being produced in Commercial Quantities

## ARTICLE V. WATER PROTECTION

**Fresh Water Damage Protection**: In the event any activity carried on by the Lessee pursuant to the terms of this Lease adversely damages, disturbs, or injures the quality or quantity of Lessor's fresh water well, spring or source located on the Leased Premises, Lessee shall, at its sole cost and expense, take all reasonable steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all related costs of repair and maintenance to be paid by Lessee.

**Water Testing**: Lessee shall maintain the quality and quantity of Lessor's water supply (wells, springs or other domestic water source) to be measured by testing the Lessor's supply prior to surface disturbance on the Leased Premises or on any lands pooled or unitized therewith located within a radius of 2000 feet surrounding the wellhead. All testing shall be conducted by a certified independent testing laboratory. Testing must be for the entire Prominent Indicator Parameters of chemicals and agents utilized by

5

Smith-Goshen Land Owners Group

Lessee in its Operations and the burden shall be upon Lessee to provide evidence of all such chemicals and agents in order for the testing agent to adequately test the water. Lessee shall pay all costs of testing and Lessor shall be provided complete copies of any and all testing results and data, and shall have full rights to contact the testing lab for inquiry and information. Lessee shall cooperate with Lessor to obtain any favorable pricing extended to it by a certified testing laboratory should Lessor desire to obtain water testing outside of the testing provided for herein. Should Lessor experience a material adverse change in the quality of Lessor's water supply, during or immediately after the completion of Lessee's drilling operations; Lessee shall, within 48 hours of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Any pollution or reduction of any water supply after operations commence will be presumed to be the result of Lessee's operations unless Lessee can prove otherwise. If Lessor's water supply is polluted, reduced, or is otherwise adversely or materially affected as a result of Lessee's Operations, Lessee shall take any and all steps to restore water quality and quantity to its pre-drilling condition or fully compensate Lessor for the damage and inconvenience caused thereby. During any period of remediation, Lessee, at its sole expense, agrees to provide Lessor with an adequate supply of potable water consistent with Lessor's use of his/her water supply prior to Lessee's Operations on the Leased Premises or on lands pooled or unitized therewith.

## ARTICLE VI. LAND PROTECTION

**Non-Disturbance**: Lessee and its employees and authorized agents shall not disturb, use or travel upon any of the land of Lessor other than that land being used in its operations being conducted pursuant to this Lease.

**Damages:** The Lessee shall be liable to Lessor and pay market or replacement cost for any and all damages to the Leased Premises resulting from Lessee's Operations. Damages include but are not limited to any damage to Lessor's water, growing crops, trees, livestock, fences, buildings, water springs, soil, septic systems, agricultural fields and lands and any other property connected with drilling, operating, producing, gathering, or any geophysical or exploratory work conducted by or for the Lessee. Lessee shall promptly replace any drain tile and barriers, including but not limited to, fences, gates and walls removed or damaged by the Lessee during its Operations on the Leased Premises. Whenever a Pad has been installed or later repaired on the Leased Premises, Lessee, at its sole expense, shall restore the surface of the Leased Premises as near as practicable to the condition it was in prior to such work being undertaken. Upon Completion of all planned Operations on the Leased Premises, Lessee will within three (3) months undertake restoration of the Leased Premises to reclaim the Leased Premises to as near as practicable the pre-drilling condition.

**Irrigation and Agricultural Activities:** Lessor reserves the right to initiate or continue irrigation and agricultural activities (including timbering) on the Leased Premises so long as those agricultural activities do not interfere with the limits of disturbance of Lessee and Lessee will use all reasonable efforts to accommodate Lessor's

6

Smith-Goshen Land Owners Group

agricultural use. Subject to Lessee's prior approval and in accordance with Lessee's safety and construction standards, Lessor shall have the right to install and/or construct drainage or drain tile systems across, atop or under any pipeline installed by Lessee in a manner that does not interfere with Lessee's use of said pipelines.

**Agricultural Activities:** Lessee will plan its surface Operations in a manner that will reduce or minimize intrusion into crop fields, hay lands, pasture lands, or any other agricultural activity which is engaged in by the Lessor. In addition to the Damages Provision contained in this Lease, in the event that the Lessee needs to injure crops in order to conduct surface Operations, Lessee shall fully compensate Lessor for all damages and loss of crops at current market value so long as those crops are not located on a Well Pad (hereinafter defined) which Lessor is receiving payment for.

**Agreement as to Location of Operations:** Before Commencing Operations on the Leased Premises or any lands pooled therewith, Lessee and Lessor shall mutually agree in writing on the location and size of all well sites, pads, meters, roads, pipelines, fences, gates, buildings, electrical wires, and other equipment, supplies and facilities which Lessee wishes to locate on any portion of the Leased Premises so as to minimize disruption of Lessor's use of the Leased Premises; provided, however, that Lessor's consent shall not be unreasonably withheld or unreasonably delayed. Any wells, pads, roads, pipelines, gates, electrical wires, and other equipment, supplies and facilities Lessee locates on the Leased Premises will be maintained in good repair at all times by Lessee at its sole expense.

**Siting/Spud Fee:** Lessee shall pay to Lessor in consideration for damage to the Leased Premises the sum of thirty thousand dollars ($30,000) for a Well Pad located on the Leased Premises contemporaneously with Lessee disturbing any land where a pad for a horizontal well is to be located on the Leased Premises (herein called the "Pad Payment") for a well pad not to exceed five (5) acres. If any well pad exceeds five (5) acres then for each additional acre of disturbed land the Lessee shall pay eight thousand dollars ($8,000). A well pad includes any acreage for pits, tanks, equipment, roadways and other operations servicing the wells on that pad. Lessee shall pay Lessor a separate Pad Payment for each pad constructed on the Leased Premises.

**Restrictions on Location of Operations:** Without a separate written agreement between the Lessor and the Lessee, no pump stations, tanks, batteries, pipelines, roads, telephone and power lines, ponds, water holding facilities, dryers, separators or other equipment or facilities shall be located on the Leased Premises unless they are for the purpose of transporting, processing or treating Leased Products from the Leased Premises or lands pooled or unitized therewith, and the afore listed items shall not be located nearer than (and no well shall be drilled nearer than) one thousand (1,000) feet from any dwelling or residential structure or five hundred (500) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent. In order to effectively develop the Leasehold Premises it is understood that it is in the best interest of both Lessor and Lessee to work together in agreeing upon the location of operations on the Leasehold Premises. Should there be

7

Smith-Goshen Land Owners Group

no alternate location outside the aforementioned "buffer zones" then Lessee and Lessor shall agree to a location within the buffer zones. There shall be no compressors located on the Leased Premises, unless the compressor is solely used for the well located on the Leasehold Premises or a well located on a property pooled or unitized with the Leasehold Premises, unless Lessor consents in a prior separate written agreement. Any compressor operations permitted hereunder shall be designed and installed utilizing means to minimize noise, including but not limited to, sound enclosures and barriers, and quiet motors.

**Restrictions on Lessee's Use of Leased Premises**: Unless Lessor consents in a separate written agreement, the Lessee shall under no circumstances:

      (a) Use the Leased Premises for the disposal of any drill cuttings, brine or other liquids, or the permanent storage or disposal of any liquids or solids.

      (b) Use the Leased Premises or any portion thereof, surface or subsurface, for gas or oil storage purposes.

      (c) Use any water from the Leased Premises, surface or subsurface, or drill any well to take water from or inject any substance into the Leased Premises

      (d) Install or dig any pits other than drilling pits (not permanent storage pits) on the Leased Premises

**Pipelines and Utility Lines:** In the event that pipeline is necessary then Lessor and Lessee shall enter into a separate pipeline right of way agreement which is consistent with the terms and conditions of this Lease including location approval. In addition to the restrictions set forth in this Lease, Lessee agrees to bury any pipelines constructed on the Leased Premises at a depth, which shall in all cases be below tillage and drainage tile depth (at least 36 inches). Lessee agrees to restore the surface as near as practicable to the condition it was in prior to such installation. Lessee shall comply with all applicable rules, regulations, and statutes regarding pipeline construction, maintenance, and operation. Absent a separate right of way agreement Lessee's right to use said pipelines terminates when Lessee's production from the Leased Premises or lands unitized with the Leased Premises permanently ceases. Any utility lines used by Lessee in its Operations shall be buried upon the written request of Lessor. Such utility lines shall be removed upon termination of this Lease, unless Lessor agrees in writing to have such utility lines kept in place. Lessee shall provide Lessor a plat map showing the location and depth of all buried utility lines and pipelines.

**Fencing:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to fence all wells, well sites, tank batteries, pits, separators, drip stations, pump engines, or other equipment permanently located on the Leased Premises. All fences must be kept in good repair by the Lessee.

**Gates:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to construct gates on all access roads and provide an access key or double lock system allowing access by both Lessor and Lessee. Gates must be closed and locked at all times when equipment is not being accessed and when Lessee's personnel are not on the Leased Premises.

8

Smith-Goshen Land Owners Group

**Roads:** Roadways or drives constructed by Lessee on the Leased Premises during its Operations shall not exceed fifty (50) feet in width or a minimum width required to perform required Operations. After the completion of all planned operations on the Leased Premises, in the event of a producing well on the Leased Premises, any permanent access road for well servicing purposes shall be a maximum of twenty (20) feet or a minimum width required to perform maintenance or other Operations. Lessee agrees to improve, construct or maintain all roads used by it in good repair utilizing shale, gravel, or crushed stone, culverts and supports as necessary to provide a smooth, rut-free all-weather surface. When such roads are no longer being used, Lessee agrees, upon Lessor's request, to remove toppings and to restore the surface as nearly as practicable to its former condition. Lessee shall not use shale, gravel, or crushed stone sourced from the Leased Premises without the prior written consent of Lessor. Lessee shall prevent its employees, agents and contractors from operating vehicles in a negligent manner or at speeds in excess of twenty-five (25) miles per hour while on the Leased Premises.

**Pits:** Any pit permitted under this Lease will conform to all applicable regulatory requirements (state, local, and federal) and will conform to the best industry practices. Lessee will immediately notify all applicable regulatory authorities and Lessor of any damage to such facilities.

**Soil Testing:** For areas within the Limits of Disturbance upon Lessor's written request, Lessee shall, at its sole cost and expense, have Lessor's current soil tested by an independent third party agreed upon by Lessor and Lessee: (1) prior to the commencement of spudding any well on the Leased Premises, (2) twelve (12) months from the date of completion of any well on the Leased Premises, (3) twenty-four (24) months from the date of completion of any well on the Leased Premises, and (4) within sixty (60) days following the completion of drilling Operations on the Leased Premises. All tests provided for herein must meet all applicable EPA requirements and Lessor shall be provided complete copies of any and all testing results and data. If such test results reflect a material adverse change in the Lessor's soil quality, then Lessee shall use its best efforts to return the soil to its pre drilling condition.

**Timber:** Lessee shall notify Lessor in writing at least forty-five (45) calendar days prior to any removal by Lessee of marketable timber (marketability to be within the reasonable discretion of a certified professional forester). At Lessor's option, Lessor may choose to harvest timber, which shall be complete by the end of the 45 day period, or Lessor may require an appraisal on the timber by a qualified independent certified, professional forester, at Lessee's expense, and Lessee shall pay Lessor the appraised value for the timber identified prior to its removal by Lessee.

**Firewalling and Maintenance of Production Equipment:** Dikes, firewalls or other methods of secondary containment must be constructed and maintained at all times around all tanks, separators and receptacles so as to contain a sufficient volume of liquid to accomplish the intended purposes.

9

Smith-Goshen Land Owners Group

**Maintenance and Repair:** Maintenance and repair of roadways and all other facilities used by Lessee in connection with this Lease shall be the sole responsibility of the Lessee. If Lessor sends written notice to Lessee informing Lessee of any repairs or other maintenance to roads or other facilities that the Lessee has failed to address and the Lessee fails to initiate the repair or other maintenance within thirty (30) days of the written notice being sent or fails to complete the repairs or other maintenance within sixty (60) days of the notice being sent (if the repairs are capable of being completed within the 60 day period) then Lessor reserves the right to repair and maintain the roadways and the Lessee agrees to fully reimburse Lessor for the cost of the maintenance or repair undertaken by the Lessor.

**Hydraulic Fracturing:** Lessee shall not use, dispose of or release on the Leased Premises or permit to exist or to be used, disposed of or released on the Leased Premises as a result of its Operations any substances (other than those Lessee has been licensed or permitted by applicable public authorities to use on the Leased Premises) which are defined as "hazardous materials," toxic substances" or "solid wastes" in federal, state or local laws, statutes or ordinances. Should any pollutant, hazardous material, toxic substances, contaminated waste or solid waste be accidentally released on the Leased Premises, Lessee shall promptly notify Lessor and any applicable governmental body of such event. Lessee shall be responsible for and timely pay all costs of clean-up, remediation, and other costs related to and arising from the event, including but not limited to penalties. Lessee represents and warrants that during any hydraulic fracturing process it will not use any chemicals it has not been permitted to use by an applicable governmental, regulatory, state or federal agency, for the purposes of fracturing or pumping the same into any formation in and/or under the Leased Premises. Upon Lessor's written request Lessee will provide Lessor with all Material Safety Data Sheets (MSDS) available for any chemicals used by Lessee in its hydraulic fracturing process on the Leased Premises.

## ARTICLE VII. TAXES AND ASSESSMENTS

**Taxes:** Lessee shall pay all taxes and/or assessments on Leased Products, and any increase in other taxes attributable to Lessee's operations imposed by any local, state, or federal entity or governmental unit attributable to, or resulting from Lessees operations under the tax and assessment structure in effect at the time of the execution of this lease. Lessee shall, in addition, pay all severance taxes or other excise or personal property taxes arising out of or relating to this Lease and/or the Leased Products under the tax and assessment structure in effect at the time of the execution of this lease. In the event Ad Valorem and/or other real property taxes pertaining to or attributable to the Leased Premises, or any property associated therewith, are increased in any manner by reason of the Operations of Lessee relating to the Leased Premises, Lessee shall be responsible for the amount of any such tax increase and shall reimburse Lessor for the amount of such increase within thirty (30) days after Lessor provides Lessee with written documentation reflecting such increase and the basis thereof. Subsequent to the execution of this Lease, in the event there is a change

10

Smith-Goshen Land Owners Group

in Ohio tax code that provides for an increase in ad valorem taxes or severance tax or any other tax attributable to or resulting from the assessment of oil and gas due to oil and gas production from the leased premises, Lessor and Lessee agree to abide by the law and pay their proportional share accordingly.

**Agricultural Programs**: In the event the Leased Premises are subject to any federal, state, local and/or agricultural program (e.g. CAUV, CREP, CRP, Forest Land Program, etc.), and any roll-back or reimbursement or recoupment or retroactive assessment (including interest and penalties therefrom) is made against the Leased Premises on account of, arising out of, or relating to the Operations of Lessee on the Leased Premises, Lessee shall be responsible for paying Lessor any and all such amounts, but only insofar as such amounts imposed result from operations on the portion of the Leased Premises actually utilized by Lessee's Operations.

## ARTICLE VIII. TITLE AND WARRANTIES

**Lessor Limited Warranty**: Lessor makes no representation or warranty as to Lessor's title to the Leased Premises other than that Lessor represents that the title is good to Lessors knowledge and Lessor is not aware of any unrecorded encumbrances or encroachments or conditions affecting title to the Leased Premises, and Lessee agrees that no claims will be made against Lessor pertaining to warranty of title. It shall be Lessee's burden and obligation to assure itself of the quality of title to the Leased Premises.

**Title Curative**: Lessee assumes primary responsibility for taking the curative steps required to resolve any issues regarding Lessor's title to the Leased Premises as may be necessary to carry out the purposes of this Lease. Lessor agrees to cooperate with the Lessee in resolving title issues.

**Monies Paid**: Any monies paid to Lessor under the terms of this Lease are nonrefundable and under no circumstances will Lessee initiate any kind of action to recover any monies paid to Lessor.

**Lessor Encumbrances**: Any mortgage, lease, easement, or other interest granted by Lessor voluntarily after the Effective Date of this Lease shall be subject to this Lease. If Lessor defaults on any obligation secured by any lien or encumbrance on the Leased Premises during the term of this Lease, Lessee may, in its sole discretion, pay and discharge such obligation on behalf of Lessor but only if Lessee gives Lessor at least forty-five (45) calendar days prior written notice of such intention to pay and after receipt of said notice Lessor makes no arrangements to address the amount in default. If Lessee makes such payment in compliance with the terms outlined above, the Lessee shall be entitled to recover from Lessor by deduction from any future payments to Lessor, with interest at Ohio's legal rate for judgments, amounts actually paid by Lessee to discharge such obligations.

11

Smith-Goshen Land Owners Group

**Liens Against Lessee**: If any lien or encumbrance is filed against the Leased Premises arising out of or pertaining to any Operations by Lessee or anyone contracting with Lessee, Lessee shall, within forty-five (45) calendar days following the date such lien or encumbrance is recorded, cause such lien or encumbrance to be released from record, and Lessee shall provide Lessor written evidence of such release. Lessee's contention that the lien or encumbrance arises from a bona fide dispute shall not be grounds for Lessee's failure or refusal to remove the lien or encumbrance as required herein.

**Lesser Interest**: If Lessor owns an interest in the Leased Premises that is less than the entire fee simple estate, then all royalties, rentals, and other payments provided for under this Lease shall be paid in the proportion that Lessor's interest in the Leased Premises bears to the entire undivided fee simple estate.

## ARTICLE IX. TERMINATION AND RELEASE

**Termination**: Upon termination of this Lease or any portion thereof for any reason, or upon expiration of this Lease, Lessee shall provide Lessor with a surrender or other written cancellation of this Lease in recordable form, cause such document to be promptly recorded and deliver such document to Lessor within sixty (60) calendar days after the date or termination or expiration. In the event that the Lessee does not comply with the terms of this provision, and there is no bona fide dispute as to the termination or expiration of the lease, Lessee grants to Lessor the right and authority, to take any other steps to evidence the said termination or expiration of this Lease, including but not limited to following the Ohio Affidavit of Forfeiture statute and/or initiating proceedings to quiet Lessor's title, and Lessee shall be obligated to pay all of Lessor's costs, including but not limited to reasonable attorneys' fees as well as any damages accruing to Lessor from Lessee's non-compliance therewith.

**Removal of Equipment**: The Lessee, upon expiration or other termination of this Lease, is obligated to remove all fixtures, improvements, pumps, tanks, tubing, casing, machinery, unused pipelines, rubbish, debris and all other property it has placed on the Leased Premises. This duty must be performed within six (6) months after expiration or other termination of this Lease, or the release of any lands covered by this Lease, or Lessor may claim the property, in whole or in part, or have property and fixtures removed, in whole or in part, at Lessee's sole expense including all of Lessor's reasonable attorneys' fees. This provision may not apply if the Lessee sells equipment to Lessor in a separately negotiated agreement.

**Plugging**: In the event Lessee deems a well is not producing in commercial quantities Lessee shall promptly, properly and effectively plug all wells on the Leased Premises in accordance with the regulations of the State of Ohio.

12

Smith-Goshen Land Owners Group

## ARTICLE X. LESSOR'S INFORMATION RIGHTS, ETC.

**Information Rights:** Lessee grants to Lessor or Lessor's authorized agent, the right to annually inspect, examine and make copies of the Lessee's books, accounts, contracts, and all other records pertaining to production, transportation, sale, and marketing of Leased Products from the Leased Premises at any time during normal business hours. In exercising this right Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee. If as a result of such inspection Lessor discovers a deficiency in payment of royalties or other amounts due to Lessor under this Lease, Lessee will be liable for the amount of the deficiency plus interest at the maximum rate allowed by law. In the event that the deficiency exceeds 125% of the amount actually owed to Lessor, then Lessee shall pay all reasonable costs incurred by Lessor in conducting the inspection that led to discovery of the deficiency.

## ARTICLE XI. ASSIGNMENT OR TRANSFER OF LESSEE INTEREST

**Assignment of Lease:** The rights of either party hereunder may be assigned or otherwise transferred, in whole or in part and as to any horizon, and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns of the parties hereto. Each assignee of all or any portion of the rights of Lessee hereunder agrees to be bound by the provisions of this Lease to the same extent as if such assignee were an original party to this Lease. Lessee and any assignee shall provide to Lessor a true copy of any assignment with recording information reflected thereon (if recorded) and addresses of all assignees within thirty (30) days of making such assignment. Failure by Lessee to satisfy any of the above stated obligations shall constitute a default and be subject to the default provisions of this Lease.

## ARTICLE XII. LESSEE COMPLIANCE

**Laws:** Lessee agrees that everything done by it in connection with this Lease shall be done in a good and workmanlike manner and in accordance with all applicable laws, orders, rules, and regulations, including, without limitation, all applicable environmental rules and regulations. Lessee's failure to comply with any applicable law, regulation, or order shall be a default under this Lease subject to the default provisions in this Lease. In addition to other requirements herein provided, in all instances, Lessee shall undertake the restoration of the Leased Premises to the condition required under the applicable laws of the State of Ohio prior to or within three (3) months following expiration or other termination of this Lease. Lessee shall also use the best industry practices, and all reasonable safeguards to prevent its operations from: (i) causing or contributing to soil erosion, (ii) polluting or contaminating any environmental medium, (iii) decreasing the fertility of the soil, (iv) damaging crops, native or cultivated grasses, trees, or pastures, (v) harming or in any way injuring persons or animals, and (vi) damaging buildings, roads, structures, improvements, farm implements, gates or fences. Lessee shall dispose of salt water, frac water or liquid waste oil and other

13

Smith-Goshen Land Owners Group

waste in accordance with the rules and regulations of the Ohio Department of Natural Resources and all other applicable governmental authorities.

**Insurance**: At any and all times the Lessee or any person acting on Lessee's behalf is on or about the Leased Premises, Lessee agrees that it will carry at least the following insurance coverage with one or more financially sound insurance carriers: a.) Commercial General Liability of $6,000,000 minimum coverage for bodily injury, property damage, contractual liability, products/completed operations and personal injury for all Operations on the Leased Premises, b.) Umbrella Liability Insurance of $6,000,000 minimum coverage, c.) Workers Compensation and Employer's Liability Insurance in the form prescribed by laws of the state of Ohio, d.) Environmental Liability Insurance of $5,000,000 minimum coverage, and e.) Business Auto and Umbrella Liability Insurance of $5,000,000 minimum coverage. Such insurance policies shall waive all rights of subrogation against Lessor. Upon request, in the event the pad location is located on the Leased Premises, Lessee shall furnish Lessor, prior to drilling, with a Certificate of Insurance naming Lessor as an additional insured. Any Certificate of Insurance under this section shall not be reduced or canceled until at least thirty (30) days after Lessor receives written notice of such change or cancellation.

**Indemnity**: Lessee agrees to indemnify, defend, and hold harmless Lessor and Lessor's heirs, successors, agents, assigns, and any other person acting under Lessor's direction and/or control against any and all claims, damages, costs, losses, liabilities, expenses (including but not limited to any reasonable attorneys' fees, expert fees, and court costs) arising out of, incidental to or resulting from the Lessee's Operations and actions, and the Operations and actions of Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under Lessee's direction and control. Lessee's obligations hereunder shall survive the termination of this Lease.

## ARTICLE XIII. FORCE MAJEURE

**Force Majeure**: In the event the Lessee is unable to perform any of the acts to be performed by the Lessee (except payment of money as required under the terms of this lease or required by a court of law) by reason of force majeure, including but not limited to events outside the control of Lessee, acts of God, strikes, riots, and governmental restrictions or any other cause which makes performance of the Lessee's duties unreasonable or impossible, the Lessee shall provide written notice to Lessor within thirty (30) days of the force majeure event. This Lease shall nevertheless remain in full force and effect until the Lessee can perform said act or acts and in no event shall the within Lease expire for a period of one hundred twenty (120) days after the termination of any force majeure. Any delay by a governmental agency beyond ninety (90) days from the date of application to obtain any required permit to drill, complete or re-work a well shall be grounds to invoke force majeure until the permit is granted. If this Lease is the subject matter of any lawsuit, arbitration proceeding or action, then this Lease shall not expire during the pendency of such

14

Smith-Goshen Land Owners Group

lawsuit, proceeding or action, or any appeal thereof, and the time period of the lawsuit, arbitration proceeding or action, or any appeal thereof, shall be added to the term of this Lease, absent such lawsuit, proceeding or action or any appeal thereof. A force majeure event as set forth above shall not exceed a period of thirty six months.

**Coal Force Majeure:** If, after using all its best efforts to obtain a drilling permit should Lessee's operations be delayed, postponed or interrupted as a result of any coal, stone or other mining related operation under any existing and effective lease, permit or authorization covering such operations on the Leased Premises or on other lands affecting the Leased Premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption. In the event a coal force majeure event is declared Lessee shall, upon termination of the conditions which caused the force majeure event or at least once every 12 months, use its best efforts to obtain a drilling permit to develop the Leasehold Acreage.

### ARTICLE XIV. NOTICES AND DEFAULT

**Notice of Default**: This lease shall not be subject to civil action or other proceeding to enforce a claim of default or forfeiture due to Lessee's alleged failure to perform as specified herein, unless Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy Lessor's demand within sixty (60) days from receipt of the notice or such longer time as may be reasonably necessary under the circumstances to satisfy Lessor's demand, but shall not exceed 180 days unless agreed upon by Lessor and Lessee. Any notices required under this Lease shall be deemed sufficiently given if personally delivered or mailed by certified mail, return receipt requested, to the Lessor and/or the Lessee, whichever is applicable, at their respective addresses recited above Article I, or to such other address as either shall notify the other in writing. In the event Lessee assigns all or any part of this Lease without properly providing Lessor with a copy of such recorded assignment which includes the assignee's address, the Lessee shall be jointly and severally liable for all of assignee's obligations under this Lease notwithstanding any language to the contrary.

**Default on Payment Terms**: Failure of Lessee to timely pay Lessor any amounts required under this Lease shall, at Lessor's option, be deemed a default by Lessee subject to the default notice requirements set forth in this Lease.

**Execution and Recording**: The Lessor and Lessee shall execute two copies of this Lease and Memorandum of Lease. The Memorandum of Lease will be recorded and a copy provided to Lessor within 30 days of receipt of the recorded document by Lessee

**Reports and Documents**: Upon written request by Lessor, a copy of all documents Lessee files with the Ohio DNR Division of Oil and Gas Resources Management, pertaining to this Lease shall be delivered to the Lessor within forty-five (45) days of

15

Smith-Goshen Land Owners Group

filing with the Ohio DNR Division of Oil and Gas Resources Management and Lessee shall give Lessor at least ten (10) days advance written notice of the spud date and commencement date of any drilling on the Leased Premises. Lessee shall provide Lessor written notice of any judicial proceedings brought to the attention of Lessee affecting the Leased Premises.

## ARTICLE XV. LESSEE COVENANTS

**Lessee Covenants**: Any and all duties and obligations Lessee has are under implied covenants to benefit landowners and covenants under this lease. The Lessee will utilize current and future technologies to develop the property as operator sees fits after drilling an initial well, as a prudent operator all reasonable efforts to maximize the development of the resources associated with the Leased Premises in a prudent and efficient manner will be employed with the intent and purpose to cause all of Lessor's acreage to be included in one or more units of production, primarily implementing horizontal drilling techniques, but not excluding vertical techniques so as to maximize production recovery of all the oil and gas resources and to minimize or eliminate any "orphan" acreage. It is mutually agreed and understood that the operator, but for force majeure or government prohibitions, will use its best efforts as a prudent operator to fully produce and include all of Lessor's acreage in one or more operating units.

## ARTICLE XVI. ACTIONS AND PROCEEDINGS

**No Arbitration**: Arbitration shall not be a remedy for dispute resolution under this Lease.

**Governing Law and Ohio Courts**: This Lease shall be governed in accordance with the laws of the State of Ohio. Any actions or proceedings arising in connection with this Lease or performance thereunder shall be ascertained and determined by the Ohio state court in the county where the Lease is recorded.

## ARTICLE XVII. HEADINGS and MISCELLANEOUS

**Section Headings**: The Section Headings contained herein are inserted for convenience only and shall not control or affect the meaning or construction of any provision.

**Entire Contract**: The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**Severability**: If any portion of this Lease is held invalid or unenforceable, the other provisions shall remain in full force and effect.

**Confidentiality Clause:** Lessor and Lessee recognizes and acknowledges the competitive and confidential nature, as well as, the economic value of the terms and

16

Smith-Goshen Land Owners Group

conditions incorporated herein and the damage that could result to Lessor and/or Lessee if said terms and conditions were disclosed to any third party. Lessor and Lessee hereby agrees to maintain said terms and conditions secret and confidential and shall not disclose same to any third party other than the family, financial, legal or other professional advisors.

## ARTICLE XVIII. DEFINITIONS

**Commercial Quantities**: "Commercial Quantities" shall mean production of quantities of Leased Products sufficient to yield a profit to the Lessee over operating, marketing and related overhead expenses.

**Operations**: "Operations" shall mean any action done by Lessee (or by Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under the Lessee's direction or control) related to or in connection with the activities contemplated by this Lease.

**Commence Operations**: Commencement of operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein described premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed promptly by a drilling rig for the spudding of the well to be drilled.

**Completion of Operations**: "Completion of Operations" shall mean the completion of all planned drilling operations as to equipment and facilities relating to drilling, including any associated pits, tanks, or other facilities no longer needed for production, or in the event of a dry hole, all such facilities.

**Affiliate**: An "Affiliate" is any entity in which Lessee, or any parent company, subsidiary, or affiliate of Lessee, owns an interest of more than ten percent (10%) or exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation or other entity which owns an interest in or exercises any degree of control, directly or indirectly, over Lessee.

**Pad**: "Pad" is defined as any construction designed to facilitate one or more wells in a concentrated surface area.

**Production Unit**: "Production Unit" is defined as a unit of one or more tracts which are brought together by the Lessee for the purpose of forming a drillsite complying with the state requirements for drilling one well in order to develop the lands as if they were under a single lease.

**Pooled Unit**: "Pooled Unit" is defined as land described in this Lease which Lessee has pooled, prior to drilling, with contiguous land covered with other leases so as to establish one or more pooled development units. A Pooled Unit may also be a production unit.

17

Smith-Goshen Land Owners Group

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth above.

LESSOR:

_JOHN A. SIKISH_ signature
JOHN A. SIKISH

_Lucinda M. Sikish AKA Cindy M. Sikish_ signature
LUCINDA M. SIKISH A/K/A CINDY M. SIKISH

LESSEE:

Rice Drilling D, LLC

_____
Toby Z. Rice
Chief Executive Officer

ACKNOWLEDGEMENT

18

Smith-Goshen Land Owners Group

STATE OF OHIO          )
                       )
COUNTY OF Belmont      )

On this 10th day of November, 2012, before me, the undersigned Notary Public for the State of Ohio, personally appeared the above named JOHN A. SIKISH & LUCINDA M. SIKISH A/K/A CINDY M. SIKISH, husband and wife, the Lessor, who acknowledged and signed the foregoing instrument, and that the same is their free act and deed individually.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal this 10th day of November, 2012

MISTY A KIDD
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
January 19, 2017
Recorded in
Belmont County

Notary Public

Printed Name: Misty A. Kidd

My Commission Expires: January 19, 2017

CORPORATE ACKNOWLEDGEMENT

STATE OF PENNSYLVANIA     )
                          )    ss.:
COUNTY OF WASHINGTON      )

On this the _____ day of _____, 2012, before me, the undersigned authority, personally appeared Toby Z. Rice, who acknowledged himself to be the Chief Executive Officer of Rice Drilling D, LLC, and that he as such Chief Executive Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Chief Executive Officer.

My commission expires_____     Signature:_____

**EXHIBIT A**

19

Smith-Goshen Land Owners Group

**LESSEE:**

**Rice Drilling D, LLC**

Toby Z. Rice
Chief Executive Officer

CORPORATE ACKNOWLEDGEMENT

COMMONWEALTH OF PENNSYLVANIA   )
                                    )    ss.:
COUNTY OF WASHINGTON           )

      On this the 23 day of April, 2013, before me, the undersigned authority, personally appeared Toby Z. Rice, who acknowledged himself to be the Chief Executive Officer of Rice Drilling D, LLC, and that he as such Chief Executive Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Chief Executive Officer.

My commission expires_____.    Signature: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Eleen Alfonso, Notary Public
Cecil Twp., Washington County
My Commission Expires Sept. 26, 2015
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

18

Smith-Goshen Land Owners Group

## LEGAL DESCRIPTION OF THE LEASED PREMISES

| Tax Parcel ID Number | Section | Township | Range | Gross Acreage | Deed Book Volume & Page |
|---|---|---|---|---|---|
| 33-00016.000 | 31 | 7 | 4 | 76.346 | 717 / 562 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

20

Smith-Goshen Land Owners Group

a ten percent (10%) tolerance without the written consent of the majority of the Lessors in the Unit unless any additional acreage added to the unit allows for further development of the unit. A majority will be determined upon the Lessors proportionate share of the total acreage owned by in the unit. Each acre, or fraction thereof, equals one vote towards consent; one acre equals one vote, 100 acres equals 100 votes. In the event the unit exceeds 640 acres with a 10% tolerance, 80% of the acreage in the unit (as measured with the one acre one vote standard as set forth above) must agree to the unit size. Without the prior written consent of all Lessors in the Unit, a unit shall not exceed 1000 acres. If a greater amount of acreage than that set forth in the designated limits provided herein is necessary to adequately develop the unit than the designated number of acres the unit may be increased. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created so long as that change is in order for Lessee to further develop and drill the Unit. The drilling, operations in preparation for drilling, production from, or payment for Royalty or Shut-In Royalty for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold. There shall be allocated to the Leased Premises included in a Pooled Unit the proportion of the production from the Pooled Unit that the number of net mineral acres covered by the Leased Premises and included in the Pooled Unit bears to the total number of net mineral acres in such Pooled Unit; and royalties shall be paid hereunder upon that portion of such production so allocated.

**Pugh Clause**: Upon expiration of the Primary Term this Lease shall automatically terminate and be of no further force or effect as to any portions of the Leased Premises not included within any Production Unit and those formations and horizons 100 feet below the deepest depth drilled. In addition, at the end of the Primary Term or any time thereafter, whichever is applicable, this Lease shall terminate as to all depths and horizons contained in a Production Unit from which oil and gas is not capable of being produced in Commercial Quantities. Initial: _J.a.S._ _L.M.S._

## ARTICLE V. WATER PROTECTION

**Fresh Water Damage Protection**: In the event any activity carried on by the Lessee pursuant to the terms of this Lease adversely damages, disturbs, or injures the quality or quantity of Lessor's fresh water well, spring or source located on the Leased Premises, Lessee shall, at its sole cost and expense, take all reasonable steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all related costs of repair and maintenance to be paid by Lessee.

**Water Testing**: Lessee shall maintain the quality and quantity of Lessor's water supply (wells, springs or other domestic water source) to be measured by testing the Lessor's supply prior to surface disturbance on the Leased Premises or on any lands pooled or unitized therewith located within a radius of 2000 feet surrounding the wellhead. All testing shall be conducted by a certified independent testing laboratory. Testing must be for the entire Prominent Indicator Parameters of chemicals and agents utilized by

5

Smith-Goshen Land Owners Group

filing with the Ohio DNR Division of Oil and Gas Resources Management and Lessee shall give Lessor at least ten (10) days advance written notice of the spud date and commencement date of any drilling on the Leased Premises. Lessee shall provide Lessor written notice of any judicial proceedings brought to the attention of Lessee affecting the Leased Premises.

## ARTICLE XV. LESSEE COVENANTS

**Lessee Covenants**: Any and all duties and obligations Lessee has are under implied covenants to benefit landowners and covenants under this lease. The Lessee will utilize current and future technologies to develop the property as operator sees fits after drilling an initial well, as a prudent operator all reasonable efforts to maximize the development of the resources associated with the Leased Premises in a prudent and efficient manner will be employed with the intent and purpose to cause all of Lessor's acreage to be included in one or more units of production, primarily implementing horizontal drilling techniques, but not excluding vertical techniques so as to maximize production recovery of all the oil and gas resources and to minimize or eliminate any "orphan" acreage. It is mutually agreed and understood that the operator, but for force majeure or government prohibitions, will use its best efforts as a prudent operator to fully produce and include all of Lessor's acreage in one or more operating units.

## ARTICLE XVI. ACTIONS AND PROCEEDINGS

**No Arbitration**: Arbitration shall not be a remedy for dispute resolution under this Lease.
**Governing Law and Ohio Courts**: This Lease shall be governed in accordance with the laws of the State of Ohio. Any actions or proceedings arising in connection with this Lease or performance thereunder shall be ascertained and determined by the Ohio state court in the county where the Lease is recorded.

## ARTICLE XVII. HEADINGS and MISCELLANEOUS

**Section Headings**: The Section Headings contained herein are inserted for convenience only and shall not control or affect the meaning or construction of any provision.

**Entire Contract**: The entire agreement between Lessor and Lessee is embodied in this Lease, Memorandum, and Letter of Understanding attached hereto. In the event of an inconsistency the Letter of Understanding shall control. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease. Initial: _J a.S. X m.S._

**Severability**: If any portion of this Lease is held invalid or unenforceable, the other provisions shall remain in full force and effect.
**Confidentiality Clause:** Lessor and Lessee recognizes and acknowledges the competitive and confidential nature, as well as, the economic value of the terms and

16

**Letter of Understanding**

The undersigned Lessor (herein referred to as "Lessor"), and Rice Drilling D, LLC (hereinafter "Lessee") hereby engage in this Letter of Understanding ("LOU") to set forth procedures that will be followed by Lessee and Lessor in connection with the title review of the oil and gas rights underlying and in connection with the property which is subject to that certain oil and gas lease ("Lease") contemplated between Lessor and Lessee, as to the period of Lessee due diligence, and subject to the terms contained herein, the payment of the bonus amount to the Lessor.

1) **Due Diligence.** Lessee is to complete its due diligence review for determination of Defensible Title within a period of one hundred twenty (120) business days following the date of execution and delivery of the Lease by Lessor ("Due Diligence Period"). "Defensible Title" is defined as title of record, subject to and including, but not limited to, the following criteria:

a. As to each described parcel, the Lessor owns one hundred percent (100%) of the working interest in and to the oil and gas rights underlying and in connection with the property subject to the Lease, and that the Lessor has the unencumbered rights to lease same.

b. The rights granted by Lessor to Lessee are free and clear of all liens and other encumbrances which may adversely affect (i) the Lessor's ability to grant all rights provided for in the Lease, or (ii) Lessee's ability to fully enjoy the rights granted in the Lease, including but not limited to mortgages. In the event a mortgage requires the consent of a lender, mortgagor, or any other party, the lack of such consent shall be considered a Title Defect.

c. The Lease has been properly executed and acknowledged by Lessor in a manner sufficient to convey the rights contemplated by the Lease to Lessee and the Memorandum of Lease is in recordable form according to the laws of the State of Ohio, or other relevant jurisdiction.

d. The evidence of a prior lease that includes or encumbers the oil and gas rights to be granted to Lessee shall be considered a Title Defect. The existence of surface or shallow easements, including utility easements, which do not materially impair Lessee's rights under the Lease according to the Ohio Marketable Title Act, and the existence of a prior coal reservation will not be deemed a Title Defect.

e. The oil and gas rights underlying and in connection with the property subject to the Lease are not affected by any other encumbrances, instruments, obligations, defects and irregularities which: (i) interfere with the operation or use of the subject property or the oil and gas rights subject to the Lease; (ii) would prevent Lessee from receiving the proceeds of production from the oil and gas rights subject to the Lease; (iii) would reduce the net mineral acres conveyed by Lessor

to Lessee below that which is noted in the Lease; (iv) would reduce the interests of Lessee with respect to hydrocarbons produced from the subject property or the oil and gas rights in connection with the Lease below a net revenue interest of 80%; or (v) would increase the share of the costs and expenses that Lessee would be obligated to pay under a Lease without a proportionate increase in the net revenue interest for such Lease.

"Title Defect" shall be defined as an event or situation that causes the oil and gas rights underlying and in connection with the property subject to the Lease, or a portion thereof, to lack Defensible Title.

During the Due Diligence Period, Lessor shall, upon request from Lessee, execute all reasonable documents, curative or otherwise, to further the intention of the parties hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary contained within this LOU, Lessor expressly acknowledges and agrees that determination of Defensible Title under this LOU shall be in Lessee's reasonable discretion. Lessor hereby waives any and all implied covenants now or hereafter existing relating to any obligations of Lessee under the terms and conditions of this LOU but no other documents.

The parties also expressly acknowledge and agree that if Lessee elects to consummate a lease that has Defensible Title with any lessor (including Lessor) that is part of the group known as the "Smith-Goshen Group" of Belmont County, Ohio that is executing this LOU contemporaneously with Lessor, then Lessee must offer to consummate leases with all members of the "Smith-Goshen Group" whose leases have Defensible Title, including Lessor (provided that Lessor has Defensible Title to the Lease). Notwithstanding the foregoing, Lessee shall have the right to terminate the LOU for any reason or no reason during the Due Diligence Period, provided that Lessee has performed its due diligence review of all leases (including the Lease) submitted by lessors (including Lessor) in the "Smith-Goshen Group", and in such event, Lessee shall provide written notice to Lessor of such termination ("Termination Notice"); provided, however, if lessors in the "Smith-Goshen Group" hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title, then within thirty (30) days after delivery of the Termination Notice, Lessee agrees to pay all such lessors, including Lessor, with leases having Defensible Title the sum of One Thousand Dollars ($1,000.00) per net acre having Defensible Title as liquidated damages and not as a penalty (the "Termination Payment"). The parties agree that no lessor in the "Smith-Goshen Group", including Lessor, shall have the right to cure a Title Defect within the Lessor Cure Period (defined below) under Section 2 below if Lessee elects to terminate the LOU in accordance with the terms of this Section 1 and it is determined by Lessee within the Due Diligence Period that lessors in the "Smith-Goshen Group" do not hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title. Upon delivery of the Termination Notice and payment of the Termination Payment, if applicable, Lessee shall have no further obligation, for payment or otherwise, to Lessor or other lessors in the "Smith-Goshen Group".

2)     **Bonus Payment.** Upon execution and delivery of the Lease by Lessor, Lessee shall pay an initial non-refundable consideration in the amount of One Dollar ($1.00) per parcel

consideration paid to and acknowledged by Lessor. Upon: (i) satisfactory completion of the Due Diligence Period (and any applicable cure periods and cure requirements provided to Lessor as specified in this Section 2); (ii) determination by Lessee that Lessor has Defensible Title to the oil and gas rights subject to the Lease; and (iii) Lessee's election to consummate the Lease, Lessee shall pay to Lessor Six Thousand Two Hundred and Fifty Dollars ($6250.00) per net mineral acre conveyed to Lessee, pursuant and subject to the terms contained in this LOU. For the avoidance of doubt, the parties expressly acknowledge and agree that Lessee shall have the right to terminate this LOU for any reason or no reason, subject to Section 1 above, in which event Lessee shall not be required to consummate the Lease with Lessor.

Subject to Lessee's right to terminate this LOU in accordance with Section 1 above and the limitations on the right of a lessor within the "Smith-Goshen Group", including Lessor, to cure a Title Defect set forth therein, the parties agree as follows:

a.  If Lessee determines that there is a Title Defect(s) affecting the Lease, Lessee shall so advise the Lessor, in writing as soon as practical, but in no event later than the expiration of the Due Diligence Period, of the Title Defect(s). When notifying Lessor of a Title Defect, Lessee shall provide Lessor with a description of the Title Defect and any supporting documentation in its possession. In the event Lessor receives written notice from the Lessee of a Title Defect, Lessor shall have one hundred and twenty (120) business days from the date of receipt ("Lessor Cure Period") of such written notice to cure the Title Defect in a manner satisfactory to the Lessee, in its reasonable discretion. If the Title Defect is cured to the satisfaction of the Lessee within such Lessor Cure Period, then (i) Lessee will pay the Lessor the bonus payment corresponding to the acreage affected by the Title Defect within thirty (30) business days following the date such Title Defect was cured to Lessee's satisfaction, or (ii) as applicable, the Termination Payment corresponding to such acreage within thirty (30) business days following the date such Title Defect was so cured, consistent with Section 1.

b.  After the Due Diligence Period and all applicable cure periods specified herein have expired, and if Lessee in its reasonable discretion determines that the Lease lacks Defensible Title, upon written notification of rejection from Lessee by regular mail to Lessor, this LOU shall terminate and shall be of no force and effect, and Lessee shall have no further payment obligation to Lessor.

3)      **Exclusivity.** Lessor agrees that during the Due Diligence Period, it will not solicit, discuss, negotiate for or enter into any agreement or arrangement with a third party for the lease of the oil and gas rights and interests set forth in the Lease.

*[remainder of page intentionally left blank; signature page to follow]*

In witness whereof, the parties have executed this LOU as of the _19_ day of _February_, 201~~7~~ 3

LESSOR(S):

_Joh a. Sikish_
JOHN A. SIKISH

_Lucinda M. Sikish_
LUCINDA M. SIKISH

RICE DRILLING D LLC

_____
BY: TOBY Z. RICE
ITS: CHIEF EXECUTIVE OFFICER

---

FOR INTERNAL USE ONLY

| | | |
|---|---|---|
| Lease # | 0623 | Leasehold Acres _76.346 Acres_ |
| Ownership Interest | | Total Payment Amount _477,162 50_ |

**EXHIBITS**

A. Form of Lease

B. IRS Form W-9 Request for Taxpayer Identification Number and Certification

C. Memorandum of Lease

**Letter of Understanding**

RICE DRILLING D, LLC

By: _____

Toby Z. Rice

Its: Chief Executive Officer

_____

---

FOR INTERNAL USE ONLY     Lease #_____ Leasehold Acres _____

Ownership Interest:_____     Total Payment Amount: _____

## TAX PARCEL # INFORMATION SHEET

LEASE # _____0623_____

| Tax Parcel ID # | 33-00016.000 | Lease Acres | 76.346 | Net Acres | 76.346 | Mineral Ownership % | 100 | % |
|---|---|---|---|---|---|---|---|---|
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |

288

Smith-Goshen Land Owners Group

## PAID-UP OIL AND GAS LEASE
### Lease Date: November 7, 2012

This is an oil and gas lease (the "Lease") made this 7th day of November, 2012, between <u>JAMES O. DUNFEE & ENA SUE DUNFEE,</u> husband and wife. herein called "Lessor" (collectively if there is more than one) whose address is <u>46605 MAIN STREET CENTERVILLE, JACOBSBURG, OH 43933</u> and Rice Drilling D, LLC, hereinafter called "Lessee", whose address is 171 Hillpointe Drive, Suite 301, Canonsburg, PA 15317.

### ARTICLE I. GRANT OF LEASE

Lessor, in consideration of the payments described herein and the covenants and agreements hereafter contained, hereby leases and lets exclusively to the Lessee all the oil, gas, minerals and their constituents (not including coal) underlying the land described below for the sole purpose of exploring for, drilling, operating, producing and gathering the oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith other than as reserved unto Lessor below (herein called "Leased Products"). Together with such exclusive rights as may be necessary or convenient for the Lessee to explore for, develop, produce, measure, and market production from the Leasehold and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploration tests; to drill (either vertically, horizontally, or directionally), maintain, operate, treat, vent, dewater, cease to operate, plug, abandon, and remove wells; to stimulate or fracture all seams or other strata or formations; to use or install roads, electric power, telephone facilities (including data acquisition), compression facilities and collection facilities for use in the production, transportation and marketing of products from the Leasehold and from neighboring lands across the Leasehold, and such rights shall survive the term of this agreement for so long thereafter as operations are continued; to use oil and gas free of cost, to operate, maintain, repair, store, and remove material and equipment relating to the operations. Lessor shall not be responsible for any costs with respect to Lessee's Operations. Lessee is prohibited from performing any activity on the Leased Premises which is not expressly permitted pursuant to the terms and conditions of the Lease.

**<u>Description of the Land Included in the Lease</u>**: The oil, gas, mineral interests and land included in this Lease (herein called the "Leased Premises") is located in the County of Belmont, State of Ohio, with a permanent parcel number (or numbers) as follows: <u>36-00302.000; 36-00307.000; 36-00308.000; 36-00309.000; 36-00310.000; 36-00311.000; 36-00312.000; 36-00920.000.</u>

1

Smith-Goshen Land Owners Group

The Leased Premises contain ~~429.915~~ 429.912 gross acres. A legal description of the Leased Premises is attached hereto and made a part hereof as Exhibit A,

**Reservations**

(a)  Lessor's Reserved Rights: Lessor reserves all rights not specifically granted to Lessee in this Lease. Lessor specifically reserves the rights to all products contained in any formation: (1) from the surface of the Leased Premises to the top of the formation commonly known as the Marcellus Shale, (2) in any and all formations below the base of the Marcellus Shale to the top of the formation commonly known as the Utica Shale, and (3) in all formations below the base of the Utica Shale. Notwithstanding anything to the contrary, Lessee is specifically granted the right to penetrate and drill through the shallower formations in order to drill and produce the Leased Products and the Leased Premises. Lessor also reserves a right of way on all lands granted hereunder and the right to use the Leased Premises and any improvements thereon for any and all other purposes, so long as that right of way does not cause unreasonable interference with Lessee's operations or pose a safety concern to Lessee. Lessee agrees not to unreasonably interfere with the use and enjoyment of said land by Lessor and Lessor's family, agents, employees, invitees, and guests and to comply with all other specific provisions herein relating to the use of the land.

(b)  Other Minerals Reserved: Lessor expressly excludes from this Lease and reserves all minerals of every kind and character in, on and under the Leased Premises except the Leased Products herein defined. This includes but is not limited to all of the sulfur, coal, lignite, uranium and other fissionable material, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances (except the Leased Products described above) presently owned by Lessor in, under, or upon the Leased Premises. Lessor also reserves rights of ingress or egress and use of the Leased Premises by Lessor or its lessees or assignees for purposes of exploration for and production and marketing of the materials and minerals reserved hereby which rights shall not unreasonably interfere with the rights of Lessee.

## ARTICLE II. TERM OF LEASE

**Lease Term**: This Lease shall become effective on the date it is signed, which date will be inserted below the title of this document on page 1 (herein called the "Lease Date") and remain in force for a Primary term of five years from the Lease Date. Subject to the provisions hereinafter contained, this Lease shall be for a term of five (5) years from the Lease Date (herein called the "Primary Term") and for as long thereafter as operations are conducted on the Leasehold or as long as a well capable of production in Commercial Quantities is located on the Leasehold or on lands unitized or combined with the Leasehold, or for as long as extended by other provisions herein.

2

Smith-Goshen Land Owners Group

**Option to Extend the Primary Term**: Lessee is given the option to extend the Primary Term of this Lease for an additional five (5) year period. To exercise this option Lessee must notify Lessor in writing of Lessee's intent to exercise the option at least ninety (90) calendar days before the expiration of the Primary Term and Lessee must pay to Lessor, at any time prior to the termination of the Primary Term, a lease bonus for the five (5) year extension period equal to the signing bonus set forth in this Lease.

## ARTICLE III. PAYMENTS

**Signing Bonus Payment**: Lessee agrees to pay Lessor, proportionate to Lessor's percentage of ownership, a lease signing bonus of Six Thousand Two Hundred and Fifty dollars ($6250.00) for each net mineral acre contained within the Leased Premises. Such payment shall be according and pursuant to the Letter of Understanding to be executed by Lessor. Lessor understands that payment of the signing bonus will not be paid until title is cleared and certified title is obtained by an oil and gas attorney of Lessees choosing.

In the event Lessee believes in good faith that a title defect exists for the Leased Premises then Lessee shall provide written notice to Lessor as soon as practical, but in no event later than the time for payment set forth in the Letter of Understanding, of the title defects which render title unacceptable to Lessee. In the event a title defect exists, Lessee shall provide a description of the title defect and any supporting documentation in its possession. Lessor shall have a 120 business day cure period from the date of receipt of written notice to cure the defect in a manner satisfactory to the Lessee. If the title defect is cured to the satisfaction of Lessee within the 120 business day cure period the bonus payment shall be paid to Lessor within 30 days following the date the title defect is cured.

**Royalty Payments**: The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arms length transaction at the point of sale for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called the "Royalty Payment"). Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. So long as payment exceeds fifty dollars ($50.00) payment of Royalty for oil, gas, other hydrocarbons and by-products marketed during any calendar month shall be on or before the 30th day after receipt of such funds by the Lessee. Each Royalty Payment shall be accompanied by a stub, schedule, summary, or remittance identifying the Lease and showing the gross amount and proceeds paid to Lessee for all Leased Products produced. All Royalty Payments shall be paid to

3

Smith-Goshen Land Owners Group

Lessor at the address recited above Article I in this Lease or at such other address as shall be provided by Lessor to Lessee in writing.

**Shut-In Royalty Payment:** After the expiration of the Primary Term of this Lease if a well drilled on the Leased Premises or lands pooled therewith which is capable of producing gas in Commercial Quantities but the production thereof is shut-in, shut-down or suspended for lack of any available market for production for a period of time exceeding three consecutive months the Lessee shall pay a "shut-in" royalty equal to the sum of twenty-five dollars ($25.00) per net mineral acre each month until production is re-established (or Lessee surrenders the Lease). Lessee shall remit all shut-in payments to Lessor at the address provided in this Lease on or before forty-five (45) days after the third month after the date on which the well is shut-in. The payment of shut-in royalties will keep this Lease in effect after the Primary Term, however this Lease will not be kept in force solely by shut-in royalty payments for a period longer than a total of thirty six (36) months whether cumulative or not. A shut in solely due to pipeline or equipment breakage, damage or malfunction, upgrade, maintenance or safety during the drilling or completions of a new well shall not be calculated towards the three (3) year aggregate limitation on shut in, provided that Lessee exercises good faith and due diligence to correct the condition.

**Payment in Lieu of Free Gas**: In the event any well is drilled upon the Leased Premises or any portion thereof, Lessee shall pay annually to Lessor, which the well pad is located on, in lieu of any right to free gas, a sum equal to the value of three hundred fifty thousand (350,000) cubic feet of natural gas produced from each such well located on the Leased Premises up to a maximum of four wells. Said amount shall be paid in annual installments, with the value based upon the prior twelve months average gross price received by Lessee for gas sold from the Leased Premises.

### ARTICLE IV. POOLING AND UNITIZATION

**Pooling and Unitization**: Subject to the limitations below, Lessee is granted the right to pool or unitize, prior to or after drilling, all or part of the land covered by this Lease with any contiguous land so as to establish a pooled unit or units (herein called "Pooled Units"). When designating Pooled Units the Lessee shall make reasonable efforts to avoid excluding small or irregular shaped portions of the Leased Premises and to form Pooled Units in the shape of a square or rectangle. Lessee shall execute in writing an instrument identifying and describing the pooled acreage being drilled for, the leases included in the Pooled Unit, the formations and depths covered by the Pooled Unit, and the substance (either oil, gas or both) and file such instrument for record in the county or counties in which the pooled land is situated prior to drilling on the Pooled Unit. The Pooled Unit shall be effective on the date of execution of the declaration of unit. Lessor shall be provided a copy of such recorded instrument, and all amendments thereto by Lessee. No Pooled Unit for any vertical well with no horizontal drilling component which includes any portion of the Leased Premises shall exceed eighty (80) contiguous acres without the written consent of Lessor. No Pooled Unit for any well that includes lateral or horizontal drilling shall exceed six hundred forty (640) acres with

4

Smith-Goshen Land Owners Group

a ten percent (10%) tolerance without the written consent of the majority of the Lessors in the Unit unless any additional acreage added to the unit allows for further development of the unit. A majority will be determined upon the Lessors proportionate share of the total acreage owned by in the unit. Each acre, or fraction thereof, equals one vote towards consent; one acre equals one vote, 100 acres equals 100 votes. In the event the unit exceeds 640 acres with a 10% tolerance, 80% of the acreage in the unit (as measured with the one acre one vote standard as set forth above) must agree to the unit size. Without the prior written consent of all Lessors in the Unit, a unit shall not exceed 1000 acres. If a greater amount of acreage than that set forth in the designated limits provided herein is necessary to adequately develop the unit than the designated number of acres the unit may be increased. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created so long as that change is in order for Lessee to further develop and drill the Unit. The drilling, operations in preparation for drilling, production from, or payment for Royalty or Shut-In Royalty for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold. There shall be allocated to the Leased Premises included in a Pooled Unit the proportion of the production from the Pooled Unit that the number of net mineral acres covered by the Leased Premises and included in the Pooled Unit bears to the total number of net mineral acres in such Pooled Unit; and royalties shall be paid hereunder upon that portion of such production so allocated.

**Pugh Clause**: Upon expiration of the Primary Term this Lease shall automatically terminate and be of no further force or effect as to any portions of the Leased Premises not included within any Production Unit and those formations and horizons 100 feet below the deepest depth drilled. In addition, at the end of the Primary Term or any time thereafter, whichever is applicable, this Lease shall terminate as to all depths and horizons contained in a Production Unit from which oil and gas is capable of being produced in Commercial Quantities

## ARTICLE V. WATER PROTECTION

**Fresh Water Damage Protection**: In the event any activity carried on by the Lessee pursuant to the terms of this Lease adversely damages, disturbs, or injures the quality or quantity of Lessor's fresh water well, spring or source located on the Leased Premises, Lessee shall, at its sole cost and expense, take all reasonable steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all related costs of repair and maintenance to be paid by Lessee.

**Water Testing**: Lessee shall maintain the quality and quantity of Lessor's water supply (wells, springs or other domestic water source) to be measured by testing the Lessor's supply prior to surface disturbance on the Leased Premises or on any lands pooled or unitized therewith located within a radius of 2000 feet surrounding the wellhead. All testing shall be conducted by a certified independent testing laboratory. Testing must be for the entire Prominent Indicator Parameters of chemicals and agents utilized by

5

Smith-Goshen Land Owners Group

Lessee in its Operations and the burden shall be upon Lessee to provide evidence of all such chemicals and agents in order for the testing agent to adequately test the water. Lessee shall pay all costs of testing and Lessor shall be provided complete copies of any and all testing results and data, and shall have full rights to contact the testing lab for inquiry and information. Lessee shall cooperate with Lessor to obtain any favorable pricing extended to it by a certified testing laboratory should Lessor desire to obtain water testing outside of the testing provided for herein. Should Lessor experience a material adverse change in the quality of Lessor's water supply, during or immediately after the completion of Lessee's drilling operations; Lessee shall, within 48 hours of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Any pollution or reduction of any water supply after operations commence will be presumed to be the result of Lessee's operations unless Lessee can prove otherwise. If Lessor's water supply is polluted, reduced, or is otherwise adversely or materially affected as a result of Lessee's Operations, Lessee shall take any and all steps to restore water quality and quantity to its pre-drilling condition or fully compensate Lessor for the damage and inconvenience caused thereby. During any period of remediation, Lessee, at its sole expense, agrees to provide Lessor with an adequate supply of potable water consistent with Lessor's use of his/her water supply prior to Lessee's Operations on the Leased Premises or on lands pooled or unitized therewith.

## ARTICLE VI. LAND PROTECTION

**Non-Disturbance**: Lessee and its employees and authorized agents shall not disturb, use or travel upon any of the land of Lessor other than that land being used in its operations being conducted pursuant to this Lease.

**Damages:** The Lessee shall be liable to Lessor and pay market or replacement cost for any and all damages to the Leased Premises resulting from Lessee's Operations. Damages include but are not limited to any damage to Lessor's water, growing crops, trees, livestock, fences, buildings, water springs, soil, septic systems, agricultural fields and lands and any other property connected with drilling, operating, producing, gathering, or any geophysical or exploratory work conducted by or for the Lessee. Lessee shall promptly replace any drain tile and barriers, including but not limited to, fences, gates and walls removed or damaged by the Lessee during its Operations on the Leased Premises. Whenever a Pad has been installed or later repaired on the Leased Premises, Lessee, at its sole expense, shall restore the surface of the Leased Premises as near as practicable to the condition it was in prior to such work being undertaken. Upon Completion of all planned Operations on the Leased Premises, Lessee will within three (3) months undertake restoration of the Leased Premises to reclaim the Leased Premises to as near as practicable the pre-drilling condition.

**Irrigation and Agricultural Activities:** Lessor reserves the right to initiate or continue irrigation and agricultural activities (including timbering) on the Leased Premises so long as those agricultural activities do not interfere with the limits of disturbance of Lessee and Lessee will use all reasonable efforts to accommodate Lessor's

6

Smith-Goshen Land Owners Group

agricultural use. Subject to Lessee's prior approval and in accordance with Lessee's safety and construction standards, Lessor shall have the right to install and/or construct drainage or drain tile systems across, atop or under any pipeline installed by Lessee in a manner that does not interfere with Lessee's use of said pipelines.

**Agricultural Activities:** Lessee will plan its surface Operations in a manner that will reduce or minimize intrusion into crop fields, hay lands, pasture lands, or any other agricultural activity which is engaged in by the Lessor. In addition to the Damages Provision contained in this Lease, in the event that the Lessee needs to injure crops in order to conduct surface Operations, Lessee shall fully compensate Lessor for all damages and loss of crops at current market value so long as those crops are not located on a Well Pad (hereinafter defined) which Lessor is receiving payment for.

**Agreement as to Location of Operations:** Before Commencing Operations on the Leased Premises or any lands pooled therewith, Lessee and Lessor shall mutually agree in writing on the location and size of all well sites, pads, meters, roads, pipelines, fences, gates, buildings, electrical wires, and other equipment, supplies and facilities which Lessee wishes to locate on any portion of the Leased Premises so as to minimize disruption of Lessor's use of the Leased Premises; provided, however, that Lessor's consent shall not be unreasonably withheld or unreasonably delayed. Any wells, pads, roads, pipelines, gates, electrical wires, and other equipment, supplies and facilities Lessee locates on the Leased Premises will be maintained in good repair at all times by Lessee at its sole expense.

**Siting/Spud Fee:** Lessee shall pay to Lessor in consideration for damage to the Leased Premises the sum of thirty thousand dollars ($30,000) for a Well Pad located on the Leased Premises contemporaneously with Lessee disturbing any land where a pad for a horizontal well is to be located on the Leased Premises (herein called the "Pad Payment") for a well pad not to exceed five (5) acres. If any well pad exceeds five (5) acres then for each additional acre of disturbed land the Lessee shall pay eight thousand dollars ($8,000). A well pad includes any acreage for pits, tanks, equipment, roadways and other operations servicing the wells on that pad. Lessee shall pay Lessor a separate Pad Payment for each pad constructed on the Leased Premises.

**Restrictions on Location of Operations:** Without a separate written agreement between the Lessor and the Lessee, no pump stations, tanks, batteries, pipelines, roads, telephone and power lines, ponds, water holding facilities, dryers, separators or other equipment or facilities shall be located on the Leased Premises unless they are for the purpose of transporting, processing or treating Leased Products from the Leased Premises or lands pooled or unitized therewith, and the afore listed items shall not be located nearer than (and no well shall be drilled nearer than) one thousand (1,000) feet from any dwelling or residential structure or five hundred (500) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent. In order to effectively develop the Leasehold Premises it is understood that it is in the best interest of both Lessor and Lessee to work together in agreeing upon the location of operations on the Leasehold Premises. Should there be

7

Smith-Goshen Land Owners Group

no alternate location outside the aforementioned "buffer zones" then Lessee and Lessor shall agree to a location within the buffer zones. There shall be no compressors located on the Leased Premises, unless the compressor is solely used for the well located on the Leasehold Premises or a well located on a property pooled or unitized with the Leasehold Premises, unless Lessor consents in a prior separate written agreement. Any compressor operations permitted hereunder shall be designed and installed utilizing means to minimize noise, including but not limited to, sound enclosures and barriers, and quiet motors.

**Restrictions on Lessee's Use of Leased Premises:** Unless Lessor consents in a separate written agreement, the Lessee shall under no circumstances:

  (a) Use the Leased Premises for the disposal of any drill cuttings, brine or other liquids, or the permanent storage or disposal of any liquids or solids.
  (b) Use the Leased Premises or any portion thereof, surface or subsurface, for gas or oil storage purposes.
  (c) Use any water from the Leased Premises, surface or subsurface, or drill any well to take water from or inject any substance into the Leased Premises
  (d) Install or dig any pits other than drilling pits (not permanent storage pits) on the Leased Premises

**Pipelines and Utility Lines:** In the event that pipeline is necessary then Lessor and Lessee shall enter into a separate pipeline right of way agreement which is consistent with the terms and conditions of this Lease including location approval. In addition to the restrictions set forth in this Lease, Lessee agrees to bury any pipelines constructed on the Leased Premises at a depth, which shall in all cases be below tillage and drainage tile depth (at least 36 inches). Lessee agrees to restore the surface as near as practicable to the condition it was in prior to such installation. Lessee shall comply with all applicable rules, regulations, and statutes regarding pipeline construction, maintenance, and operation. Absent a separate right of way agreement Lessee's right to use said pipelines terminates when Lessee's production from the Leased Premises or lands unitized with the Leased Premises permanently ceases. Any utility lines used by Lessee in its Operations shall be buried upon the written request of Lessor. Such utility lines shall be removed upon termination of this Lease, unless Lessor agrees in writing to have such utility lines kept in place. Lessee shall provide Lessor a plat map showing the location and depth of all buried utility lines and pipelines.

**Fencing:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to fence all wells, well sites, tank batteries, pits, separators, drip stations, pump engines, or other equipment permanently located on the Leased Premises. All fences must be kept in good repair by the Lessee.

**Gates:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to construct gates on all access roads and provide an access key or double lock system allowing access by both Lessor and Lessee. Gates must be closed and locked at all times when equipment is not being accessed and when Lessee's personnel are not on the Leased Premises.

8

Smith-Goshen Land Owners Group

**Roads:** Roadways or drives constructed by Lessee on the Leased Premises during its Operations shall not exceed fifty (50) feet in width or a minimum width required to perform required Operations. After the completion of all planned operations on the Leased Premises, in the event of a producing well on the Leased Premises, any permanent access road for well servicing purposes shall be a maximum of twenty (20) feet or a minimum width required to perform maintenance or other Operations. Lessee agrees to improve, construct or maintain all roads used by it in good repair utilizing shale, gravel, or crushed stone, culverts and supports as necessary to provide a smooth, rut-free all-weather surface. When such roads are no longer being used, Lessee agrees, upon Lessor's request, to remove toppings and to restore the surface as nearly as practicable to its former condition. Lessee shall not use shale, gravel, or crushed stone sourced from the Leased Premises without the prior written consent of Lessor. Lessee shall prevent its employees, agents and contractors from operating vehicles in a negligent manner or at speeds in excess of twenty-five (25) miles per hour while on the Leased Premises.

**Pits:** Any pit permitted under this Lease will conform to all applicable regulatory requirements (state, local, and federal) and will conform to the best industry practices. Lessee will immediately notify all applicable regulatory authorities and Lessor of any damage to such facilities.

**Soil Testing:** For areas within the Limits of Disturbance upon Lessor's written request, Lessee shall, at its sole cost and expense, have Lessor's current soil tested by an independent third party agreed upon by Lessor and Lessee: (1) prior to the commencement of spudding any well on the Leased Premises, (2) twelve (12) months from the date of completion of any well on the Leased Premises, (3) twenty-four (24) months from the date of completion of any well on the Leased Premises, and (4) within sixty (60) days following the completion of drilling Operations on the Leased Premises. All tests provided for herein must meet all applicable EPA requirements and Lessor shall be provided complete copies of any and all testing results and data. If such test results reflect a material adverse change in the Lessor's soil quality, then Lessee shall use its best efforts to return the soil to its pre drilling condition.

**Timber:** Lessee shall notify Lessor in writing at least forty-five (45) calendar days prior to any removal by Lessee of marketable timber (marketability to be within the reasonable discretion of a certified professional forester). At Lessor's option, Lessor may choose to harvest timber, which shall be complete by the end of the 45 day period, or Lessor may require an appraisal on the timber by a qualified independent certified, professional forester, at Lessee's expense, and Lessee shall pay Lessor the appraised value for the timber identified prior to its removal by Lessee.

**Firewalling and Maintenance of Production Equipment:** Dikes, firewalls or other methods of secondary containment must be constructed and maintained at all times around all tanks, separators and receptacles so as to contain a sufficient volume of liquid to accomplish the intended purposes.

9

Smith-Goshen Land Owners Group

**Maintenance and Repair:** Maintenance and repair of roadways and all other facilities used by Lessee in connection with this Lease shall be the sole responsibility of the Lessee. If Lessor sends written notice to Lessee informing Lessee of any repairs or other maintenance to roads or other facilities that the Lessee has failed to address and the Lessee fails to initiate the repair or other maintenance within thirty (30) days of the written notice being sent or fails to complete the repairs or other maintenance within sixty (60) days of the notice being sent (If the repairs are capable of being completed within the 60 day period) then Lessor reserves the right to repair and maintain the roadways and the Lessee agrees to fully reimburse Lessor for the cost of the maintenance or repair undertaken by the Lessor.

**Hydraulic Fracturing:** Lessee shall not use, dispose of or release on the Leased Premises or permit to exist or to be used, disposed of or released on the Leased Premises as a result of its Operations any substances (other than those Lessee has been licensed or permitted by applicable public authorities to use on the Leased Premises) which are defined as "hazardous materials," toxic substances" or "solid wastes" in federal, state or local laws, statutes or ordinances. Should any pollutant, hazardous material, toxic substances, contaminated waste or solid waste be accidentally released on the Leased Premises, Lessee shall promptly notify Lessor and any applicable governmental body of such event. Lessee shall be responsible for and timely pay all costs of clean-up, remediation, and other costs related to and arising from the event, including but not limited to penalties. Lessee represents and warrants that during any hydraulic fracturing process it will not use any chemicals it has not been permitted to use by an applicable governmental, regulatory, state or federal agency, for the purposes of fracturing or pumping the same into any formation in and/or under the Leased Premises. Upon Lessor's written request Lessee will provide Lessor with all Material Safety Data Sheets (MSDS) available for any chemicals used by Lessee in its hydraulic fracturing process on the Leased Premises.

## ARTICLE VII. TAXES AND ASSESSMENTS

**Taxes:** Lessee shall pay all taxes and/or assessments on Leased Products, and any increase in other taxes attributable to Lessee's operations imposed by any local, state, or federal entity or governmental unit attributable to, or resulting from Lessees operations under the tax and assessment structure in effect at the time of the execution of this lease. Lessee shall, in addition, pay all severance taxes or other excise or personal property taxes arising out of or relating to this Lease and/or the Leased Products under the tax and assessment structure in effect at the time of the execution of this lease. In the event Ad Valorem and/or other real property taxes pertaining to or attributable to the Leased Premises, or any property associated therewith, are increased in any manner by reason of the Operations of Lessee relating to the Leased Premises, Lessee shall be responsible for the amount of any such tax increase and shall reimburse Lessor for the amount of such increase within thirty (30) days after Lessor provides Lessee with written documentation reflecting such increase and the basis thereof. Subsequent to the execution of this Lease, in the event there is a change

10

Smith-Goshen Land Owners Group

in Ohio tax code that provides for an increase in ad valorem taxes or severance tax or any other tax attributable to or resulting from the assessment of oil and gas due to oil and gas production from the leased premises, Lessor and Lessee agree to abide by the law and pay their proportional share accordingly.

**Agricultural Programs**: In the event the Leased Premises are subject to any federal, state, local and/or agricultural program (e.g. CAUV, CREP, CRP, Forest Land Program, etc.), and any roll-back or reimbursement or recoupment or retroactive assessment (including interest and penalties therefrom) is made against the Leased Premises on account of, arising out of, or relating to the Operations of Lessee on the Leased Premises, Lessee shall be responsible for paying Lessor any and all such amounts, but only insofar as such amounts imposed result from operations on the portion of the Leased Premises actually utilized by Lessee's Operations.

## ARTICLE VIII. TITLE AND WARRANTIES

**Lessor Limited Warranty**: Lessor makes no representation or warranty as to Lessor's title to the Leased Premises other than that Lessor represents that the title is good to Lessors knowledge and Lessor is not aware of any unrecorded encumbrances or encroachments or conditions affecting title to the Leased Premises, and Lessee agrees that no claims will be made against Lessor pertaining to warranty of title. It shall be Lessee's burden and obligation to assure itself of the quality of title to the Leased Premises.

**Title Curative**: Lessee assumes primary responsibility for taking the curative steps required to resolve any issues regarding Lessor's title to the Leased Premises as may be necessary to carry out the purposes of this Lease. Lessor agrees to cooperate with the Lessee in resolving title issues.

**Monies Paid**: Any monies paid to Lessor under the terms of this Lease are nonrefundable and under no circumstances will Lessee initiate any kind of action to recover any monies paid to Lessor.

**Lessor Encumbrances**: Any mortgage, lease, easement, or other interest granted by Lessor voluntarily after the Effective Date of this Lease shall be subject to this Lease. If Lessor defaults on any obligation secured by any lien or encumbrance on the Leased Premises during the term of this Lease, Lessee may, in its sole discretion, pay and discharge such obligation on behalf of Lessor but only if Lessee gives Lessor at least forty-five (45) calendar days prior written notice of such intention to pay and after receipt of said notice Lessor makes no arrangements to address the amount in default. If Lessee makes such payment in compliance with the terms outlined above, the Lessee shall be entitled to recover from Lessor by deduction from any future payments to Lessor, with interest at Ohio's legal rate for judgments, amounts actually paid by Lessee to discharge such obligations.

11

Smith-Goshen Land Owners Group

**Liens Against Lessee**: If any lien or encumbrance is filed against the Leased Premises arising out of or pertaining to any Operations by Lessee or anyone contracting with Lessee, Lessee shall, within forty-five (45) calendar days following the date such lien or encumbrance is recorded, cause such lien or encumbrance to be released from record, and Lessee shall provide Lessor written evidence of such release. Lessee's contention that the lien or encumbrance arises from a bona fide dispute shall not be grounds for Lessee's failure or refusal to remove the lien or encumbrance as required herein.

**Lesser Interest**: If Lessor owns an interest in the Leased Premises that is less than the entire fee simple estate, then all royalties, rentals, and other payments provided for under this Lease shall be paid in the proportion that Lessor's interest in the Leased Premises bears to the entire undivided fee simple estate.

## ARTICLE IX. TERMINATION AND RELEASE

**Termination**: Upon termination of this Lease or any portion thereof for any reason, or upon expiration of this Lease, Lessee shall provide Lessor with a surrender or other written cancellation of this Lease in recordable form, cause such document to be promptly recorded and deliver such document to Lessor within sixty (60) calendar days after the date or termination or expiration. In the event that the Lessee does not comply with the terms of this provision, and there is no bona fide dispute as to the termination or expiration of the lease, Lessee grants to Lessor the right and authority, to take any other steps to evidence the said termination or expiration of this Lease, including but not limited to following the Ohio Affidavit of Forfeiture statute and/or initiating proceedings to quiet Lessor's title, and Lessee shall be obligated to pay all of Lessor's costs, including but not limited to reasonable attorneys' fees as well as any damages accruing to Lessor from Lessee's non-compliance therewith.

**Removal of Equipment**: The Lessee, upon expiration or other termination of this Lease, is obligated to remove all fixtures, improvements, pumps, tanks, tubing, casing, machinery, unused pipelines, rubbish, debris and all other property it has placed on the Leased Premises. This duty must be performed within six (6) months after expiration or other termination of this Lease, or the release of any lands covered by this Lease, or Lessor may claim the property, in whole or in part, or have property and fixtures removed, in whole or in part, at Lessee's sole expense including all of Lessor's reasonable attorneys' fees. This provision may not apply if the Lessee sells equipment to Lessor in a separately negotiated agreement.

**Plugging**: In the event Lessee deems a well is not producing in commercial quantities Lessee shall promptly, properly and effectively plug all wells on the Leased Premises in accordance with the regulations of the State of Ohio.

12

Smith-Goshen Land Owners Group

## ARTICLE X. LESSOR'S INFORMATION RIGHTS, ETC.

**Information Rights**: Lessee grants to Lessor or Lessor's authorized agent, the right to annually inspect, examine and make copies of the Lessee's books, accounts, contracts, and all other records pertaining to production, transportation, sale, and marketing of Leased Products from the Leased Premises at any time during normal business hours. In exercising this right Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee. If as a result of such inspection Lessor discovers a deficiency in payment of royalties or other amounts due to Lessor under this Lease, Lessee will be liable for the amount of the deficiency plus interest at the maximum rate allowed by law. In the event that the deficiency exceeds 125% of the amount actually owed to Lessor, then Lessee shall pay all reasonable costs incurred by Lessor in conducting the inspection that led to discovery of the deficiency.

## ARTICLE XI. ASSIGNMENT OR TRANSFER OF LESSEE INTEREST

**Assignment of Lease**: The rights of either party hereunder may be assigned or otherwise transferred, in whole or in part and as to any horizon, and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns of the parties hereto. Each assignee of all or any portion of the rights of Lessee hereunder agrees to be bound by the provisions of this Lease to the same extent as if such assignee were an original party to this Lease. Lessee and any assignee shall provide to Lessor a true copy of any assignment with recording information reflected thereon (if recorded) and addresses of all assignees within thirty (30) days of making such assignment. Failure by Lessee to satisfy any of the above stated obligations shall constitute a default and be subject to the default provisions of this Lease.

## ARTICLE XII. LESSEE COMPLIANCE

**Laws**: Lessee agrees that everything done by it in connection with this Lease shall be done in a good and workmanlike manner and in accordance with all applicable laws, orders, rules, and regulations, including, without limitation, all applicable environmental rules and regulations. Lessee's failure to comply with any applicable law, regulation, or order shall be a default under this Lease subject to the default provisions in this Lease. In addition to other requirements herein provided, in all instances, Lessee shall undertake the restoration of the Leased Premises to the condition required under the applicable laws of the State of Ohio prior to or within three (3) months following expiration or other termination of this Lease. Lessee shall also use the best industry practices, and all reasonable safeguards to prevent its operations from: (i) causing or contributing to soil erosion, (ii) polluting or contaminating any environmental medium, (iii) decreasing the fertility of the soil, (iv) damaging crops, native or cultivated grasses, trees, or pastures, (v) harming or in any way injuring persons or animals, and (vi) damaging buildings, roads, structures, improvements, farm implements, gates or fences. Lessee shall dispose of salt water, frac water or liquid waste oil and other

13

Smith-Goshen Land Owners Group

waste in accordance with the rules and regulations of the Ohio Department of Natural Resources and all other applicable governmental authorities.

**Insurance**: At any and all times the Lessee or any person acting on Lessee's behalf is on or about the Leased Premises, Lessee agrees that it will carry at least the following insurance coverage with one or more financially sound insurance carriers: a.) Commercial General Liability of $6,000,000 minimum coverage for bodily injury, property damage, contractual liability, products/completed operations and personal injury for all Operations on the Leased Premises, b.) Umbrella Liability Insurance of $6,000,000 minimum coverage, c.) Workers Compensation and Employer's Liability Insurance in the form prescribed by laws of the state of Ohio, d.) Environmental Liability Insurance of $5,000,000 minimum coverage, and e.) Business Auto and Umbrella Liability Insurance of $5,000,000 minimum coverage. Such insurance policies shall waive all rights of subrogation against Lessor. Upon request, in the event the pad location is located on the Leased Premises, Lessee shall furnish Lessor, prior to drilling, with a Certificate of Insurance naming Lessor as an additional insured. Any Certificate of Insurance under this section shall not be reduced or canceled until at least thirty (30) days after Lessor receives written notice of such change or cancellation.

**Indemnity**: Lessee agrees to indemnify, defend, and hold harmless Lessor and Lessor's heirs, successors, agents, assigns, and any other person acting under Lessor's direction and/or control against any and all claims, damages, costs, losses, liabilities, expenses (including but not limited to any reasonable attorneys' fees, expert fees, and court costs) arising out of, incidental to or resulting from the Lessee's Operations and actions, and the Operations and actions of Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under Lessee's direction and control. Lessee's obligations hereunder shall survive the termination of this Lease.

## ARTICLE XIII. FORCE MAJEURE

**Force Majeure**: In the event the Lessee is unable to perform any of the acts to be performed by the Lessee (except payment of money as required under the terms of this lease or required by a court of law) by reason of force majeure, including but not limited to events outside the control of Lessee, acts of God, strikes, riots, and governmental restrictions or any other cause which makes performance of the Lessee's duties unreasonable or impossible, the Lessee shall provide written notice to Lessor within thirty (30) days of the force majeure event. This Lease shall nevertheless remain in full force and effect until the Lessee can perform said act or acts and in no event shall the within Lease expire for a period of one hundred twenty (120) days after the termination of any force majeure. Any delay by a governmental agency beyond ninety (90) days from the date of application to obtain any required permit to drill, complete or re-work a well shall be grounds to invoke force majeure until the permit is granted. If this Lease is the subject matter of any lawsuit, arbitration proceeding or action, then this Lease shall not expire during the pendency of such

14

Smith-Goshen Land Owners Group

lawsuit, proceeding or action, or any appeal thereof, and the time period of the lawsuit, arbitration proceeding or action, or any appeal thereof, shall be added to the term of this Lease, absent such lawsuit, proceeding or action or any appeal thereof. A force majeure event as set forth above shall not exceed a period of thirty six months.

**Coal Force Majeure:** If, after using all its best efforts to obtain a drilling permit should Lessee's operations be delayed, postponed or interrupted as a result of any coal, stone or other mining related operation under any existing and effective lease, permit or authorization covering such operations on the Leased Premises or on other lands affecting the Leased Premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption. In the event a coal force majeure event is declared Lessee shall, upon termination of the conditions which caused the force majeure event or at least once every 12 months, use its best efforts to obtain a drilling permit to develop the Leasehold Acreage.

## ARTICLE XIV. NOTICES AND DEFAULT

**Notice of Default:** This lease shall not be subject to civil action or other proceeding to enforce a claim of default or forfeiture due to Lessee's alleged failure to perform as specified herein, unless Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy Lessor's demand within sixty (60) days from receipt of the notice or such longer time as may be reasonably necessary under the circumstances to satisfy Lessor's demand, but shall not exceed 180 days unless agreed upon by Lessor and Lessee. Any notices required under this Lease shall be deemed sufficiently given if personally delivered or mailed by certified mail, return receipt requested, to the Lessor and/or the Lessee, whichever is applicable, at their respective addresses recited above Article I, or to such other address as either shall notify the other in writing. In the event Lessee assigns all or any part of this Lease without properly providing Lessor with a copy of such recorded assignment which includes the assignee's address, the Lessee shall be jointly and severally liable for all of assignee's obligations under this Lease notwithstanding any language to the contrary.

**Default on Payment Terms:** Failure of Lessee to timely pay Lessor any amounts required under this Lease shall, at Lessor's option, be deemed a default by Lessee subject to the default notice requirements set forth in this Lease.

**Execution and Recording:** The Lessor and Lessee shall execute two copies of this Lease and Memorandum of Lease. The Memorandum of Lease will be recorded and a copy provided to Lessor within 30 days of receipt of the recorded document by Lessee

**Reports and Documents:** Upon written request by Lessor, a copy of all documents Lessee files with the Ohio DNR Division of Oil and Gas Resources Management, pertaining to this Lease shall be delivered to the Lessor within forty-five (45) days of

15

Smith-Goshen Land Owners Group

filing with the Ohio DNR Division of Oil and Gas Resources Management and Lessee shall give Lessor at least ten (10) days advance written notice of the spud date and commencement date of any drilling on the Leased Premises. Lessee shall provide Lessor written notice of any judicial proceedings brought to the attention of Lessee affecting the Leased Premises.

## ARTICLE XV. LESSEE COVENANTS

**Lessee Covenants**: Any and all duties and obligations Lessee has are under implied covenants to benefit landowners and covenants under this lease. The Lessee will utilize current and future technologies to develop the property as operator sees fits after drilling an initial well, as a prudent operator all reasonable efforts to maximize the development of the resources associated with the Leased Premises in a prudent and efficient manner will be employed with the intent and purpose to cause all of Lessor's acreage to be included in one or more units of production, primarily implementing horizontal drilling techniques, but not excluding vertical techniques so as to maximize production recovery of all the oil and gas resources and to minimize or eliminate any "orphan" acreage. It is mutually agreed and understood that the operator, but for force majeure or government prohibitions, will use its best efforts as a prudent operator to fully produce and include all of Lessor's acreage in one or more operating units.

## ARTICLE XVI. ACTIONS AND PROCEEDINGS

**No Arbitration**: Arbitration shall not be a remedy for dispute resolution under this Lease.

**Governing Law and Ohio Courts**: This Lease shall be governed in accordance with the laws of the State of Ohio. Any actions or proceedings arising in connection with this Lease or performance thereunder shall be ascertained and determined by the Ohio state court in the county where the Lease is recorded.

## ARTICLE XVII. HEADINGS and MISCELLANEOUS

**Section Headings**: The Section Headings contained herein are inserted for convenience only and shall not control or affect the meaning or construction of any provision.

**Entire Contract**: The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

**Severability**: If any portion of this Lease is held invalid or unenforceable, the other provisions shall remain in full force and effect.

**Confidentiality Clause:** Lessor and Lessee recognizes and acknowledges the competitive and confidential nature, as well as, the economic value of the terms and

16

Smith-Goshen Land Owners Group

conditions incorporated herein and the damage that could result to Lessor and/or Lessee if said terms and conditions were disclosed to any third party. Lessor and Lessee hereby agrees to maintain said terms and conditions secret and confidential and shall not disclose same to any third party other than the family, financial, legal or other professional advisors.

## ARTICLE XVIII. DEFINITIONS

**Commercial Quantities**: "Commercial Quantities" shall mean production of quantities of Leased Products sufficient to yield a profit to the Lessee over operating, marketing and related overhead expenses.

**Operations**: "Operations" shall mean any action done by Lessee (or by Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under the Lessee's direction or control) related to or in connection with the activities contemplated by this Lease.

**Commence Operations**: Commencement of operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein described premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed promptly by a drilling rig for the spudding of the well to be drilled.

**Completion of Operations**: "Completion of Operations" shall mean the completion of all planned drilling operations as to equipment and facilities relating to drilling, including any associated pits, tanks, or other facilities no longer needed for production, or in the event of a dry hole, all such facilities.

**Affiliate**: An "Affiliate" is any entity in which Lessee, or any parent company, subsidiary, or affiliate of Lessee, owns an interest of more than ten percent (10%) or exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation or other entity which owns an interest in or exercises any degree of control, directly or indirectly, over Lessee.

**Pad**: "Pad" is defined as any construction designed to facilitate one or more wells in a concentrated surface area.

**Production Unit**: "Production Unit" is defined as a unit of one or more tracts which are brought together by the Lessee for the purpose of forming a drillsite complying with the state requirements for drilling one well in order to develop the lands as if they were under a single lease.

**Pooled Unit**: "Pooled Unit" is defined as land described in this Lease which Lessee has pooled, prior to drilling, with contiguous land covered with other leases so as to establish one or more pooled development units. A Pooled Unit may also be a production unit.

17

Smith-Goshen Land Owners Group

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth above.

LESSOR:

_____
JAMES O. DUNFEE

_____
ENA SUE DUNFEE

LESSEE:

Rice Drilling D, LLC

_____
Toby Z. Rice
Chief Executive Officer

18

Smith-Goshen Land Owners Group

## ACKNOWLEDGEMENT

STATE OF OHIO                    )

COUNTY OF _Belmont_              )

On this __7__ day of November, 2012, before me, the undersigned Notary Public for the State of Ohio, personally appeared the above named JAMES O. DUNFEE & ENA SUE DUNFEE, husband and wife, the Lessor, who acknowledged and signed the foregoing instrument, and that the same is their free act and deed individually.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal this ___7___ day of November, 2012

Anthony J. Zambito III
Notary Public, State of Ohio
My Commission expires _____

_____
Notary Public

Anthony J. Zambito III
Notary Public, State of Ohio
My Commission expires _____

Printed Name: _Anthony J. Zambito_

My Commission Expires: _13 Mar 17_

## CORPORATE ACKNOWLEDGEMENT

STATE OF PENNSYLVANIA        )
                             )    ss.:
COUNTY OF WASHINGTON         )

On this the _16th_ day of _April_, ~~2012~~ 2013, before me, the undersigned authority, personally appeared Toby Z. Rice, who acknowledged himself to be the Chief Executive Officer of Rice Drilling B, LLC, and that he as such Chief Executive Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Chief Executive Officer.

My commission expires _Sept 26, 2015_   Signature: _Eileen Alfonso_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Eileen Alfonso, Notary Public
Cecil Twp., Washington County
My Commission Expires Sept. 26, 2015
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

19

Smith-Goshen Land Owners Group

## EXHIBIT A

### LEGAL DESCRIPTION OF THE LEASED PREMISES

| Tax Parcel ID Number | Section | Township | Range | Gross Acreage | Deed Book Volume & Page |
|---|---|---|---|---|---|
| 36-00302.000 | 2 | 6 | 4 | 83.742 | Book 263 Page 1 |
| 36-00307.000 | 2 | 6 | 4 | 81.46 | |
| 36-00308.000 | 8 | 6 | 4 | 76.7105 | |
| 36-00309.000 | 9 | 6 | 4 | 45.13 | |
| 36-00310.000 | 15 | 6 | 4 | 12.59 | |
| 36-00311.000 | 8 | 6 | 4 | 6.425 | |
| 36-00312.000 | 8 & 9 | 6 | 4 | 92.31 | |
| 36-00920.000 | 21 | 6 | 4 | 31.55 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

20

Smith-Goshen Land Owners Group

a ten percent (10%) tolerance without the written consent of the majority of the Lessors in the Unit unless any additional acreage added to the unit allows for further development of the unit. A majority will be determined upon the Lessors proportionate share of the total acreage owned by in the unit. Each acre, or fraction thereof, equals one vote towards consent; one acre equals one vote, 100 acres equals 100 votes. In the event the unit exceeds 640 acres with a 10% tolerance, 80% of the acreage in the unit (as measured with the one acre one vote standard as set forth above) must agree to the unit size. Without the prior written consent of all Lessors in the Unit, a unit shall not exceed 1000 acres. If a greater amount of acreage than that set forth in the designated limits provided herein is necessary to adequately develop the unit than the designated number of acres the unit may be increased. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created so long as that change is in order for Lessee to further develop and drill the Unit. The drilling, operations in preparation for drilling, production from, or payment for Royalty or Shut-In Royalty for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold. There shall be allocated to the Leased Premises included in a Pooled Unit the proportion of the production from the Pooled Unit that the number of net mineral acres covered by the Leased Premises and included in the Pooled Unit bears to the total number of net mineral acres in such Pooled Unit; and royalties shall be paid hereunder upon that portion of such production so allocated.

**Pugh Clause**: Upon expiration of the Primary Term this Lease shall automatically terminate and be of no further force or effect as to any portions of the Leased Premises not included within any Production Unit and those formations and horizons 100 feet below the deepest depth drilled. In addition, at the end of the Primary Term or any time thereafter, whichever is applicable, this Lease shall terminate as to all depths and horizons contained in a Production Unit from which oil and gas is not capable of being produced in Commercial Quantities. Initial: JoA FSD

## ARTICLE V. WATER PROTECTION

**Fresh Water Damage Protection**: In the event any activity carried on by the Lessee pursuant to the terms of this Lease adversely damages, disturbs, or injures the quality or quantity of Lessor's fresh water well, spring or source located on the Leased Premises, Lessee shall, at its sole cost and expense, take all reasonable steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all related costs of repair and maintenance to be paid by Lessee.

**Water Testing**: Lessee shall maintain the quality and quantity of Lessor's water supply (wells, springs or other domestic water source) to be measured by testing the Lessor's supply prior to surface disturbance on the Leased Premises or on any lands pooled or unitized therewith located within a radius of 2000 feet surrounding the wellhead. All testing shall be conducted by a certified independent testing laboratory. Testing must be for the entire Prominent Indicator Parameters of chemicals and agents utilized by

5

Smith-Goshen Land Owners Group

filing with the Ohio DNR Division of Oil and Gas Resources Management and Lessee shall give Lessor at least ten (10) days advance written notice of the spud date and commencement date of any drilling on the Leased Premises. Lessee shall provide Lessor written notice of any judicial proceedings brought to the attention of Lessee affecting the Leased Premises.

## ARTICLE XV. LESSEE COVENANTS

**Lessee Covenants**: Any and all duties and obligations Lessee has are under implied covenants to benefit landowners and covenants under this lease. The Lessee will utilize current and future technologies to develop the property as operator sees fits after drilling an initial well, as a prudent operator all reasonable efforts to maximize the development of the resources associated with the Leased Premises in a prudent and efficient manner will be employed with the intent and purpose to cause all of Lessor's acreage to be included in one or more units of production, primarily implementing horizontal drilling techniques, but not excluding vertical techniques so as to maximize production recovery of all the oil and gas resources and to minimize or eliminate any "orphan" acreage. It is mutually agreed and understood that the operator, but for force majeure or government prohibitions, will use its best efforts as a prudent operator to fully produce and include all of Lessor's acreage in one or more operating units.

## ARTICLE XVI. ACTIONS AND PROCEEDINGS

**No Arbitration**: Arbitration shall not be a remedy for dispute resolution under this Lease.
**Governing Law and Ohio Courts**: This Lease shall be governed in accordance with the laws of the State of Ohio. Any actions or proceedings arising in connection with this Lease or performance thereunder shall be ascertained and determined by the Ohio state court in the county where the Lease is recorded.

## ARTICLE XVII. HEADINGS and MISCELLANEOUS

**Section Headings**: The Section Headings contained herein are inserted for convenience only and shall not control or affect the meaning or construction of any provision.

**Entire Contract:** The entire agreement between Lessor and Lessee is embodied in this Lease, Memorandum, and Letter of Understanding attached hereto. In the event of an inconsistency the Letter of Understanding shall control. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease. Initial: _____ _____ _____

**Severability**: If any portion of this Lease is held invalid or unenforceable, the other provisions shall remain in full force and effect.
**Confidentiality Clause:** Lessor and Lessee recognizes and acknowledges the competitive and confidential nature, as well as, the economic value of the terms and

16

### Letter of Understanding

The undersigned Lessor (herein referred to as "Lessor"), and Rice Drilling D, LLC (hereinafter "Lessee") hereby engage in this Letter of Understanding ("LOU") to set forth procedures that will be followed by Lessee and Lessor in connection with the title review of the oil and gas rights underlying and in connection with the property which is subject to that certain oil and gas lease ("Lease") contemplated between Lessor and Lessee, as to the period of Lessee due diligence, and subject to the terms contained herein, the payment of the bonus amount to the Lessor.

1)      **Due Diligence.** Lessee is to complete its due diligence review for determination of Defensible Title within a period of one hundred twenty (120) business days following the date of execution and delivery of the Lease by Lessor ("Due Diligence Period"). "Defensible Title" is defined as title of record, subject to and including, but not limited to, the following criteria:

a.      As to each described parcel, the Lessor owns one hundred percent (100%) of the working interest in and to the oil and gas rights underlying and in connection with the property subject to the Lease, and that the Lessor has the unencumbered rights to lease same.

b.      The rights granted by Lessor to Lessee are free and clear of all liens and other encumbrances which may adversely affect (i) the Lessor's ability to grant all rights provided for in the Lease, or (ii) Lessee's ability to fully enjoy the rights granted in the Lease, including but not limited to mortgages. In the event a mortgage requires the consent of a lender, mortgagor, or any other party, the lack of such consent shall be considered a Title Defect.

c.      The Lease has been properly executed and acknowledged by Lessor in a manner sufficient to convey the rights contemplated by the Lease to Lessee and the Memorandum of Lease is in recordable form according to the laws of the State of Ohio, or other relevant jurisdiction.

d.      The evidence of a prior lease that includes or encumbers the oil and gas rights to be granted to Lessee shall be considered a Title Defect. The existence of surface or shallow easements, including utility easements, which do not materially impair Lessee's rights under the Lease according to the Ohio Marketable Title Act, and the existence of a prior coal reservation will not be deemed a Title Defect.

e.      The oil and gas rights underlying and in connection with the property subject to the Lease are not affected by any other encumbrances, instruments, obligations, defects and irregularities which: (i) interfere with the operation or use of the subject property or the oil and gas rights subject to the Lease; (ii) would prevent Lessee from receiving the proceeds of production from the oil and gas rights subject to the Lease; (iii) would reduce the net mineral acres conveyed by Lessor

to Lessee below that which is noted in the Lease; (iv) would reduce the interests of Lessee with respect to hydrocarbons produced from the subject property or the oil and gas rights in connection with the Lease below a net revenue interest of 80%; or (v) would increase the share of the costs and expenses that Lessee would be obligated to pay under a Lease without a proportionate increase in the net revenue interest for such Lease.

"Title Defect" shall be defined as an event or situation that causes the oil and gas rights underlying and in connection with the property subject to the Lease, or a portion thereof, to lack Defensible Title.

During the Due Diligence Period, Lessor shall, upon request from Lessee, execute all reasonable documents, curative or otherwise, to further the intention of the parties hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary contained within this LOU, Lessor expressly acknowledges and agrees that determination of Defensible Title under this LOU shall be in Lessee's reasonable discretion. Lessor hereby waives any and all implied covenants now or hereafter existing relating to any obligations of Lessee under the terms and conditions of this LOU but no other documents.

The parties also expressly acknowledge and agree that if Lessee elects to consummate a Lease that has Defensible Title with any lessor (including Lessor) that is part of the group known as the "Smith-Goshen Group" of Belmont County, Ohio that is executing this LOU contemporaneously with Lessor, then Lessee must offer to consummate leases with all members of the "Smith-Goshen Group" whose leases have Defensible Title, including Lessor (provided that Lessor has Defensible Title to the Lease). Notwithstanding the foregoing, Lessee shall have the right to terminate the LOU for any reason or no reason during the Due Diligence Period, provided that Lessee has performed its due diligence review of all leases (including the Lease) submitted by lessors (including Lessor) in the "Smith-Goshen Group", and in such event, Lessee shall provide written notice to Lessor of such termination ("Termination Notice"); provided, however, if lessors in the "Smith-Goshen Group" hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title, then within thirty (30) days after delivery of the Termination Notice, Lessee agrees to pay all such lessors, including Lessor, with leases having Defensible Title the sum of One Thousand Dollars ($1,000.00) per net acre having Defensible Title as liquidated damages and not as a penalty (the "Termination Payment"). The parties agree that no lessor in the "Smith-Goshen Group", including Lessor, shall have the right to cure a Title Defect within the Lessor Cure Period (defined below) under Section 2 below if Lessee elects to terminate the LOU in accordance with the terms of this Section 1 and it is determined by Lessee within the Due Diligence Period that lessors in the "Smith-Goshen Group" do not hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title. Upon delivery of the Termination Notice and payment of the Termination Payment, if applicable, Lessee shall have no further obligation, for payment or otherwise, to Lessor or other lessors in the "Smith-Goshen Group".

2)      **Bonus Payment.** Upon execution and delivery of the Lease by Lessor, Lessee shall pay an initial non-refundable consideration in the amount of One Dollar ($1.00) per parcel

consideration paid to and acknowledged by Lessor. Upon: (i) satisfactory completion of the Due Diligence Period (and any applicable cure periods and cure requirements provided to Lessor as specified in this Section 2); (ii) determination by Lessee that Lessor has Defensible Title to the oil and gas rights subject to the Lease; and (iii) Lessee's election to consummate the Lease, Lessee shall pay to Lessor Six Thousand Two Hundred and Fifty Dollars ($6250.00) per net mineral acre conveyed to Lessee, pursuant and subject to the terms contained in this LOU. For the avoidance of doubt, the parties expressly acknowledge and agree that Lessee shall have the right to terminate this LOU for any reason or no reason, subject to Section 1 above, in which event Lessee shall not be required to consummate the Lease with Lessor.

Subject to Lessee's right to terminate this LOU in accordance with Section 1 above and the limitations on the right of a lessor within the "Smith-Goshen Group", including Lessor, to cure a Title Defect set forth therein, the parties agree as follows:

   a.  If Lessee determines that there is a Title Defect(s) affecting the Lease, Lessee shall so advise the Lessor, in writing as soon as practical, but in no event later than the expiration of the Due Diligence Period, of the Title Defect(s). When notifying Lessor of a Title Defect, Lessee shall provide Lessor with a description of the Title Defect and any supporting documentation in its possession. In the event Lessor receives written notice from the Lessee of a Title Defect, Lessor shall have one hundred and twenty (120) business days from the date of receipt ("Lessor Cure Period") of such written notice to cure the Title Defect in a manner satisfactory to the Lessee, in its reasonable discretion. If the Title Defect is cured to the satisfaction of the Lessee within such Lessor Cure Period, then (i) Lessee will pay the Lessor the bonus payment corresponding to the acreage affected by the Title Defect within thirty (30) business days following the date such Title Defect was cured to Lessee's satisfaction, or (ii) as applicable, the Termination Payment corresponding to such acreage within thirty (30) business days following the date such Title Defect was so cured, consistent with Section 1.

   b.  After the Due Diligence Period and all applicable cure periods specified herein have expired, and if Lessee in its reasonable discretion determines that the Lease lacks Defensible Title, upon written notification of rejection from Lessee by regular mail to Lessor, this LOU shall terminate and shall be of no force and effect, and Lessee shall have no further payment obligation to Lessor.

3)  **Exclusivity**. Lessor agrees that during the Due Diligence Period, it will not solicit, discuss, negotiate for or enter into any agreement or arrangement with a third party for the lease of the oil and gas rights and interests set forth in the Lease.

*[remainder of page intentionally left blank; signature page to follow]*

In witness whereof, the parties have executed this LOU as of the ___7___ day of __December__ , 2012.

LESSOR(S):

_____
JAMES O. DUNFEE

_____
ENA SUE DUNFEE

RICE DRILLING D LLC

_____
BY: TOBY Z. RICE
ITS: CHIEF EXECUTIVE OFFICER

---

FOR INTERNAL USE ONLY

| | |
|---|---|
| Lease # _____0288_____ | Leasehold Acres ~~423,915~~ 429.912 Acres |
| Ownership Interest ___100%___ | Total Payment Amount ~~2,686,968.80~~ 2,686,950.00 |

**EXHIBITS**

A. Form of Lease

B. IRS Form W-9 Request for Taxpayer Identification Number and Certification

C. Memorandum of Lease

# TAX PARCEL # INFORMATION SHEET

## LEASE # _____0288_____

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tax Parcel ID # | 36-00302.000 | Lease Acres | 83.74? | Net Acres | 83.7472 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00307.000 | Lease Acres | 81.460 | Net Acres | 81.460 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00308.000 | Lease Acres | 76.7105 | Net Acres | 76.7105 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00309.000 | Lease Acres | 45.130 | Net Acres | 45.130 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00310.000 | Lease Acres | 12.590 | Net Acres | 12.590 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00311.000 | Lease Acres | 6.425 | Net Acres | 6.425 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00312.000 | Lease Acres | 92.310 | Net Acres | 92.310 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 36-00920.000 | Lease Acres | 31.550 | Net Acres | 31.550 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |

Smith-Goshen Land Owners Group

## PAID-UP OIL AND GAS LEASE
### Lease Date: November 6, 2012

This is an oil and gas lease (the "Lease") made this 6 day of November, 2012, between **Terrence L. Kemp and Virginia M. Kemp, husband and wife,** herein called "Lessor" (collectively if there is more than one) whose address is 60905 Chestnut Level Road, Belmont, OH 43718, and Rice Drilling D, LLC, hereinafter called "Lessee", whose address is 171 Hillpointe Drive, Suite 301, Canonsburg, PA 15317.

## ARTICLE I. GRANT OF LEASE

Lessor, in consideration of the payments described herein and the covenants and agreements hereafter contained, hereby leases and lets exclusively to the Lessee all the oil, gas, minerals and their constituents (not including coal) underlying the land described below for the sole purpose of exploring for, drilling, operating, producing and gathering the oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith other than as reserved unto Lessor below (herein called "Leased Products"). Together with such exclusive rights as may be necessary or convenient for the Lessee to explore for, develop, produce, measure, and market production from the Leasehold and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploration tests; to drill (either vertically, horizontally, or directionally), maintain, operate, treat, vent, dewater, cease to operate, plug, abandon, and remove wells; to stimulate or fracture all seams or other strata or formations; to use or install roads, electric power, telephone facilities (including data acquisition), compression facilities and collection facilities for use in the production, transportation and marketing of products from the Leasehold and from neighboring lands across the Leasehold, and such rights shall survive the term of this agreement for so long thereafter as operations are continued; to use oil and gas free of cost, to operate, maintain, repair, store, and remove material and equipment relating to the operations. Lessor shall not be responsible for any costs with respect to Lessee's Operations. Lessee is prohibited from performing any activity on the Leased Premises which is not expressly permitted pursuant to the terms and conditions of the Lease.

**Description of the Land Included in the Lease**: The oil, gas, mineral interests and land included in this Lease (herein called the "Leased Premises") is located in the County of Belmont, State of Ohio, with a permanent parcel number (or numbers) as follows: 09-00321.000 (29.522) , 09-00320.001 (44.916), 09-01266.000 (0.774), 09-01320.000 (13.838), 09-01354.000 (134.964)          0.7746

1

Smith-Goshen Land Owners Group

The Leased Premises contain 224.014 gross acres. A legal description of the Leased Premises is attached hereto and made a part hereof as Exhibit A,

## Reservations

(a) <u>Lessor's Reserved Rights</u>: Lessor reserves all rights not specifically granted to Lessee in this Lease. Lessor specifically reserves the rights to all products contained in any formation: (1) from the surface of the Leased Premises to the top of the formation commonly known as the Marcellus Shale, (2) in any and all formations below the base of the Marcellus Shale to the top of the formation commonly known as the Utica Shale, and (3) in all formations below the base of the Utica Shale. Notwithstanding anything to the contrary, Lessee is specifically granted the right to penetrate and drill through the shallower formations in order to drill and produce the Leased Products and the Leased Premises. Lessor also reserves a right of way on all lands granted hereunder and the right to use the Leased Premises and any improvements thereon for any and all other purposes, so long as that right of way does not cause unreasonable interference with Lessee's operations or pose a safety concern to Lessee. Lessee agrees not to unreasonably interfere with the use and enjoyment of said land by Lessor and Lessor's family, agents, employees, invitees, and guests and to comply with all other specific provisions herein relating to the use of the land.

(b) <u>Other Minerals Reserved</u>: Lessor expressly excludes from this Lease and reserves all minerals of every kind and character in, on and under the Leased Premises except the Leased Products herein defined. This includes but is not limited to all of the sulfur, coal, lignite, uranium and other fissionable material, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances (except the Leased Products described above) presently owned by Lessor in, under, or upon the Leased Premises. Lessor also reserves rights of ingress or egress and use of the Leased Premises by Lessor or its lessees or assignees for purposes of exploration for and production and marketing of the materials and minerals reserved hereby which rights shall not unreasonably interfere with the rights of Lessee.

## ARTICLE II. TERM OF LEASE

**Lease Term**: This Lease shall become effective on the date it is signed, which date will be inserted below the title of this document on page 1 (herein called the "Lease Date") and remain in force for a Primary term of five years from the Lease Date. Subject to the provisions hereinafter contained, this Lease shall be for a term of five (5) years from the Lease Date (herein called the "Primary Term") and for as long thereafter as operations are conducted on the Leasehold or as long as a well capable of production in Commercial Quantities is located on the Leasehold or on lands unitized or combined with the Leasehold, or for as long as extended by other provisions herein.

2

Smith-Goshen Land Owners Group

**Option to Extend the Primary Term**: Lessee is given the option to extend the Primary Term of this Lease for an additional five (5) year period. To exercise this option Lessee must notify Lessor in writing of Lessee's intent to exercise the option at least ninety (90) calendar days before the expiration of the Primary Term and Lessee must pay to Lessor, at any time prior to the termination of the Primary Term, a lease bonus for the five (5) year extension period equal to the signing bonus set forth in this Lease.

## ARTICLE III. PAYMENTS

**Signing Bonus Payment**: Lessee agrees to pay Lessor, proportionate to Lessor's percentage of ownership, a lease signing bonus of Six Thousand Two Hundred Fifty dollars ($6250.00) for each net mineral acre contained within the Leased Premises. Such payment shall be according and pursuant to the Letter of Understanding to be executed by Lessor. Lessor understands that payment of the signing bonus will not be paid until title is cleared and certified title is obtained by an oil and gas attorney of Lessees choosing.

In the event Lessee believes in good faith that a title defect exists for the Leased Premises then Lessee shall provide written notice to Lessor as soon as practical, but in no event later than the time for payment set forth in the Letter of Understanding, of the title defects which render title unacceptable to Lessee. In the event a title defect exists, Lessee shall provide a description of the title defect and any supporting documentation in its possession. Lessor shall have a 120 business day cure period from the date of receipt of written notice to cure the defect in a manner satisfactory to the Lessee. If the title defect is cured to the satisfaction of Lessee within the 120 business day cure period the bonus payment shall be paid to Lessor within 30 days following the date the title defect is cured.

**Royalty Payments**: The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arms length transaction at the point of sale for all of the Leased Products produced from each and every well on the Leased Premises or on lands pooled or unitized therewith (herein called the "Royalty Payment"). Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds. Lessor agrees to accept and receive out of the production or the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. So long as payment exceeds fifty dollars ($50.00) payment of Royalty for oil, gas, other hydrocarbons and by-products marketed during any calendar month shall be on or before the 30th day after receipt of such funds by the Lessee. Each Royalty Payment shall be accompanied by a stub, schedule, summary, or remittance identifying the Lease and showing the gross amount and proceeds paid

3

Smith-Goshen Land Owners Group

to Lessee for all Leased Products produced. All Royalty Payments shall be paid to Lessor at the address recited above Article I in this Lease or at such other address as shall be provided by Lessor to Lessee in writing.

**Shut-in Royalty Payment:** After the expiration of the Primary Term of this Lease if a well drilled on the Leased Premises or lands pooled therewith which is capable of producing gas in Commercial Quantities but the production thereof is shut-in, shut-down or suspended for lack of any available market for production for a period of time exceeding three consecutive months the Lessee shall pay a "shut-in" royalty equal to the sum of twenty-five dollars ($25.00) per net mineral acre each month until production is re-established (or Lessee surrenders the Lease). Lessee shall remit all shut-in payments to Lessor at the address provided in this Lease on or before forty-five (45) days after the third month after the date on which the well is shut-in. The payment of shut-in royalties will keep this Lease in effect after the Primary Term, however this Lease will not be kept in force solely by shut-in royalty payments for a period longer than a total of thirty six (36) months whether cumulative or not. A shut in solely due to pipeline or equipment breakage, damage or malfunction, upgrade, maintenance or safety during the drilling or completions of a new well shall not be calculated towards the three (3) year aggregate limitation on shut in, provided that Lessee exercises good faith and due diligence to correct the condition.

**Payment in Lieu of Free Gas:** In the event any well is drilled upon the Leased Premises or any portion thereof, Lessee shall pay annually to Lessor, which the well pad is located on, in lieu of any right to free gas, a sum equal to the value of three hundred fifty thousand (350,000) cubic feet of natural gas produced from each such well located on the Leased Premises up to a maximum of four wells. Said amount shall be paid in annual installments, with the value based upon the prior twelve months average gross price received by Lessee for gas sold from the Leased Premises.

## ARTICLE IV. POOLING AND UNITIZATION

**Pooling and Unitization:** Subject to the limitations below, Lessee is granted the right to pool or unitize, prior to or after drilling, all or part of the land covered by this Lease with any contiguous land so as to establish a pooled unit or units (herein called "Pooled Units"). When designating Pooled Units the Lessee shall make reasonable efforts to avoid excluding small or irregular shaped portions of the Leased Premises and to form Pooled Units in the shape of a square or rectangle. Lessee shall execute in writing an instrument identifying and describing the pooled acreage being drilled for, the leases included in the Pooled Unit, the formations and depths covered by the Pooled Unit, and the substance (either oil, gas or both) and file such instrument for record in the county or counties in which the pooled land is situated prior to drilling on the Pooled Unit. The Pooled Unit shall be effective on the date of execution of the declaration of unit. Lessor shall be provided a copy of such recorded instrument, and all amendments thereto by Lessee. No Pooled Unit for any vertical well with no horizontal drilling component which includes any portion of the Leased Premises shall exceed eighty (80) contiguous acres without the written consent of Lessor. No Pooled Unit for any well

4

Smith-Goshen Land Owners Group

a ten percent (10%) tolerance without the written consent of the majority of the Lessors in the Unit unless any additional acreage added to the unit allows for further development of the unit. A majority will be determined upon the Lessors proportionate share of the total acreage owned by in the unit. Each acre, or fraction thereof, equals one vote towards consent; one acre equals one vote, 100 acres equals 100 votes. In the event the unit exceeds 640 acres with a 10% tolerance, 80% of the acreage in the unit (as measured with the one acre one vote standard as set forth above) must agree to the unit size. Without the prior written consent of all Lessors in the Unit, a unit shall not exceed 1000 acres. If a greater amount of acreage than that set forth in the designated limits provided herein is necessary to adequately develop the unit than the designated number of acres the unit may be increased. Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created so long as that change is in order for Lessee to further develop and drill the Unit. The drilling, operations in preparation for drilling, production from, or payment for Royalty or Shut-In Royalty for a well on such a unit shall have the same effect upon the terms of this Lease as if the well were located on the Leasehold. There shall be allocated to the Leased Premises included in a Pooled Unit the proportion of the production from the Pooled Unit that the number of net mineral acres covered by the Leased Premises and included in the Pooled Unit bears to the total number of net mineral acres in such Pooled Unit; and royalties shall be paid hereunder upon that portion of such production so allocated.

**Pugh Clause**: Upon expiration of the Primary Term this Lease shall automatically terminate and be of no further force or effect as to any portions of the Leased Premises not included within any Production Unit and those formations and horizons 100 feet below the deepest depth drilled. In addition, at the end of the Primary Term or any time thereafter, whichever is applicable, this Lease shall terminate as to all depths and horizons contained in a Production Unit from which oil and gas is not capable of being produced in Commercial Quantities. Initial: ⅃ M ⳑ 자 k _____ _____

## ARTICLE V. WATER PROTECTION

**Fresh Water Damage Protection**: In the event any activity carried on by the Lessee pursuant to the terms of this Lease adversely damages, disturbs, or injures the quality or quantity of Lessor's fresh water well, spring or source located on the Leased Premises, Lessee shall, at its sole cost and expense, take all reasonable steps to correct any such damage, disturbance or injury and to remediate the same to as close to pre-damage status quo as reasonably possible, with all related costs of repair and maintenance to be paid by Lessee.

**Water Testing**: Lessee shall maintain the quality and quantity of Lessor's water supply (wells, springs or other domestic water source) to be measured by testing the Lessor's supply prior to surface disturbance on the Leased Premises or on any lands pooled or unitized therewith located within a radius of 2000 feet surrounding the wellhead. All testing shall be conducted by a certified independent testing laboratory. Testing must be for the entire Prominent Indicator Parameters of chemicals and agents utilized by

5

Smith-Goshen Land Owners Group

be for the entire Prominent Indicator Parameters of chemicals and agents utilized by Lessee in its Operations and the burden shall be upon Lessee to provide evidence of all such chemicals and agents in order for the testing agent to adequately test the water. Lessee shall pay all costs of testing and Lessor shall be provided complete copies of any and all testing results and data, and shall have full rights to contact the testing lab for inquiry and information. Lessee shall cooperate with Lessor to obtain any favorable pricing extended to it by a certified testing laboratory should Lessor desire to obtain water testing outside of the testing provided for herein. Should Lessor experience a material adverse change in the quality of Lessor's water supply, during or immediately after the completion of Lessee's drilling operations; Lessee shall, within 48 hours of Lessor's written request, sample and test Lessor's water supply at Lessee's expense. Any pollution or reduction of any water supply after operations commence will be presumed to be the result of Lessee's operations unless Lessee can prove otherwise. If Lessor's water supply is polluted, reduced, or is otherwise adversely or materially affected as a result of Lessee's Operations, Lessee shall take any and all steps to restore water quality and quantity to its pre-drilling condition or fully compensate Lessor for the damage and inconvenience caused thereby. During any period of remediation, Lessee, at its sole expense, agrees to provide Lessor with an adequate supply of potable water consistent with Lessor's use of his/her water supply prior to Lessee's Operations on the Leased Premises or on lands pooled or unitized therewith.

## ARTICLE VI. LAND PROTECTION

**Non-Disturbance**: Lessee and its employees and authorized agents shall not disturb, use or travel upon any of the land of Lessor other than that land being used in its operations being conducted pursuant to this Lease.

**Damages:** The Lessee shall be liable to Lessor and pay market or replacement cost for any and all damages to the Leased Premises resulting from Lessee's Operations. Damages include but are not limited to any damage to Lessor's water, growing crops, trees, livestock, fences, buildings, water springs, soil, septic systems, agricultural fields and lands and any other property connected with drilling, operating, producing, gathering, or any geophysical or exploratory work conducted by or for the Lessee. Lessee shall promptly replace any drain tile and barriers, including but not limited to, fences, gates and walls removed or damaged by the Lessee during its Operations on the Leased Premises. Whenever a Pad has been installed or later repaired on the Leased Premises, Lessee, at its sole expense, shall restore the surface of the Leased Premises as near as practicable to the condition it was in prior to such work being undertaken. Upon Completion of all planned Operations on the Leased Premises, Lessee will within three (3) months undertake restoration of the Leased Premises to reclaim the Leased Premises to as near as practicable the pre-drilling condition.

**Irrigation and Agricultural Activities:** Lessor reserves the right to initiate or continue irrigation and agricultural activities (including timbering) on the Leased Premises so long as those agricultural activities do not interfere with the limits of disturbance of

6

Smith-Goshen Land Owners Group

Lessee and Lessee will use all reasonable efforts to accommodate Lessor's agricultural use. Subject to Lessee's prior approval and in accordance with Lessee's safety and construction standards, Lessor shall have the right to install and/or construct drainage or drain tile systems across, atop or under any pipeline installed by Lessee in a manner that does not interfere with Lessee's use of said pipelines.

**Agricultural Activities:** Lessee will plan its surface Operations in a manner that will reduce or minimize intrusion into crop fields, hay lands, pasture lands, or any other agricultural activity which is engaged in by the Lessor. In addition to the Damages Provision contained in this Lease, in the event that the Lessee needs to injure crops in order to conduct surface Operations, Lessee shall fully compensate Lessor for all damages and loss of crops at current market value so long as those crops are not located on a Well Pad (hereinafter defined) which Lessor is receiving payment for.

**Agreement as to Location of Operations:** Before Commencing Operations on the Leased Premises or any lands pooled therewith, Lessee and Lessor shall mutually agree in writing on the location and size of all well sites, pads, meters, roads, pipelines, fences, gates, buildings, electrical wires, and other equipment, supplies and facilities which Lessee wishes to locate on any portion of the Leased Premises so as to minimize disruption of Lessor's use of the Leased Premises; provided, however, that Lessor's consent shall not be unreasonably withheld or unreasonably delayed. Any wells, pads, roads, pipelines, gates, electrical wires, and other equipment, supplies and facilities Lessee locates on the Leased Premises will be maintained in good repair at all times by Lessee at its sole expense.

**Siting/Spud Fee:** Lessee shall pay to Lessor in consideration for damage to the Leased Premises the sum of thirty thousand dollars ($30,000) for a Well Pad located on the Leased Premises contemporaneously with Lessee disturbing any land where a pad for a horizontal well is to be located on the Leased Premises (herein called the "Pad Payment") for a well pad not to exceed five (5) acres. If any well pad exceeds five (5) acres then for each additional acre of disturbed land the Lessee shall pay eight thousand dollars ($8,000). A well pad includes any acreage for pits, tanks, equipment, roadways and other operations servicing the wells on that pad. Lessee shall pay Lessor a separate Pad Payment for each pad constructed on the Leased Premises.

**Restrictions on Location of Operations:** Without a separate written agreement between the Lessor and the Lessee, no pump stations, tanks, batteries, pipelines, roads, telephone and power lines, ponds, water holding facilities, dryers, separators or other equipment or facilities shall be located on the Leased Premises unless they are for the purpose of transporting, processing or treating Leased Products from the Leased Premises or lands pooled or unitized therewith, and the afore listed items shall not be located nearer than (and no well shall be drilled nearer than) one thousand (1,000) feet from any dwelling or residential structure or five hundred (500) feet from any barn or other non-residential structure then on the Leased Premises without the Lessor's written consent. In order to effectively develop the Leasehold Premises it is understood that it is in the best interest of both Lessor and Lessee to work together in

7

Smith-Goshen Land Owners Group

agreeing upon the location of operations on the Leasehold Premises. Should there be no alternate location outside the aforementioned "buffer zones" then Lessee and Lessor shall agree to a location within the buffer zones. There shall be no compressors located on the Leased Premises, unless the compressor is solely used for the well located on the Leasehold Premises or a well located on a property pooled or unitized with the Leasehold Premises, unless Lessor consents in a prior separate written agreement. Any compressor operations permitted hereunder shall be designed and installed utilizing means to minimize noise, including but not limited to, sound enclosures and barriers, and quiet motors.

**Restrictions on Lessee's Use of Leased Premises:** Unless Lessor consents in a separate written agreement, the Lessee shall under no circumstances:
   (a) Use the Leased Premises for the disposal of any drill cuttings, brine or other liquids, or the permanent storage or disposal of any liquids or solids.
   (b) Use the Leased Premises or any portion thereof, surface or subsurface, for gas or oil storage purposes.
   (c) Use any water from the Leased Premises, surface or subsurface, or drill any well to take water from or inject any substance into the Leased Premises
   (d) Install or dig any pits other than drilling pits (not permanent storage pits) on the Leased Premises

**Pipelines and Utility Lines:** In the event that pipeline is necessary then Lessor and Lessee shall enter into a separate pipeline right of way agreement which is consistent with the terms and conditions of this Lease including location approval. In addition to the restrictions set forth in this Lease, Lessee agrees to bury any pipelines constructed on the Leased Premises at a depth, which shall in all cases be below tillage and drainage tile depth (at least 36 inches). Lessee agrees to restore the surface as near as practicable to the condition it was in prior to such installation. Lessee shall comply with all applicable rules, regulations, and statutes regarding pipeline construction, maintenance, and operation. Absent a separate right of way agreement Lessee's right to use said pipelines terminates when Lessee's production from the Leased Premises or lands unitized with the Leased Premises permanently ceases. Any utility lines used by Lessee in its Operations shall be buried upon the written request of Lessor. Such utility lines shall be removed upon termination of this Lease, unless Lessor agrees in writing to have such utility lines kept in place. Lessee shall provide Lessor a plat map showing the location and depth of all buried utility lines and pipelines.

**Fencing:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to fence all wells, well sites, tank batteries, pits, separators, drip stations, pump engines, or other equipment permanently located on the Leased Premises. All fences must be kept in good repair by the Lessee.

**Gates:** Upon Lessor's written request, Lessee is required, at its sole cost and expense, to construct gates on all access roads and provide an access key or double lock system allowing access by both Lessor and Lessee. Gates must be closed and locked

8

Smith-Goshen Land Owners Group

at all times when equipment is not being accessed and when Lessee's personnel are not on the Leased Premises.

**Roads:** Roadways or drives constructed by Lessee on the Leased Premises during its Operations shall not exceed fifty (50) feet in width or a minimum width required to perform required Operations. After the completion of all planned operations on the Leased Premises, in the event of a producing well on the Leased Premises, any permanent access road for well servicing purposes shall be a maximum of twenty (20) feet or a minimum width required to perform maintenance or other Operations. Lessee agrees to improve, construct or maintain all roads used by it in good repair utilizing shale, gravel, or crushed stone, culverts and supports as necessary to provide a smooth, rut-free all-weather surface. When such roads are no longer being used, Lessee agrees, upon Lessor's request, to remove toppings and to restore the surface as nearly as practicable to its former condition. Lessee shall not use shale, gravel, or crushed stone sourced from the Leased Premises without the prior written consent of Lessor. Lessee shall prevent its employees, agents and contractors from operating vehicles in a negligent manner or at speeds in excess of twenty-five (25) miles per hour while on the Leased Premises.

**Pits:** Any pit permitted under this Lease will conform to all applicable regulatory requirements (state, local, and federal) and will conform to the best industry practices. Lessee will immediately notify all applicable regulatory authorities and Lessor of any damage to such facilities.

**Soil Testing:** For areas within the Limits of Disturbance upon Lessor's written request, Lessee shall, at its sole cost and expense, have Lessor's current soil tested by an independent third party agreed upon by Lessor and Lessee: (1) prior to the commencement of spudding any well on the Leased Premises, (2) twelve (12) months from the date of completion of any well on the Leased Premises, (3) twenty-four (24) months from the date of completion of any well on the Leased Premises, and (4) within sixty (60) days following the completion of drilling Operations on the Leased Premises. All tests provided for herein must meet all applicable EPA requirements and Lessor shall be provided complete copies of any and all testing results and data. If such test results reflect a material adverse change in the Lessor's soil quality, then Lessee shall use its best efforts to return the soil to its pre drilling condition.

**Timber:** Lessee shall notify Lessor in writing at least forty-five (45) calendar days prior to any removal by Lessee of marketable timber (marketability to be within the reasonable discretion of a certified professional forester). At Lessor's option, Lessor may choose to harvest timber, which shall be complete by the end of the 45 day period, or Lessor may require an appraisal on the timber by a qualified independent certified, professional forester, at Lessee's expense, and Lessee shall pay Lessor the appraised value for the timber identified prior to its removal by Lessee.

**Firewalling and Maintenance of Production Equipment:** Dikes, firewalls or other methods of secondary containment must be constructed and maintained at all times

9

Smith-Goshen Land Owners Group

around all tanks, separators and receptacles so as to contain a sufficient volume of liquid to accomplish the intended purposes.

**Maintenance and Repair:** Maintenance and repair of roadways and all other facilities used by Lessee in connection with this Lease shall be the sole responsibility of the Lessee. If Lessor sends written notice to Lessee informing Lessee of any repairs or other maintenance to roads or other facilities that the Lessee has failed to address and the Lessee fails to initiate the repair or other maintenance within thirty (30) days of the written notice being sent or fails to complete the repairs or other maintenance within sixty (60) days of the notice being sent (if the repairs are capable of being completed within the 60 day period) then Lessor reserves the right to repair and maintain the roadways and the Lessee agrees to fully reimburse Lessor for the cost of the maintenance or repair undertaken by the Lessor.

**Hydraulic Fracturing:** Lessee shall not use, dispose of or release on the Leased Premises or permit to exist or to be used, disposed of or released on the Leased Premises as a result of its Operations any substances (other than those Lessee has been licensed or permitted by applicable public authorities to use on the Leased Premises) which are defined as "hazardous materials," toxic substances" or "solid wastes" in federal, state or local laws, statutes or ordinances. Should any pollutant, hazardous material, toxic substances, contaminated waste or solid waste be accidentally released on the Leased Premises, Lessee shall promptly notify Lessor and any applicable governmental body of such event. Lessee shall be responsible for and timely pay all costs of clean-up, remediation, and other costs related to and arising from the event, including but not limited to penalties. Lessee represents and warrants that during any hydraulic fracturing process it will not use any chemicals it has not been permitted to use by an applicable governmental, regulatory, state or federal agency, for the purposes of fracturing or pumping the same into any formation in and/or under the Leased Premises. Upon Lessor's written request Lessee will provide Lessor with all Material Safety Data Sheets (MSDS) available for any chemicals used by Lessee in its hydraulic fracturing process on the Leased Premises.

## ARTICLE VII. TAXES AND ASSESSMENTS

**Taxes:** Lessee shall pay all taxes and/or assessments on Leased Products, and any increase in other taxes attributable to Lessee's operations imposed by any local, state, or federal entity or governmental unit attributable to, or resulting from Lessees operations under the tax and assessment structure in effect at the time of the execution of this lease. Lessee shall, in addition, pay all severance taxes or other excise or personal property taxes arising out of or relating to this Lease and/or the Leased Products under the tax and assessment structure in effect at the time of the execution of this lease. In the event Ad Valorem and/or other real property taxes pertaining to or attributable to the Leased Premises, or any property associated therewith, are increased in any manner by reason of the Operations of Lessee relating to the Leased Premises, Lessee shall be responsible for the amount of any such tax increase and shall reimburse Lessor for the amount of such increase within thirty (30) days after

10

Smith-Goshen Land Owners Group

Lessor provides Lessee with written documentation reflecting such increase and the basis thereof. Subsequent to the execution of this Lease, in the event there is a change in Ohio tax code that provides for an increase in ad valorem taxes or severance tax or any other tax attributable to or resulting from the assessment of oil and gas due to oil and gas production from the leased premises, Lessor and Lessee agree to abide by the law and pay their proportional share accordingly.

**Agricultural Programs**: In the event the Leased Premises are subject to any federal, state, local and/or agricultural program (e.g. CAUV, CREP, CRP, Forest Land Program, etc.), and any roll-back or reimbursement or recoupment or retroactive assessment (including interest and penalties therefrom) is made against the Leased Premises on account of, arising out of, or relating to the Operations of Lessee on the Leased Premises, Lessee shall be responsible for paying Lessor any and all such amounts, but only insofar as such amounts imposed result from operations on the portion of the Leased Premises actually utilized by Lessee's Operations.

## ARTICLE VIII. TITLE AND WARRANTIES

**Lessor Limited Warranty**: Lessor makes no representation or warranty as to Lessor's title to the Leased Premises other than that Lessor represents that the title is good to Lessors knowledge and Lessor is not aware of any unrecorded encumbrances or encroachments or conditions affecting title to the Leased Premises, and Lessee agrees that no claims will be made against Lessor pertaining to warranty of title. It shall be Lessee's burden and obligation to assure itself of the quality of title to the Leased Premises.

**Title Curative**: Lessee assumes primary responsibility for taking the curative steps required to resolve any issues regarding Lessor's title to the Leased Premises as may be necessary to carry out the purposes of this Lease. Lessor agrees to cooperate with the Lessee in resolving title issues.

**Monies Paid**: Any monies paid to Lessor under the terms of this Lease are nonrefundable and under no circumstances will Lessee initiate any kind of action to recover any monies paid to Lessor.

**Lessor Encumbrances**: Any mortgage, lease, easement, or other interest granted by Lessor voluntarily after the Effective Date of this Lease shall be subject to this Lease. If Lessor defaults on any obligation secured by any lien or encumbrance on the Leased Premises during the term of this Lease, Lessee may, in its sole discretion, pay and discharge such obligation on behalf of Lessor but only if Lessee gives Lessor at least forty-five (45) calendar days prior written notice of such intention to pay and after receipt of said notice Lessor makes no arrangements to address the amount in default. If Lessee makes such payment in compliance with the terms outlined above, the Lessee shall be entitled to recover from Lessor by deduction from any future payments to Lessor, with interest at Ohio's legal rate for judgments, amounts actually paid by Lessee to discharge such obligations.

11

Smith-Goshen Land Owners Group

**Liens Against Lessee**: If any lien or encumbrance is filed against the Leased Premises arising out of or pertaining to any Operations by Lessee or anyone contracting with Lessee, Lessee shall, within forty-five (45) calendar days following the date such lien or encumbrance is recorded, cause such lien or encumbrance to be released from record, and Lessee shall provide Lessor written evidence of such release. Lessee's contention that the lien or encumbrance arises from a bona fide dispute shall not be grounds for Lessee's failure or refusal to remove the lien or encumbrance as required herein.

**Lesser Interest**: If Lessor owns an interest in the Leased Premises that is less than the entire fee simple estate, then all royalties, rentals, and other payments provided for under this Lease shall be paid in the proportion that Lessor's interest in the Leased Premises bears to the entire undivided fee simple estate.

## ARTICLE IX. TERMINATION AND RELEASE

**Termination**: Upon termination of this Lease or any portion thereof for any reason, or upon expiration of this Lease, Lessee shall provide Lessor with a surrender or other written cancellation of this Lease in recordable form, cause such document to be promptly recorded and deliver such document to Lessor within sixty (60) calendar days after the date or termination or expiration. In the event that the Lessee does not comply with the terms of this provision, and there is no bona fide dispute as to the termination or expiration of the lease, Lessee grants to Lessor the right and authority, to take any other steps to evidence the said termination or expiration of this Lease, including but not limited to following the Ohio Affidavit of Forfeiture statute and/or initiating proceedings to quiet Lessor's title, and Lessee shall be obligated to pay all of Lessor's costs, including but not limited to reasonable attorneys' fees as well as any damages accruing to Lessor from Lessee's non-compliance therewith.

**Removal of Equipment**: The Lessee, upon expiration or other termination of this Lease, is obligated to remove all fixtures, improvements, pumps, tanks, tubing, casing, machinery, unused pipelines, rubbish, debris and all other property it has placed on the Leased Premises. This duty must be performed within six (6) months after expiration or other termination of this Lease, or the release of any lands covered by this Lease, or Lessor may claim the property, in whole or in part, or have property and fixtures removed, in whole or in part, at Lessee's sole expense including all of Lessor's reasonable attorneys' fees. This provision may not apply if the Lessee sells equipment to Lessor in a separately negotiated agreement.

**Plugging**: In the event Lessee deems a well is not producing in commercial quantities Lessee shall promptly, properly and effectively plug all wells on the Leased Premises in accordance with the regulations of the State of Ohio.

12

Smith-Goshen Land Owners Group

## ARTICLE X. LESSOR'S INFORMATION RIGHTS, ETC.

**Information Rights**: Lessee grants to Lessor or Lessor's authorized agent, the right to annually inspect, examine and make copies of the Lessee's books, accounts, contracts, and all other records pertaining to production, transportation, sale, and marketing of Leased Products from the Leased Premises at any time during normal business hours. In exercising this right Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee. If as a result of such inspection Lessor discovers a deficiency in payment of royalties or other amounts due to Lessor under this Lease, Lessee will be liable for the amount of the deficiency plus interest at the maximum rate allowed by law. In the event that the deficiency exceeds 125% of the amount actually owed to Lessor, then Lessee shall pay all reasonable costs incurred by Lessor in conducting the inspection that led to discovery of the deficiency.

## ARTICLE XI. ASSIGNMENT OR TRANSFER OF LESSEE INTEREST

**Assignment of Lease**: The rights of either party hereunder may be assigned or otherwise transferred, in whole or in part and as to any horizon, and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns of the parties hereto. Each assignee of all or any portion of the rights of Lessee hereunder agrees to be bound by the provisions of this Lease to the same extent as if such assignee were an original party to this Lease. Lessee and any assignee shall provide to Lessor a true copy of any assignment with recording information reflected thereon (if recorded) and addresses of all assignees within thirty (30) days of making such assignment. Failure by Lessee to satisfy any of the above stated obligations shall constitute a default and be subject to the default provisions of this Lease.

## ARTICLE XII. LESSEE COMPLIANCE

**Laws**: Lessee agrees that everything done by it in connection with this Lease shall be done in a good and workmanlike manner and in accordance with all applicable laws, orders, rules, and regulations, including, without limitation, all applicable environmental rules and regulations. Lessee's failure to comply with any applicable law, regulation, or order shall be a default under this Lease subject to the default provisions in this Lease. In addition to other requirements herein provided, in all instances, Lessee shall undertake the restoration of the Leased Premises to the condition required under the applicable laws of the State of Ohio prior to or within three (3) months following expiration or other termination of this Lease. Lessee shall also use the best industry practices, and all reasonable safeguards to prevent its operations from: (i) causing or contributing to soil erosion, (ii) polluting or contaminating any environmental medium, (iii) decreasing the fertility of the soil, (iv) damaging crops, native or cultivated grasses, trees, or pastures, (v) harming or in any way injuring persons or animals, and (vi) damaging buildings, roads, structures, improvements, farm implements, gates or fences. Lessee shall dispose of salt water, frac water or liquid waste oil and other

13

Smith-Goshen Land Owners Group

waste in accordance with the rules and regulations of the Ohio Department of Natural Resources and all other applicable governmental authorities.

**Insurance**: At any and all times the Lessee or any person acting on Lessee's behalf is on or about the Leased Premises, Lessee agrees that it will carry at least the following insurance coverage with one or more financially sound insurance carriers: a.) Commercial General Liability of $6,000,000 minimum coverage for bodily injury, property damage, contractual liability, products/completed operations and personal injury for all Operations on the Leased Premises, b.) Umbrella Liability Insurance of $6,000,000 minimum coverage, c.) Workers Compensation and Employer's Liability Insurance in the form prescribed by laws of the state of Ohio, d.) Environmental Liability Insurance of $5,000,000 minimum coverage, and e.) Business Auto and Umbrella Liability Insurance of $5,000,000 minimum coverage. Such insurance policies shall waive all rights of subrogation against Lessor. Upon request, in the event the pad location is located on the Leased Premises, Lessee shall furnish Lessor, prior to drilling, with a Certificate of Insurance naming Lessor as an additional insured. Any Certificate of Insurance under this section shall not be reduced or canceled until at least thirty (30) days after Lessor receives written notice of such change or cancellation.

**Indemnity**: Lessee agrees to indemnify, defend, and hold harmless Lessor and Lessor's heirs, successors, agents, assigns, and any other person acting under Lessor's direction and/or control against any and all claims, damages, costs, losses, liabilities, expenses (including but not limited to any reasonable attorneys' fees, expert fees, and court costs) arising out of, incidental to or resulting from the Lessee's Operations and actions, and the Operations and actions of Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under Lessee's direction and control. Lessee's obligations hereunder shall survive the termination of this Lease.

## ARTICLE XIII. FORCE MAJEURE

**Force Majeure**: In the event the Lessee is unable to perform any of the acts to be performed by the Lessee (except payment of money as required under the terms of this lease or required by a court of law) by reason of force majeure, including but not limited to events outside the control of Lessee, acts of God, strikes, riots, and governmental restrictions or any other cause which makes performance of the Lessee's duties unreasonable or impossible, the Lessee shall provide written notice to Lessor within thirty (30) days of the force majeure event. This Lease shall nevertheless remain in full force and effect until the Lessee can perform said act or acts and in no event shall the within Lease expire for a period of one hundred twenty (120) days after the termination of any force majeure. Any delay by a governmental agency beyond ninety (90) days from the date of application to obtain any required permit to drill, complete or re-work a well shall be grounds to invoke force majeure until the permit is granted. If this Lease is the subject matter of any lawsuit, arbitration proceeding or action, then this Lease shall not expire during the pendency of such

14

Smith-Goshen Land Owners Group

lawsuit, proceeding or action, or any appeal thereof, and the time period of the lawsuit, arbitration proceeding or action, or any appeal thereof, shall be added to the term of this Lease, absent such lawsuit, proceeding or action or any appeal thereof. A force majeure event as set forth above shall not exceed a period of thirty six months.

**Coal Force Majeure:** If, after using all its best efforts to obtain a drilling permit should Lessee's operations be delayed, postponed or interrupted as a result of any coal, stone or other mining related operation under any existing and effective lease, permit or authorization covering such operations on the Leased Premises or on other lands affecting the Leased Premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption. In the event a coal force majeure event is declared Lessee shall, upon termination of the conditions which caused the force majeure event or at least once every 12 months, use its best efforts to obtain a drilling permit to develop the Leasehold Acreage.

## ARTICLE XIV. NOTICES AND DEFAULT

**Notice of Default:** This lease shall not be subject to civil action or other proceeding to enforce a claim of default or forfeiture due to Lessee's alleged failure to perform as specified herein, unless Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy Lessor's demand within sixty (60) days from receipt of the notice or such longer time as may be reasonably necessary under the circumstances to satisfy Lessor's demand, but shall not exceed 180 days unless agreed upon by Lessor and Lessee. Any notices required under this Lease shall be deemed sufficiently given if personally delivered or mailed by certified mail, return receipt requested, to the Lessor and/or the Lessee, whichever is applicable, at their respective addresses recited above Article I, or to such other address as either shall notify the other in writing. In the event Lessee assigns all or any part of this Lease without properly providing Lessor with a copy of such recorded assignment which includes the assignee's address, the Lessee shall be jointly and severally liable for all of assignee's obligations under this Lease notwithstanding any language to the contrary.

**Default on Payment Terms:** Failure of Lessee to timely pay Lessor any amounts required under this Lease shall, at Lessor's option, be deemed a default by Lessee subject to the default notice requirements set forth in this Lease.

**Execution and Recording:** The Lessor and Lessee shall execute two copies of this Lease and Memorandum of Lease. The Memorandum of Lease will be recorded and a copy provided to Lessor within 30 days of receipt of the recorded document by Lessee

**Reports and Documents:** Upon written request by Lessor, a copy of all documents Lessee files with the Ohio DNR Division of Oil and Gas Resources Management, pertaining to this Lease shall be delivered to the Lessor within forty-five (45) days of

15

Smith-Goshen Land Owners Group

filing with the Ohio DNR Division of Oil and Gas Resources Management and Lessee shall give Lessor at least ten (10) days advance written notice of the spud date and commencement date of any drilling on the Leased Premises. Lessee shall provide Lessor written notice of any judicial proceedings brought to the attention of Lessee affecting the Leased Premises.

## ARTICLE XV. LESSEE COVENANTS

**Lessee Covenants**: Any and all duties and obligations Lessee has are under implied covenants to benefit landowners and covenants under this lease. The Lessee will utilize current and future technologies to develop the property as operator sees fits after drilling an initial well, as a prudent operator all reasonable efforts to maximize the development of the resources associated with the Leased Premises in a prudent and efficient manner will be employed with the intent and purpose to cause all of Lessor's acreage to be included in one or more units of production, primarily implementing horizontal drilling techniques, but not excluding vertical techniques so as to maximize production recovery of all the oil and gas resources and to minimize or eliminate any "orphan" acreage. It is mutually agreed and understood that the operator, but for force majeure or government prohibitions, will use its best efforts as a prudent operator to fully produce and include all of Lessor's acreage in one or more operating units.

## ARTICLE XVI. ACTIONS AND PROCEEDINGS

**No Arbitration**: Arbitration shall not be a remedy for dispute resolution under this Lease.
**Governing Law and Ohio Courts**: This Lease shall be governed in accordance with the laws of the State of Ohio. Any actions or proceedings arising in connection with this Lease or performance thereunder shall be ascertained and determined by the Ohio state court in the county where the Lease is recorded.

## ARTICLE XVII. HEADINGS and MISCELLANEOUS

**Section Headings**: The Section Headings contained herein are inserted for convenience only and shall not control or affect the meaning or construction of any provision.

**Entire Contract:** The entire agreement between Lessor and Lessee is embodied in this Lease, Memorandum, and Letter of Understanding attached hereto. In the event of an inconsistency the Letter of Understanding shall control. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease. Initial: _UMR TXK_

**Severability**: If any portion of this Lease is held invalid or unenforceable, the other provisions shall remain in full force and effect.
**Confidentiality Clause:** Lessor and Lessee recognizes and acknowledges the competitive and confidential nature, as well as, the economic value of the terms and

16

Smith-Goshen Land Owners Group

conditions incorporated herein and the damage that could result to Lessor and/or Lessee if said terms and conditions were disclosed to any third party. Lessor and Lessee hereby agrees to maintain said terms and conditions secret and confidential and shall not disclose same to any third party other than the family, financial, legal or other professional advisors.

## ARTICLE XVIII. DEFINITIONS

**Commercial Quantities**: "Commercial Quantities" shall mean production of quantities of Leased Products sufficient to yield a profit to the Lessee over operating, marketing and related overhead expenses.

**Operations**: "Operations" shall mean any action done by Lessee (or by Lessee's servants, agents, employees, guests, licensees, invitees, independent contractors, assigns, or any other person acting under the Lessee's direction or control) related to or in connection with the activities contemplated by this Lease.

**Commence Operations**: Commencement of operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein described premises with equipment necessary to build any access road(s) for drilling of a well subsequently followed promptly by a drilling rig for the spudding of the well to be drilled.

**Completion of Operations**: "Completion of Operations" shall mean the completion of all planned drilling operations as to equipment and facilities relating to drilling, including any associated pits, tanks, or other facilities no longer needed for production, or in the event of a dry hole, all such facilities.

**Affiliate**: An "Affiliate" is any entity in which Lessee, or any parent company, subsidiary, or affiliate of Lessee, owns an interest of more than ten percent (10%) or exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation or other entity which owns an interest in or exercises any degree of control, directly or indirectly, over Lessee.

**Pad**: "Pad" is defined as any construction designed to facilitate one or more wells in a concentrated surface area.

**Production Unit**: "Production Unit" is defined as a unit of one or more tracts which are brought together by the Lessee for the purpose of forming a drillsite complying with the state requirements for drilling one well in order to develop the lands as if they were under a single lease.

**Pooled Unit**: "Pooled Unit" is defined as land described in this Lease which Lessee has pooled, prior to drilling, with contiguous land covered with other leases so as to establish one or more pooled development units. A Pooled Unit may also be a production unit.

17

Smith-Goshen Land Owners Group

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth above.

LESSOR:

_Terrence L. Kemp_
Terrence L. Kemp

_Virginia M. Kemp_
Virginia M. Kemp

LESSEE:

Rice Drilling D, LLC

Toby Z. Rice
Chief Executive Officer

18

Smith-Goshen Land Owners Group

## ACKNOWLEDGEMENT

STATE OF OHIO     )
          )
COUNTY OF Belmont    )

   On this 6 day of November, 2012, before me, the undersigned Notary Public for the State of Ohio, personally appeared the above named **Terrence L. Kemp and Virginia M. Kemp, husband and wife,** the Lessors, who acknowledged and signed the foregoing instrument, and that the same is their free act and deed individually.

   IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal this 6 day of November, 2012

Notary Public

Anthony J. Zambito III
Notary Public, State of Ohio
My Commission expires _____

Printed Name: _Anthony J. Zambito III_

My Commission Expires: _17 Mar 13_

## CORPORATE ACKNOWLEDGEMENT

STATE OF PENNSYLVANIA     )
             )   ss.:
COUNTY OF WASHINGTON    )

   On this the _16_ day of _APRIL_ , 2012, ~~2012,~~ before me, the undersigned authority, personally appeared Toby Z. Rice, who acknowledged himself to be the Chief Executive Officer of Rice Drilling D, LLC, and that he as such Chief Executive Officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Chief Executive Officer.

My commission expires _5.17.2015_ Signature: _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Judith P. Nemeth, Notary Public
Claysville Boro, Washington County
My Commission Expires May 17, 2015
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

19

Smith-Goshen Land Owners Group

## **EXHIBIT A**

### LEGAL DESCRIPTION OF THE LEASED PREMISES

| Tax Parcel ID Number | Section | Township | Range | Gross Acreage | Deed Book Volume & Page | |
|---|---|---|---|---|---|---|
| 09-00871.000 | 9 | 7 | 5 | 29.572 | 801 | 992 |
| 09-00370.001 | 3 | 7 | 5 | 44.916 | 801 | 992 |
| 09-01266.000 | 2 | 7 | 5 | 0.7746 | 661 | 577 |
| 09-01370.000 | 2 | 7 | 5 | 13.888 | 661 | 577 |
| 09-01354.000 | 2 | 7 | 5 | 134.564 | 623 | 597 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

20

## Letter of Understanding

The undersigned Lessor (herein referred to as "Lessor"), and Rice Drilling D, LLC (hereinafter "Lessee") hereby engage in this Letter of Understanding ("LOU") to set forth procedures that will be followed by Lessee and Lessor in connection with the title review of the oil and gas rights underlying and in connection with the property which is subject to that certain oil and gas lease ("Lease") contemplated between Lessor and Lessee, as to the period of Lessee due diligence, and subject to the terms contained herein, the payment of the bonus amount to the Lessor.

1)      **Due Diligence.** Lessee is to complete its due diligence review for determination of Defensible Title within a period of one hundred twenty (120) business days following the date of execution and delivery of the Lease by Lessor ("Due Diligence Period"). "Defensible Title" is defined as title of record, subject to and including, but not limited to, the following criteria:

   a.      As to each described parcel, the Lessor owns one hundred percent (100%) of the working interest in and to the oil and gas rights underlying and in connection with the property subject to the Lease, and that the Lessor has the unencumbered rights to lease same.

   b.      The rights granted by Lessor to Lessee are free and clear of all liens and other encumbrances which may adversely affect (i) the Lessor's ability to grant all rights provided for in the Lease, or (ii) Lessee's ability to fully enjoy the rights granted in the Lease, including but not limited to mortgages. In the event a mortgage requires the consent of a lender, mortgagor, or any other party, the lack of such consent shall be considered a Title Defect.

   c.      The Lease has been properly executed and acknowledged by Lessor in a manner sufficient to convey the rights contemplated by the Lease to Lessee and the Memorandum of Lease is in recordable form according to the laws of the State of Ohio, or other relevant jurisdiction.

   d.      The evidence of a prior lease that includes or encumbers the oil and gas rights to be granted to Lessee shall be considered a Title Defect. The existence of surface or shallow easements, including utility easements, which do not materially impair Lessee's rights under the Lease according to the Ohio Marketable Title Act, and the existence of a prior coal reservation will not be deemed a Title Defect.

   e.      The oil and gas rights underlying and in connection with the property subject to the Lease are not affected by any other encumbrances, instruments, obligations, defects and irregularities which: (i) interfere with the operation or use of the subject property or the oil and gas rights subject to the Lease; (ii) would prevent Lessee from receiving the proceeds of production from the oil and gas rights subject to the Lease; (iii) would reduce the net mineral acres conveyed by Lessor

to Lessee below that which is noted in the Lease; (iv) would reduce the interests of Lessee with respect to hydrocarbons produced from the subject property or the oil and gas rights in connection with the Lease below a net revenue interest of 80%; or (v) would increase the share of the costs and expenses that Lessee would be obligated to pay under a Lease without a proportionate increase in the net revenue interest for such Lease.

"Title Defect" shall be defined as an event or situation that causes the oil and gas rights underlying and in connection with the property subject to the Lease, or a portion thereof, to lack Defensible Title.

During the Due Diligence Period, Lessor shall, upon request from Lessee, execute all reasonable documents, curative or otherwise, to further the intention of the parties hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary contained within this LOU, Lessor expressly acknowledges and agrees that determination of Defensible Title under this LOU shall be in Lessee's reasonable discretion. Lessor hereby waives any and all implied covenants now or hereafter existing relating to any obligations of Lessee under the terms and conditions of this LOU but no other documents.

The parties also expressly acknowledge and agree that if Lessee elects to consummate a lease that has Defensible Title with any lessor (including Lessor) that is part of the group known as the "Smith-Goshen Group" of Belmont County, Ohio that is executing this LOU contemporaneously with Lessor, then Lessee must offer to consummate leases with all members of the "Smith-Goshen Group" whose leases have Defensible Title, including Lessor (provided that Lessor has Defensible Title to the Lease). Notwithstanding the foregoing, Lessee shall have the right to terminate the LOU for any reason or no reason during the Due Diligence Period, provided that Lessee has performed its due diligence review of all leases (including the Lease) submitted by lessors (including Lessor) in the "Smith-Goshen Group", and in such event, Lessee shall provide written notice to Lessor of such termination ("Termination Notice"); provided, however, if lessors in the "Smith-Goshen Group" hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title, then within thirty (30) days after delivery of the Termination Notice, Lessee agrees to pay all such lessors, including Lessor, with leases having Defensible Title the sum of One Thousand Dollars ($1,000.00) per net acre having Defensible Title as liquidated damages and not as a penalty (the "Termination Payment"). The parties agree that no lessor in the "Smith-Goshen Group", including Lessor, shall have the right to cure a Title Defect within the Lessor Cure Period (defined below) under Section 2 below if Lessee elects to terminate the LOU in accordance with the terms of this Section 1 and it is determined by Lessee within the Due Diligence Period that lessors in the "Smith-Goshen Group" do not hold leases which, in the aggregate, cover at least 25,000 net acres with Defensible Title. Upon delivery of the Termination Notice and payment of the Termination Payment, if applicable, Lessee shall have no further obligation, for payment or otherwise, to Lessor or other lessors in the "Smith-Goshen Group".

2) **Bonus Payment.** Upon execution and delivery of the Lease by Lessor, Lessee shall pay an initial non-refundable consideration in the amount of One Dollar ($1.00) per parcel

consideration paid to and acknowledged by Lessor. Upon: (i) satisfactory completion of the Due Diligence Period (and any applicable cure periods and cure requirements provided to Lessor as specified in this Section 2); (ii) determination by Lessee that Lessor has Defensible Title to the oil and gas rights subject to the Lease; and (iii) Lessee's election to consummate the Lease, Lessee shall pay to Lessor Six Thousand Two Hundred and Fifty Dollars ($6250.00) per net mineral acre conveyed to Lessee, pursuant and subject to the terms contained in this LOU. For the avoidance of doubt, the parties expressly acknowledge and agree that Lessee shall have the right to terminate this LOU for any reason or no reason, subject to Section 1 above, in which event Lessee shall not be required to consummate the Lease with Lessor.

Subject to Lessee's right to terminate this LOU in accordance with Section 1 above and the limitations on the right of a lessor within the "Smith-Goshen Group", including Lessor, to cure a Title Defect set forth therein, the parties agree as follows:

a. If Lessee determines that there is a Title Defect(s) affecting the Lease, Lessee shall so advise the Lessor, in writing as soon as practical, but in no event later than the expiration of the Due Diligence Period, of the Title Defect(s). When notifying Lessor of a Title Defect, Lessee shall provide Lessor with a description of the Title Defect and any supporting documentation in its possession. In the event Lessor receives written notice from the Lessee of a Title Defect, Lessor shall have one hundred and twenty (120) business days from the date of receipt ("Lessor Cure Period") of such written notice to cure the Title Defect in a manner satisfactory to the Lessee, in its reasonable discretion. If the Title Defect is cured to the satisfaction of the Lessee within such Lessor Cure Period, then (i) Lessee will pay the Lessor the bonus payment corresponding to the acreage affected by the Title Defect within thirty (30) business days following the date such Title Defect was cured to Lessee's satisfaction, or (ii) as applicable, the Termination Payment corresponding to such acreage within thirty (30) business days following the date such Title Defect was so cured, consistent with Section 1.

b. After the Due Diligence Period and all applicable cure periods specified herein have expired, and if Lessee in its reasonable discretion determines that the Lease lacks Defensible Title, upon written notification of rejection from Lessee by regular mail to Lessor, this LOU shall terminate and shall be of no force and effect, and Lessee shall have no further payment obligation to Lessor.

3) **Exclusivity.** Lessor agrees that during the Due Diligence Period, it will not solicit, discuss, negotiate for or enter into any agreement or arrangement with a third party for the lease of the oil and gas rights and interests set forth in the Lease.

[remainder of page intentionally left blank; signature page to follow]

In witness whereof, the parties have executed this LOU as of the __10__ day of __December__, 2012.

LESSOR(S):

_Terrence L. Kemp_
TERRENCE L. KEMP

_Virginia M. Kemp_
VIRGINIA M. KEMP

RICE DRILLING D, LLC

BY: TOBY Z. RICE
ITS: CHIEF EXECUTIVE OFFICER

---

FOR INTERNAL USE ONLY

| | | | |
|---|---|---|---|
| Lease # | 0154 | Leasehold Acres | 224.0146 ~~211.108 Acres~~ |
| Ownership Interest | 100% | Total Payment Amount | $1,400,091.25 |

**EXHIBITS**

A. Form of Lease

B. IRS Form W-9 Request for Taxpayer Identification Number and Certification

C. Memorandum of Lease

## TAX PARCEL # INFORMATION SHEET

LEASE # ____0154____

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 09-01320.000 | | |
| | | | | | | | 13.838 | | |
| Tax Parcel ID # | ~~09-00132.000~~ | Lease Acres | ~~1.980~~ | Net Acres | 13.838 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 09-00320.001 | Lease Acres | 44.916 | Net Acres | 44.916 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 09-00321.000 | Lease Acres | 29.522 | Net Acres | 29.522 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 09-01266.000 | Lease Acres | ~~0.7746 0.770~~ | Net Acres | 0.7746 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | 09-01354.000 | Lease Acres | 134.964 | Net Acres | 134.964 | Mineral Ownership % | 100 | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |
| Tax Parcel ID # | | Lease Acres | | Net Acres | | Mineral Ownership % | | % |



**RESULTS. PERIOD.**

Patrick Kasson
Direct: 614-232-2418
Email: pkasson@reminger.com

May 11, 2021

<u>VIA CERTIFIED MAIL AND EMAIL</u>

Larry Skrzysowski, Esq.
LSkrzysowski@eqt.com
Rice Drilling D, LLC
625 Liberty Avenue
Suite 1700
Pittsburgh, PA 15222-3111

OwnerRelations@eqt.com
EQT Production Company
400 Woodcliff Drive
Canonsburg, PA 15317
ATTN: Owner Relations

     Re:    November 6, 2012 Leases between Dallas C. Kemp and Rice Drilling D, LLC.

Dear Mr. Skrzysowski and Other EQT representatives:

    I represent the Dallas C. Kemp Trust (the Trust") Trustee, Heidi Kemp (Owner No. 1281900). The Trust is the successor in interest to Dallas C. Kemp under two November 6, 2012 Leases between Dallas C. Kemp and Rice Drilling D, LLC, copies of which I have attached (the "Leases"). I am writing to (1) confirm to whom Rice Drilling D, LLC and/or EQT Production Company (collectively "Rice Drilling") is selling the "Leased Products" on which our client is being paid royalties and which transactions are being used to calculate our client's royalties and (2) inform Rice Drilling the Trustee believes Rice Drilling's conduct is in breach of the terms of the Leases.

    *First*, the Leases are clear the Lessee is to be paid royalties based upon gross proceeds from the sale of the Leased Products to an "unaffiliated third-party purchaser in an arms-length transaction." (Lease Article III). We understand Rice Drilling is selling the Leased Product on which our client is being paid royalties to an affiliate. The affiliate is paying Rice Drilling based upon an "index price" and our client's royalties are being calculated based upon the "index price" paid by the affiliate. Then Rice Drilling's affiliate is selling the Leased Product to one or more unaffiliated third-parties, in arms-length transactions, for higher prices than the "index price" paid by the affiliate.

    I wish to confirm our understanding is correct. <u>We do not wish to file a lawsuit if we are incorrect as to what is occurring</u>. As such, please, within two weeks of receipt of this letter, either confirm that what we believe is occurring is correct, or provide some evidence that we are incorrect. If we do not hear from you, we will assume that our understanding of the transactions and royalty calculation is correct and proceed to file suit on behalf of the Trust and other similarly situated landowners.

**REMINGER**

200 Civic Center Dr · Ste 800 · Columbus, OH 43215 · T: 614.228.1311 · F: 614.232.2410 · www.reminger.c
CLEVELAND / COLUMBUS / CINCINNATI / AKRON / SANDUSKY / TOLEDO / YOUNGSTOWN / FT MITCHELL
LEXINGTON / LOUISVILLE / INDIANAPOLIS / FT WAYNE / NW INDIANA / EVANSVILLE



EXHIBIT
2

*Second*, we are putting you on notice that we believe the terms of the Leases have been breached. My client demands an accounting and that it be paid the royalties due, based upon the arms-length transactions with unaffiliated third parties.

Time is of the essence in this matter. I thus suggest that your response comes swiftly if either we are incorrect in our understanding or you wish to avoid litigation.

Very truly yours,

**REMINGER CO., L.P.A.**

Patrick Kasson

DPK/sb
Enclosure
cc:    Sean Jacobs, Esq.
        Heidi Kemp, Esq.
        Dick Emens, Esq.



RESULTS. PERIOD.

Patrick Kasson
Direct: 614-232-2418
Email: pkasson@reminger.com

June 1, 2021

<u>VIA CERTIFIED MAIL AND EMAIL</u>

Larry Skrzysowski, Esq. - LSkrzysowski@eqt.com
Rice Drilling D, LLC
625 Liberty Avenue
Suite 1700
Pittsburgh, PA 15222-3111


Jeffrey D. Roberts - jdroberts@eqt.com
Senior Counsel
EQT Corporation
625 Liberty Avenue, Suite 1700
Pittsburgh, PA 15222

Re:    November 6, 2012 Leases between Dallas C. Kemp and Rice Drilling D, LLC.

Dear Mr. Skrzysowski and Mr. Roberts:

Pursuant to my letter dated May 11, 2021, I apologize for not attaching the other Lease which I have now attached to this letter. Also, obviously there is a mistake in the second paragraph referring to "Lessee's obligation" which should have said "Lessor" in the second paragraph of the letter.

Thank you for your attention to this matter.


Very truly yours,

**REMINGER CO., L.P.A.**

/s/ Patrick Kasson

Patrick Kasson


DPK/sb
Enclosure

## Stephanie Bowden

| | |
|---|---|
| **From:** | Trina Multon |
| **Sent:** | Friday, June 18, 2021 10:23 AM |
| **To:** | JDRoberts@eqt.com |
| **Subject:** | Follow-Up - Rice Drilling |

**SENT ON BEHALF OF PAT KASSON**

Jeff:

It was good speaking with you. I appreciate your open approach and your candor.

As we discussed, I believe the Lease prohibits EQT's current calculation method of royalty payments. From our discussion, I understand that the royalty payments are based upon a sale to an affiliated company, using an index price. As we discussed, so long as the first sale to a non-affiliated company is for more than an index price, my clients are entitled to royalties based upon that calculation, even if the price paid by the affiliated company is fair, and market value. Article III of the Lease is clear:

> "The Lessee shall pay to the Lessor twenty-percent (20%) of the gross proceeds received by Lessee *from an unaffiliated third party purchaser in an arms length transaction* at the point of sale for all of the lease products produced. . ." (Emphasis added).

There is no exception in the lease for payment based upon a sale to an affiliated party, just because the payment is made at an index rate – which you contend is market price.

Given that it appears that we are not going to agree on this issue, I am going to file suit. If you are willing to make my clients' whole, based upon the price paid by the first non-affiliated purchaser, we can enter into a tolling agreement and work that out.

Again, I appreciate your candor and think we will work well together. But I do not think I have much choice but to file next week.

*Pat*

Website | vCard

T 614-232-2526
F 614-232-2410
M 614-260-6459
www.reminger.com

Trina Multon
Office Manager
Reminger Co., LPA
TMulton@reminger.com
200 Civic Center Drive, Suite 800
Columbus, OH 43215

## REMINGER
RESULTS · PERIOD ·